UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────────

ERIK WHITE,

                                        Plaintiff,

                                                                9:21-CV-791
v.                                                              (LEK/TWD)

TERRANCE MIELNICKI, et al.,

                                        Defendants.

───────────────────────────────────────────────

APPEARANCES:                                    OF COUNSEL:

ERIK WHITE
   *Plaintiff, pro se*
175819
CNY PC
P.O. Box 300
Marcy, NY 13403

HON. LETITIA JAMES                              STEVE H. NGUYEN
Attorney General for New York State            Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### AMENDED ORDER AND REPORT-RECOMMENDATION

        In this action, Erik White claims Terrance Mielnicki, T. Davis, T. Kozak, M. Debraccio,

William Fennessy, Jeff McKoy, and Anthony J. Annucci ("Defendants") violated his Fifth and

Fourteenth Amendment rights by compelling him to incriminate himself while participating in

New York's Sex Offender Counseling and Treatment Program ("SOCTP").  (*See* Dkt. No. 12,

the "Amended Complaint".)  Defendants now move to dismiss White's Fifth and Fourteenth

Amendment claims.  (Dkt. No. 24.)  For the following reasons, the undersigned recommends

granting Defendants' motion and dismissing White's Amended Complaint.  (Dkt. No. 12.)

## I.      BACKGROUND

White initiated this action *pro se* on July 12, 2021, claiming Defendants, other

individuals, and the State of New York violated his rights under 28 U.S.C. § 1983.  (Dkt. No. 1;

*see generally White v. Mielnicki*, No. 9:21-CV-0791 (LEK) (TWD), 2021 WL 5410170, at *1

(N.D.N.Y. Nov. 19, 2021).)  Among other claims, White asserted Defendants violated his Fifth

and Fourteenth Amendment rights while his criminal appeal was pending by compelling him to

make incriminating statements as part of his required participation in SOCTP.  (Dkt. No. 1.)

White claimed Defendants compelled him to give incriminating statements by threatening to

remove him from the SOCTP program, rescind his good time credits, and extend his

incarceration if he asserted his right against self-incrimination.  *Id.* at 6-7.  Conducting an initial

review of White's claims under 28 U.S.C. § 1915(e), Senior District Judge Lawrence E. Kahn

granted White's motion to proceed *in forma pauperis*, accepted for filing his Fifth and

Fourteenth Amendment claims against Defendants, dismissed all other claims without prejudice,

and terminated all remaining defendants.  (Dkt. No. 4 at 9-10.)

White subsequently filed the Amended Complaint wherein he requested the assistance

of legal counsel.  (Dkt. No. 12.)  In addition to other claims, White re-asserted his claims that

Defendants violated his Fifth and Fourteenth Amendment rights by compelling him to give

incriminating statements while his criminal appeal was pending.  *Id.* at 5-13.  Conducting

another initial review under 28 U.S.C. § 1915(e), Judge Kahn accepted for filing White's Fifth

and Fourteenth Amendment claims against Defendants but dismissed all remaining claims and

terminated all other parties.  (Dkt. No. 15 at 8-9; *White*, 2021 WL 5410170, at *4-5.)  Judge

Kahn also denied without prejudice White's request for legal counsel.  (Dkt. No. 15 at 8-9.)

Defendants now move to dismiss White's Amended Complaint.  (Dkt. No. 24-1.)

## II.    DISCUSSION

Defendants move to dismiss White's compelled self-incrimination and due process claims.  (Dkt. No. 24-1.)  First, Defendants move to dismiss White's compelled self-incrimination claim on the grounds that he has failed to allege his inculpatory statements were used against him in a criminal proceeding.  *Id.* at 5-7.  Defendants argue that even if White's statements were compelled, "it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs."  *Id.* at 5 (quoting *Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (Thomas, J., announcing the judgment of the Court)).  Second, Defendants argue "White's substantive due process claims fail because his good time revocation was neither arbitrary nor irrational."  *Id.* at 7.  Defendants argue "New York's good time scheme is discretionary," and the decision to revoke White's good time credits was "firmly rooted in statute."  *Id.* at 7-8.  In response, White repeats many of the allegations asserted through his Amended Complaint, contends Defendants had no lawful reason for rescinding his good time credits, and claims many of the statements he made in the SOCTP were used against him in a psychiatric evaluation. (Dkt. No. 29.[1])

For the following reasons, the undersigned concludes White has failed to adequately state a claim that he was compelled to offer incriminating testimony against himself in a criminal case. *See* U.S. Const. amend. V; *see also Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998).  The undersigned further concludes White has failed to adequately state a claim that his due process rights were violated when Defendants rescinded his good time credits. *See* U.S. Const. amend. XIV.

---

[1] White also asked the Court to reconsider his request for the appointment of counsel under 28 U.S.C. § 1915.  (Dkt. No. 29 at 11.)  Judge Kahn denied that request.  (Dkt. No. 30.)

A.      **Legal Standard**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also* Fed. R. Civ. P. 8(a)(2).[2]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The factual allegations must also "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. 544, 555; *see also* Fed. R. Civ. P. 8(a)(2).

"Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that []he is entitled to relief and the action is subject to dismissal." *Yerdon v. Poitras*, No. 1:21-CV-0565 (LEK) (ML), 2022 WL 798271, at *2 (N.D.N.Y. Mar. 16, 2022) (citing *Iqbal*, 556 U.S. at 678-79.)

---

[2] Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted. *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

### B.     Compelled Self-Incrimination

"The Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that a person shall not be 'compelled in any criminal case to be a witness against himself.'" *Deshawn E.*, 156 F.3d at 346 (quoting U.S. Const. amend. V.).  The Supreme Court has explained that this right against compulsory self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972); *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 804-805 (1977); *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).

However, in *Chavez v. Martinez*, four Justices concluded the plaintiff's self-incrimination claim—challenging a *Miranda* violation under 28 U.S.C. § 1983—failed because the disclosures he was compelled to offer the defendant "were never admitted as testimony against him in a criminal case."  538 U.S. at 767.  Justice Souter concurred that defendant's "questioning alone was [not] a completed violation of the Fifth and Fourteenth Amendments subject to redress by an action for damages under § 1983."  *Id.* at 777 (Souter, J., concurring).  However, the fact that plaintiff's statements were not used against him in a criminal case was "not a sufficient reason to reject Martinez's claim" for Justice Souter.  *Id.*  Rather, he rejected the claim on the additional grounds that Martinez had failed to make the "powerful showing . . . necessary to expand protection of the privilege against compelled self-incrimination to the point of the civil liability he asks us to recognize here."  *Id.* at 778; *see generally id.* at 791 (Kennedy, J., concurring in part and dissenting in part) ("Our cases and our legal tradition establish that the Self–Incrimination Clause is a substantive constraint on the conduct of the government, not merely an

evidentiary rule governing the work of the courts . . . The Clause provides both assurance that a person will not be compelled to testify against himself in a criminal proceeding and a continuing right against government conduct intended to bring about self-incrimination.").

Several circuit courts have "interpreted *Chavez* as standing for the proposition that use of a compelled statement in a criminal proceeding is a prerequisite to a § 1983 suit based on a violation of the Self-Incrimination Clause." *Chavez v. Robinson*, 12 F.4th 978, 991 (9th Cir. 2021) (collecting cases); *see also Higazy v. Templeton*, 505 F.3d 161, 171 (2d Cir. 2007) ("The Supreme Court concluded that an officer could not be subjected to civil liability for an alleged violation of the privilege against compelled self-incrimination where the coerced statement is not thereafter used against the person who gave the statement."); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1024-25 (7th Cir. 2006) ("After *Chavez,* therefore, violation of the *Miranda* safeguards cannot provide the basis for § 1983 liability without use of a suspect's statements against him in a criminal case.").

In the Second Circuit, "a § 1983 action may exist under the Fifth Amendment self-incrimination clause if coercion was applied to . . . obtain inculpatory statements, and the statements thereby obtained were used against the plaintiffs in a criminal proceeding." *Deshawn E.*, 156 F.3d at 346; *see also Sedunova v. City of New York*, 652 F. App'x 29, 31 (2d Cir. 2016); *Newman v. Hoyt*, No. 3:17-CV-808 (TJM) (DEP), 2018 WL 3730170, at *5 (N.D.N.Y. Aug. 6, 2018); *Tankleff v. Cnty. of Suffolk*, No. 09-CV-1207(JS) (AYS), 2017 WL 2729084, at *16 (E.D.N.Y. June 23, 2017); *Dunkelberger v. Dunkelberger*, No. 14-CV-3877 (KMK), 2015 WL 5730605, at *18 (S.D.N.Y. Sept. 30, 2015). Accordingly, "[e]ven if it can be shown that a statement was obtained by coercion, there can be no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding." *Deshawn E.*, 156 F.3d

at 346; *see also United States v. Allen*, 864 F.3d 63, 81 (2d Cir. 2017); *see, e.g.*, *Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 302 (S.D.N.Y. 2020) (dismissing plaintiff's compelled self-incrimination claim, advanced under 28 U.S.C. § 1983, where he failed to "allege that Defendants ever used, sought to use, or could have used any incriminating statements against him in a criminal proceeding."); *Adams v. Annucci*, No. 17-CV-3794 (KMK), 2018 WL 4608216, at *8 (S.D.N.Y. Sept. 25, 2018) (same); *McChesney v. Hogan*, No. 6:08-CV-1290 (NAM) (DEP), 2010 WL 1027443, at *8 (N.D.N.Y. Feb. 26, 2010), *report and recommendation adopted,* No. 908-CV-1186 (NAM) (DEP), 2010 WL 1037957 (N.D.N.Y. Mar. 18, 2010) (same); *Fifield v. Eaton*, 669 F. Supp. 2d 294, 298 (W.D.N.Y. 2009) (same); *but see Krull v. Oey*, 805 F. App'x 73, 75 (2d Cir. 2020) ("A sex-offender treatment program that requires disclosure of criminal conduct without guaranteeing immunity does not violate the Fifth Amendment's Self-Incrimination Clause *unless the consequences for non-disclosure compel the prisoner to make self-incriminating statements*.") (emphasis added); *Lacy v. Butts*, 922 F.3d 371, 378 (7th Cir. 2019) (concluding Indiana's Sex Offender Management and Monitoring program, which had a "system of revoking good time credits and denying the opportunity to earn such credits for convicted sex offenders who refused to confess their crimes," violated the Fifth Amendment privilege against self-incrimination); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 127 (N.D.N.Y. 2004) (concluding that "requiring plaintiff as part of the SOCP to divulge a history of sexual conduct, including illegal acts for which no criminal charges have been brought, or else face a loss of good time credits, violates his Fifth Amendment privilege against self-incrimination.").

Here, White failed to advance any allegation suggesting the incriminating statements he gave as a condition of his participation in SOCTP were offered or will be offered against him in

a criminal case. (*See* Dkt. No. 12.) Absent an allegation that his compelled statements were used against him in a criminal case, White has failed to state a claim for a violation of his right to be free from compelled self-incrimination. *Sedunova*, 652 F. App'x at 31; *Deshawn E.*, 156 F.3d at 346. Moreover, any contention that the statements White made in the SOCTP might be used against him in a future criminal proceeding is not now ripe for adjudication. *See Carney v. Hogan*, No. 9:08-CV-1251 (DNH) (ATB), 2010 WL 2519121, at *4 (N.D.N.Y. Mar. 30, 2010), *report and recommendation adopted*, 2010 WL 2519961 (N.D.N.Y. June 15, 2010); *McChesney*, 2010 WL 1027443, at *8 n.12. The undersigned accordingly recommends that the Court dismiss White's compelled self-incrimination claim. *See Adams*, 2018 WL 4608216, at *8; *McChesney*, 2010 WL 1027443, at *8; *Fifield*, 669 F. Supp. 2d at 298.

C.    **Due Process**

The Fourteenth Amendment prohibits States from depriving individuals of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "To present a procedural due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Adams*, 2018 WL 4608216, at *6 (quoting *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). "By contrast, to state a claim for substantive due process a plaintiff must allege that: (1) he had a valid liberty interest and (2) defendants infringed on that right in an arbitrary or irrational manner." *Id.*; *see also Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of NY*, 746 F.3d 538, 545 (2d Cir. 2014). White's Amended Complaint fails to state a claim for a due process violation because none of his factual allegations give rise to a reasonable inference that Defendants' temporary revocation of his good time credits was done without sufficient process

or in an arbitrary or irrational manner.  (*See generally* Dkt. No. 12; *see also Iqbal*, 556 U.S. at 678.)

White's procedural due process claim fails because White concedes that before his good time credits were revoked, he had a hearing with the Time Allowance Committee ("T.A.C.") on February 14, 2020.  (*See* Dkt. No. 12 at 6.)  White also concedes that he was able to appeal the decision of the T.A.C. several times.  *See id.* at 7-9.  According to White, the decision to revoke his good time credits was repeatedly affirmed—first by Deputy Superintendent of Programs T. Kozak, then by Superintendent of Midstate Correctional William Fennessy, and finally by Deputy Commissioner of Programs Jeff KcKoy and Acting Commissioner of the Department of Corrections and Community Supervision Anthony J. Annucci.  *See id.*  White advances no allegations about how the T.A.C. hearing—or any subsequent determination—was procedurally deficient.  *See id.*  Nor does he advance any factual allegations that indicate how or why these decisions were arbitrary or irrational.  *See id.*; *see, e.g.*, *Adams*, 2018 WL 4608216, at *6 ("Plaintiff does not allege how this hearing, or any other aspect of the decision to revoke his credits, was procedurally deficient under *Wolff* [*v. McDonnell*, 418 U.S. 539 (1974)] or its progeny . . . Nor does Plaintiff allege how the revocation of his Good Time Credits for failure to participate in the SOTP was so arbitrary or irrational that it violated his substantive due process rights.").  White has accordingly failed to plead sufficient factual matter to give rise to a reasonable inference that Defendants' temporary revocation of his good time credits was done without sufficient process or in an arbitrary or irrational manner.  (*See generally* Dkt. No. 12.)  The undersigned accordingly recommends dismissing White's due process claims for failure to state a claim.  *See Adams*, 2018 WL 4608216, at *6.

### III.    CONCLUSION

For the foregoing reasons, the undersigned concludes White has failed to state a claim for a violation of his Fifth or Fourteenth Amendment rights.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss be **GRANTED** (Dkt. No. 24) and White's Amended Complaint be **DISMISSED WITHOUT LEAVE TO AMEND** (Dkt. No. 12).

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[3]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: June 1, 2022
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[3] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

White v. Mielnicki, Slip Copy (2021)

2021 WL 5410170

2021 WL 5410170
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Erik WHITE, Plaintiff,
v.
T. MIELNICKI, et al., Defendants.

9:21-CV-0791 (LEK/TWD)
|
Signed 11/19/2021

**Attorneys and Law Firms**

Erik White, Marcy, NY, Pro Se.

Steve Nguyen, New York State Attorney General, Albany, NY, for Defendants T. Mielnicki, T. Davis, M. Debraccio.

**DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

 *1  On or about July 12, 2021, pro se Plaintiff Erik White, a former New York State Department of Corrections and Community Supervision ("DOCCS") inmate, commenced this action with the filing of a complaint, accompanied by an application to proceed in the action in forma pauperis ("IFP"). Dkt. Nos. 1–2. On September 9, 2021, the Court issued a Decision and Order granting Plaintiff's IFP application and accepting the complaint for filing only to the extent it asserted constitutional violations arising under the Fifth and Fourteenth Amendments against three individual defendants. See Dkt. No. 4 ("September Order"). Following service of process on those three defendants, but before they filed a response to the original complaint, Plaintiff filed an amended complaint. Dkt. No. 12 ("Amended Complaint"). The Clerk has now forwarded to the Court Plaintiff's Amended Complaint for review under 28 U.S.C. § 1915 ("Section 1915").

**II. DISCUSSION**

  **A. Governing Legal Standard**
The legal standard governing the Court's review of a pleading pursuant to Section 1915 was discussed at length in the

September Order and will not be restated in this Decision and Order. See September Order at 2–3.

  **B. Summary of the Amended Complaint**
While Plaintiff was confined in DOCCS custody, he was required to participate in the Sex Offender Counseling and Treatment Program ("SOCTP"). Am. Compl. at 5. The SOCTP is governed by the New York State Office of Mental Health ("OMH"). Id. Plaintiff was enrolled in the SOCTP while he was confined in Mid-State Correctional Facility ("Mid-State C.F."). Id.

To successfully complete the SOCTP, participants must admit responsibility in writing and in group sessions for the crimes of which they were convicted. Am. Compl. at 5–6. According to Plaintiff, if a participant in the program refuses to take responsibility, he is negatively removed from the program, "his good-time is rescinded, and his release from incarceration denied until he either complies with the program's dictate, or [he reaches] his maximum release date." Id. at 6. Although Defendant Social Worker T. Mielnicki knew that Plaintiff had professed his innocence to the crimes of which he was convicted and knew that Plaintiff had an appeal pending challenging his criminal convictions, Mielnicki nevertheless required Plaintiff take responsibility for his crimes as part of the SOCTP. Id.

On or about February 14, 2020, Defendant Mid-State C.F. Assistant Deputy Superintendent of Programs M. Debraccio informed Plaintiff that his "good time would be rescinded until [he] complete[d] the S.O.C.T.P.," which meant that Plaintiff would "not be released on [his], then, upcoming conditional release ... date, June 13th, 2020, unless [he] finished the program in time." Am. Compl. at 7. Defendant Mid-State C.F. Deputy Superintendent of Programs T. Kozak "supported/affirmed" Defendant Debraccio's rescission of Plaintiff's good time credits. Id. "Thereafter, Debraccio's decision [was] then also ... affirmed by [defendant Mid-State C.F. Superintendent] William Fennessy." Id. The matter was then "forwarded to the [DOCCS] Central Office[, where] it was reviewed by [defendant] Jeff McKoy, [DOCCS] Deputy Commissioner of Programs, and [defendant] Anthony J. Annucci, Acting [DOCCS] Commissioner." Id. at 8. Debraccio's decision was "supported, affirmed and finalized by ... McKoy and Annucci" on September 7, 2020. Id. at 9.

 *2  Soon after Plaintiff's good time credit was rescinded, the pandemic shut down all prison programs, and Plaintiff was

unable to complete the SOCTP in time to meet his conditional release date. Am. Compl. at 10.

On or about June 26, 2020, Plaintiff had a meeting with Defendant Mielnicki and Defendant Senior Counselor T. Davis. Am. Compl. at 10. They informed Plaintiff that he was "on probation for 30 days," during which time Plaintiff was provided the opportunity to "accept responsibility for [his] alleged offense(s)." Id. Plaintiff was told that his failure to accept responsibility during the probationary period would result in his negative removal from the SOCTP and his "release from incarceration would be withheld until either [he] compl[ied] with the program's dictate, or [his] maximum release date from prison, whichever came first." Id. at 10–11. Plaintiff thereafter "reluctantly ... took responsibility for the offense(s) charged against [him]," and his good time credit was reinstated and his "conditional release date [was] reset to Oct[ober] 19[ ], 2020." Id. at 11.

Plaintiff alleges that his statements provided in the SOCTP regarding his alleged crimes "are currently being used against [him]" in connection with his Article 10 proceeding. [1] Am. Compl. at 13.

[1]    As noted in the September Order, although plaintiff's criminal sentence expired in June 2021, he is now civilly confined pursuant to Article 10 of the New York Mental Hygiene Law, which governs, inter alia, sex offenders requiring inpatient commitment. See MHL § 10.01.

In addition to the above-named defendants, the Amended Complaint names the New York State Attorney General and OMH as defendants. See Am. Compl. at 2–4, 14, 15.

Liberally construed, Plaintiff's Amended Complaint asserts violations of his constitutional rights arising under the Fifth and Fourteenth Amendments. [2] See generally Am. Compl. For a complete statement of Plaintiff's claims, reference is made to the Amended Complaint.

[2]    Like the original complaint, the Amended Complaint also invokes the Eighth Amendment as a basis for his claims. See Am. Compl. at 11, 13–14. The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " Estelle v. Gamble,

429 U.S. 97, 102–03 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 100–01 (1958) and Gregg v. Georgia, 428 U.S. 153, 169–73 (1976) (citations omitted)). Even liberally construed, however, Plaintiff's Amended Complaint does not allege that he was subjected to cruel and unusual punishment under the Eighth Amendment. Instead, the focus of the amended pleading is that, by mandating he take responsibility for the underlying crimes of which he was convicted while enrolled in the SOCTP, Defendants forced him to violate his right against self-incrimination under the Fifth Amendment and/or that they violated his substantive due process rights under the Fifth Amendment. Because the Court is obligated to "read the pleadings of a pro se plaintiff liberally and interpret them to 'raise the strongest arguments that they suggest,' " McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)), the Court has construed Plaintiff's Amended Complaint to assert claims arising under only the Fifth and Fourteenth Amendments.

**C. Analysis**

*1. New York State Attorney General and OMH*

**\*3** As explained in the September Order, the Eleventh Amendment bars individuals from suing states in federal court, unless Congress abrogates states' immunity or a state consents to suit. See U.S.Const. Amend. XI; Gollomp v. Spitzer, 568 F.3d 355, 365–66 (2d Cir. 2009). Eleventh Amendment immunity in this case extends to arms of New York State, including the New York State Attorney General and OMH. See Smith v. United States, 554 F. App'x 30, 31 (2d Cir. 2013) (affirming dismissal of claims against the New York State Attorney General on sovereign immunity grounds); Komlosi v. New York State Office of Mental Retardation and Dev'l Disabilities, 64 F.3d 810, 815 (2d Cir. 1995) (applying Eleventh Amendment immunity to bar the plaintiff from suing the New York State Office of Mental Retardation and Developmental Disabilities). Accordingly, Plaintiff's claims asserted against the New York State Attorney General and OMH are dismissed pursuant to Section 1915(e)(2)(B)(i).

## 2. Equal Protection Claims

In addition to being barred by Eleventh Amendment immunity, Plaintiff's equal protection claims against the New York State Attorney General are dismissed for failure to state a claim for which relief may be granted. Plaintiff's Amended Complaint asserts an equal protection claim against the New York State Attorney General based on allegations that the Attorney General does not subject other criminals to "housing restrictions, civil management, nor otherwise" in the way she imposes treatment programs and civil management on sex offenders. Am. Compl. at 15. The Equal Protection Clause provides that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

To state a cognizable equal protection cause of action, a plaintiff must allege sufficient facts that plausibly suggest he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995). Because convicted sex offenders do not comprise a suspect class for equal protection purposes, the state sex offender programs and civil management provisions are analyzed under the rational basis test. See Cutshall v. Sundquist, 193 F.3d 466, 482 (6th Cir. 1999). Courts in this circuit have concluded that New York's sex offender management programs and registration requirements survive this test. See, e.g., Medina v. Cuomo, No. 15-CV-1283, 2015 WL 13744627, at *15 (N.D.N.Y. Nov. 9, 2015), adopted by 2016 WL 756539 (N.D.N.Y. Feb. 25, 2016). Plaintiff's Amended Complaint in this case alleges no new facts that require modifying that conclusion. Accordingly, Plaintiff's equal protection claim against the New York Attorney General is also dismissed pursuant to Section 1915(e)(2)(B)(ii) for failure to state a claim upon which relief may be granted.

## 3. Remaining Claims

Mindful of the Court's obligation to liberally construe a pro se litigant's pleadings, see Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008), the Court will require a response to Plaintiff's remaining Fifth and Fourteenth Amendment claims arising from allegations that Defendants Debraccio, Davis, Mielnicki, Kozak, Fennessy, McKoy, and Annucci compelled him to incriminate himself while enrolled

in the SOCTP. In so ruling the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

## III. Motion for Counsel

At the conclusion of Plaintiff's Amended Complaint, he includes a request that the Court appoint pro bono counsel to represent him in this action. Am. Compl. at 16. The statute that governs IFP proceedings provides, in relevant part, that "[t]he court may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1); see also Hodge v. Police Officers, 802 F.2d 58, 61–62 (2d Cir. 1986). That section, however, does not require that counsel be appointed for every indigent civil litigant. Although the United States Constitution assures that indigent litigants have "meaningful access" to the courts, it does not guarantee that all such parties will receive the benefit of pro bono representation. Hodge, 802 F.2d at 60 (quoting Bounds v. Smith, 430 U.S. 817, 823 (1977)). Instead, section 1915(e) confers broad discretion on the courts to appoint counsel to deserving indigent litigants in appropriate circumstances. Hodge, 802 F.2d at 60–62.

*4 While the appointment of counsel to represent indigent parties in civil suits is authorized by statute, when that authority is exercised, the Court is required to call upon attorneys to donate their time pro bono, to the benefit of indigent litigants and the Court. In deference to the limited resources available to the Court to serve the interests of the many indigent litigants who pursue claims before it, and recognizing the "thankless burden" associated with such assignments, Miller v. Pleasure, 296 F.2d 283, 285 (2d Cir. 1961), courts should not grant such applications indiscriminately, but instead must exercise sound judgment and restraint in doing so. Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 171–72 (2d Cir. 1989).

There is no bright line test to be applied when a pro se, indigent civil litigant seeks appointment of counsel. Hendricks v. Coughlin, 114 F.3d 390, 392–93 (2d Cir. 1997). The factors informing the decision of whether to exercise discretion in favor of appointing counsel were summarized by the Second Circuit in its decision in Hodge:

> In deciding whether to appoint counsel ..., the district judge should first determine whether the indigent's

position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

Hodge, 802 F.2d at 61–62. In weighing these factors, each case must be decided on its own merits. Velasquez v. O'Keefe, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (citing Hodge, 802 F.2d at 61). Of these criteria, the Second Circuit has "stressed the importance of the apparent merits of the indigent's claim." Cooper, 877 F.2d at 172. While a plaintiff need not demonstrate that he can win his case without the aid of counsel, he does have to show "likely merit." McDowell v. State of N.Y., No. 91-CV-2440, 1991 WL 177271, at *1 (S.D.N.Y. 1991).

Although, as discussed above, Plaintiff's Amended Complaint is accepted for filing, none of the Defendants have yet responded to that pleading. This action is in its earliest stages, and the threshold for surviving review under Section 1915 is minimal. The Court's finding that Plaintiff's Amended Complaint should be accepted for filing is hardly the product of a thorough analysis of the likely merits of the case. In light of the foregoing, Plaintiff's motion for the appointment of counsel is denied without prejudice.

**IV. CONCLUSION**

Accordingly, it is hereby:

ORDERED that Plaintiff's Amended Complaint (Dkt. No. 12) is **ACCEPTED for filing** only to the extent that it asserts Fifth and Fourteenth Amendment claims against Defendants Mielnicki, Davis, Kozak, Debraccio, Fennessy, McKoy, and Annucci; and it is further

ORDERED that, except as to the foregoing, the remaining claims asserted in the Amended Complaint are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

ORDERED that, because there are no claims remaining in this action pending against the New York State Attorney General or OMH, the Clerk is respectfully directed to **TERMINATE** those defendants from the docket; and it is further

ORDERED that the Clerk shall issue summonses, along with copies of the Amended Complaint, to the United States Marshal Service for service upon Defendants Kozak, Fennessy, McKoy, and Annucci; and it is further

**\*5** ORDERED that a response to the Amended Complaint shall be filed by Defendants Mielnicki, Davis, Kozak, Debraccio, Fennessy, McKoy, and Annucci, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

ORDERED that Plaintiff's motion for the appointment of pro bono counsel (Dkt. No. 12) is **DENIED without prejudice**; and it is further

ORDERED that the Clerk shall serve a copy of this Decision and Order on the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 5410170

---

**End of Document**                 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Yerdon v. Poitras, Slip Copy (2022)

2022 WL 798271

2022 WL 798271
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edward A. YERDON, Plaintiff,

v.

Karin POITRAS, et al., Defendants.

1:21-CV-0565 (LEK/ML)
|
Signed 03/16/2022

**Attorneys and Law Firms**

Edward A. Yerdon, Cohoes, NY, Pro Se.

Lynn Marie Knapp, Stacey A. Hamilton, New York State Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

 *1 Plaintiff Edward Yerdon brings this pro se civil rights action pursuant to the Americans with Disabilities Act ("ADA"), against Defendants Karin Poitras, Elizabeth Romand, and the New York State Department of Motor Vehicles ("DMV"). Dkt. No. 1 ("Complaint"). Presently before the Court is Defendants' motion to dismiss the complaint pursuant to Rules 12(b)(1), 12(b)(5), and 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. Nos. 14 ("Motion"), 14-1 ("Defendants' Memorandum"). Plaintiff opposes Defendants' motion to dismiss. Dkt. No. 20 ("Response"). For the reasons that follow, the Motion is denied.

**II. BACKGROUND**

The following factual allegations contained in the Complaint are assumed to be true. See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 76 (2d Cir. 2015).

Briefly, Plaintiff's allegations arise from disability discrimination he experienced while employed at the DMV. See Compl. at 2–3, 5. Defendant Poitras was responsible for assigning Plaintiff's tasks and graded Plaintiff on his work performance. Id. at 5. Before Plaintiff was terminated, he filed a discrimination complaint with the New York

State Governor's Office of Employee Relations. Id. However, Plaintiff alleges that neither the Governor's Office of Employee Relations nor Defendant Romand, an employee of the Office, did anything to intervene. Id.

**III. LEGAL STANDARD**

**A. Rule 12(b)(1) Motion to Dismiss**

When a defendant "moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." United States ex rel. Kreindler & Kreindler v. United Tech. Corp., 985 F.2d 1148, 1155–56 (2d Cir. 1993) (internal quotation marks and citation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "To survive a defendant's Rule 12(b)(1) motion to dismiss for lack of standing, plaintiffs must allege facts that affirmatively and plausibly suggest that [they have] standing to sue." Kiryas Joel Alliance v. Village of Kiryas Joel, 495 F. App'x 183, 188 (2d Cir. 2012) (alteration in original) (internal quotation marks omitted). In considering a motion to dismiss under Rule 12(b)(1), a court must accept as true all material factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiffs. Buday v. N.Y. Yankees P'Ship, 486 F. App'x 894, 896 (2d Cir. 2012). Plaintiffs, as the parties asserting subject matter jurisdiction, bear the burden of establishing their standing as the proper parties to bring this action. See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc., 697 F.3d 59, 65 (2d Cir. 2012).

**B. Rule 12(b)(5) Motion to Dismiss**

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." Sikhs for Justice v. Nath, 850 F. Supp. 2d 435, 439–40 (S.D.N.Y. 2012) (quoting Dynegy Midstream Servs. v. Trammochem, 451 F.3d 89, 94 (2d Cir. 2006)). On a motion to dismiss pursuant to 12(b)(5) for deficient service of process, the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." Soos v. Niagara County, 195 F. Supp. 3d 458, 462 (W.D.N.Y. 2016) (quoting In re Magnetic Audiotape Antitrust Litig., 334 F.3d 205, 206 (2d Cir. 2003)). Plaintiff must meet this burden by making a prima facie case of proper service "through

specific factual allegations and any supporting materials."
[Kwon v. Yun](), No. 05-CV-1142, 2006 WL 416375, at *2
(S.D.N.Y. Feb. 21, 2006). "A Rule 12(b)(5) motion is the
proper vehicle for challenging the mode of delivery or lack
of delivery of the summons and complaint." [Soos](), 195 F.
Supp. 3d at 463 (quoting [Jackson v. City of New York](), No.
14-CV-5755, 2015 WL 4470004, at *4 (S.D.N.Y. June 26,
2015)).

### C. Rule 12(b)(6) Motion to Dismiss

**\*2** To survive a motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6), a "complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to
relief that is plausible on its face.' " [Ashcroft v. Iqbal](), 556
U.S. 662, 663 (2009) (quoting [Bell Atl. Corp. v. Twombly](),
550 U.S. 544, 570 (2007)); see also Fed. R. Civ. P. 12(b)(6).
A court must accept as true the factual allegations contained
in a complaint and draw all inferences in favor of a plaintiff.
See [Allaire Corp. v. Okumus](), 433 F.3d 248, 249–50 (2d Cir.
2006). A complaint may be dismissed pursuant to Rule 12(b)
(6) only where it appears that there are not "enough facts to
state a claim to relief that is plausible on its face." [Twombly](),
550 U.S. at 570. Plausibility requires "enough fact[s] to raise
a reasonable expectation that discovery will reveal evidence
of [the alleged misconduct]." [Id.]() at 556. The plausibility
standard "asks for more than a sheer possibility that a
defendant has acted unlawfully." [Iqbal](), 556 U.S. at 678 (citing
[Twombly](), 550 U.S. at 556). "[T]he pleading standard Rule
8 announces does not require 'detailed factual allegations,'
but it demands more than an unadorned, the-defendant-
unlawfully-harmed-me accusation." [Id.]() (citing [Twombly](), 550
U.S. at 555). Where a court is unable to infer more than
the mere possibility of the alleged misconduct based on the
pleaded facts, the pleader has not demonstrated that she is
entitled to relief and the action is subject to dismissal. See [id.]()
at 678–79.

## IV. DISCUSSION

Defendants raise three arguments. First, that the Court lacks
subject matter jurisdiction against Defendant DMV. Defs.'
Mem. at 5. [1] Second, that the Court lacks personal jurisdiction
over the defendants. [Id.]() at 6–8. Third, that the Complaint fails
to state a claim under the ADA. [Id.]() at 8–9. As mentioned
above, the Court will first consider the Rule 12(b)(1)
challenge. Afterwards, the Court will consider the Rule 12(b)
(5) challenge before reaching a Rule 12(b)(6) determination.
See [Styles v. Westchester Cty.](), No. 18-CV-12021, 2020 WL
1166404, at *4 (S.D.N.Y. Mar. 10, 2020) ("Where a defendant

moves for dismissal under Rules 12(b)(2), (5), and (6), the
Court must first address the preliminary questions of service
and personal jurisdiction.") (quoting [Hertzner v. U.S. Postal
Serv.](), No. 05-CV-2371, 2007 WL 869585, at *3 (E.D.N.Y.
Mar. 20, 2007)).

1  Where page numbers are generated by CM/ECF,
the Court's electronic filing system, citations to
filings refer to these generated page numbers.

### A. Rule 12(b)(1) Motion to Dismiss

Defendants first argue that the Court lacks subject matter
jurisdiction over the ADA claims against the DMV because
of the Eleventh Amendment. Defs.' Mem. at 5. The Eleventh
Amendment bars individuals from suing states in federal
court, unless Congress abrogates states' immunity or a state
consents to suit. See U.S.Const. Amend. XI; [Gollomp v.
Spitzer](), 568 F.3d 355, 365–66 (2d Cir. 2009). Eleventh
Amendment immunity in this case extends to arms of New
York State, including the New York State Department of
Motor Vehicles. See [Sandoval v. Dep't of Motor Vehicles
State of New York](), 333 F. Supp. 2d 40, 43 (E.D.N.Y. 2004).
However, the Court is not convinced that it can determine
the sovereign immunity issue at the Rule 12(b)(1) stage
because "[w]hile the Eleventh Amendment is jurisdictional
in the sense that it is a limitation on the federal court's
judicial power, and therefore can be raised at any stage of
the proceedings, ... it is not coextensive with the limitations
on judicial power in Article III." [Calderon v. Ashmus](), 523
U.S. 740, 745 n.2 (1998); see also [Warburton v. John Jay
Coll. of Criminal Justice of City Univ. of New York](), No.
14-CV-9170, 2015 WL 3948107, at *3 (S.D.N.Y. June 29,
2015) ("sovereign immunity [is more like] an affirmative
defense than ... a jurisdictional bar") (quoting [Carver v.
Nassau Cty. Interim Fin. Auth.](), 730 F.3d 150, 156 (2d Cir.
2013)). Therefore, the Court finds that it is more appropriate
to address the DMV's sovereign immunity arguments as a
motion to dismiss for failure to state a claim pursuant to Rule
12(b)(6).

### B. Rule 12(b)(5) Motion to Dismiss

**\*3** Next, Defendants argue that Plaintiff failed to properly
serve them with the summons and Complaint in accordance
with Rule 4 of the Federal Rules of Civil Procedure. Defs.'
Mem. at 6–8.

Rule 4(e) of the Federal Rules of Civil Procedure provides
that an individual may be served either by:

(1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

(2) doing any of the following:

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e)(1).

Rule 4 of the Federal Rules of Civil Procedure also provides that a state, a municipal corporation, or any other state-created governmental organization must be served by (a) "delivering a copy of the summons and of the complaint to its chief executive officer" or (b) "serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant." Fed. R. Civ. P. 4(j)(2)(A)–(B).

Moreover, under Rule 4(d), a plaintiff may notify a defendant "that an action has been commenced and request that the defendant waive service." See Fed. R. Civ. P. 4(d)(1). The request may "be sent by first-class mail or other reliable means," and must "be accompanied by a copy of the complaint, 2 copies of the [required] waiver form ..., and a prepaid means for returning the form." See Fed. R. Civ. P. 4(d)(1)(C), (G). "When the plaintiff files a waiver, proof of service is not required and [the] rules apply as if a summons and complaint had been served at the time of filing the waiver." Fed. R. Civ. P. 4(d)(4). There is nothing to indicate Plaintiff made any request to the Defendants to waive service.

Finally, under Rule 4(m), "[i]f the plaintiff fails to serve a defendant within 90 days of filing the complaint, the action must be dismissed without prejudice unless the plaintiff shows 'good cause.' " Trombetta v. Novocin, No. 18-CV-993, 2020 WL 7053301, at *2 (S.D.N.Y. Nov. 24, 2020) (citing Fed. R. Civ. P. 4(m)). Still, the Second Circuit has held that "district courts have discretion to grant extensions, and may do so even in the absence of good cause." Meilleur v. Strong, 682 F.3d 56, 61 (2d Cir. 2012).

Here, Plaintiff "served" Defendants by leaving the documents in a drop box and affixing it to the door. See Dkt. Nos. 6–7, 11 (collectively, "Affidavits of Service"). Furthermore, in the Affidavits of Service, the service processor noted that a security guard advised him to leave it in a drop box on Central Avenue. Id. Defendants argue that Plaintiff's service did not comply with the New York Civil Practice Law and Rules ("CPLR"). Defs.' Mem. at 6–8. In Plaintiff's Response, he indicates that he relied on Servico, a professional process server company, to complete service. Resp., Point 2. Additionally, in a supplemental filing months after his Response, Plaintiff provided the Court with an email from Servico explaining the COVID-19 service procedures. See Dkt. No. 21. The Court will analyze whether the service complied with the Federal Rules of Civil Procedure and the CPLR.

*1. Individual Defendants*

**\*4** The Court begins by noting that Plaintiffs' service on Defendants Poitras and Romand did not comply with Rule 4(e)(2). [2] First, Rule 4(e)(2)(A) includes service that is delivered personally. See, e.g., Ivey v. Albany Cty., No. 20-CV-1617, 2021 WL 6125386, at *4 (N.D.N.Y. Dec. 28, 2021) (Kahn, J.) ("Courts have recognized that the term 'delivery' is a term of art under Rule 4 and it must be personal."); Tate v. YRC Worldwide, Inc., No. 08-CV-0007, 2008 WL 11318316, at *2 (E.D.N.Y. Sept. 23, 2008) ("Because the 'term "delivery" as used in Rule 4(h)(1)(B) does not include service by mail,' service under that Rule must be personal —i.e., by hand." (citing Travelodge Hotels, Inc. v. Vijay Investments, LLC, No. 07-CV-4033, 2007 WL 4557641, at *1 (D.N.J. Dec. 21, 2007)). Because service was not delivered personally, Rule 4(e)(2)(A) does not save Plaintiff. Rule 4(e)(2)(B) does not provide relief to Plaintiff either because he left the copy of the summons and complaint at the individual defendants' place of employment and in a mail box, which is not what the rule requires. See Fed. R. Civ. P. 4(e)(2)(B) ("leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there") (emphasis added). Finally, Plaintiff fails under Rule 4(e)(2)(C) because there is nothing to indicate that individual defendants were agents authorized to accept service, and even if they were, the delivery must be personal.

Yerdon v. Poitras, Slip Copy (2022)

2022 WL 798271

2    Defendants do not address Rule 4(e)(2) at all and instead focus on Rule 4(e)(1) and the incorporated CPLR provisions.

Having found that Plaintiff failed to comply with Rule 4(e)(2), the Court turns its attention to Rule 4(e)(1), which incorporates the CPLR. New York law provides:

Personal service upon a natural person shall be made by any of the following methods:

1. by delivering the summons within the state to the person to be served; or

2. by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend "personal and confidential" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served, such delivery and mailing to be effected within twenty days of each other; proof of such service shall be filed with the clerk of the court designated in the summons within twenty days of either such delivery or mailing, whichever is effected later; service shall be complete ten days after such filing; proof of service shall identify such person of suitable age and discretion and state the date, time and place of service, except in matrimonial actions where service hereunder may be made pursuant to an order made in accordance with the provisions of subdivision a of section two hundred thirty-two of the domestic relations law; or

3. by delivering the summons within the state to the agent for service of the person to be served as designated under rule 318, except in matrimonial actions where service hereunder may be made pursuant to an order made in accordance with the provisions of subdivision a of section two hundred thirty-two of the domestic relations law;

4. where service under paragraphs one and two cannot be made with due diligence, by affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person to be served and by either mailing the summons to such person at his or her last known residence or by mailing the summons by first class mail to the person to be served at

his or her actual place of business in an envelope bearing the legend "personal and confidential" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served, such affixing and mailing to be effected within twenty days of each other; proof of such service shall be filed with the clerk of the court designated in the summons within twenty days of either such affixing or mailing, whichever is effected later; service shall be complete ten days after such filing, except in matrimonial actions where service hereunder may be made pursuant to an order made in accordance with the provisions of subdivision a of section two hundred thirty-two of the domestic relations law;

*5  5. in such manner as the court, upon motion without notice, directs, if service is impracticable under paragraphs one, two and four of this section.

6. For purposes of this section, "actual place of business" shall include any location that the defendant, through regular solicitation or advertisement, has held out as its place of business.

CPLR § 308.

Defendants focus on CPLR § 308(4) and argue that Plaintiff has not shown due diligence. Defs.' Mem. at 7. The Court agrees. "New York courts hold that plaintiffs may only resort to the 'nail and mail' method of service described in CPLR § 308(4) 'where personal service under CPLR 308(1) and (2) cannot be made with due diligence.' " Jordan v. Pierre, No. 18-CV-8528, 2019 WL 2461721, at *1 (S.D.N.Y. May 28, 2019) (quoting JP Morgan Chase Bank, N.A. v. Baldi, 10 N.Y.S.3d 126, 127 (App. Div. 2015)). "The due diligence requirement of CPLR 308(4) must be strictly observed, given the reduced likelihood that a summons served pursuant to that section will be received." O'Connell v. Post, 811 N.Y.S.2d 441, 442 (App. Div. 2006) (quotation marks omitted).

According to the Affidavits of Service, the "Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion[.]" See Affs. of Serv. Such a conclusory statement alone is not sufficient to meet the due diligence requirement. "When determining whether the process server's actions constitute due diligence [under CPLR § 308], courts should not focus on the quantity of the attempts at personal delivery, but on their quality." Allstate Ins. Co. v. Rozenberg, 771 F. Supp. 2d 254, 261 (E.D.N.Y. 2011). "In considering whether the 'due diligence' requirement has

been met, New York courts frequently inquire as to whether a plaintiff attempted service at both the defendant's residence and the defendant's place of employment." Jordan, 2019 WL 2461721, at *1. Here, without anything else in the record, the process server only attempted personal service once at Defendants' place of employment before resorting to "nail and mail" service. This does not constitute "due diligence." See J & J Sports Prods., Inc. v. Morocho, No. 18-CV-2303, 2019 WL 1339198, at *4 (E.D.N.Y. Feb. 27, 2019) ("Here, the process server's single attempt at personal service prior to attempting nail and mail service did not constitute 'due diligence' within the meaning of N.Y. C.P.L.R. § 308."), report and recommendation adopted, 2019 WL 1333245 (E.D.N.Y. Mar. 25, 2019). Thus, the Court finds that Plaintiff's Affidavits of Service on Defendants Poitras and Romand did not comply with CPLR § 308.

### 2. State Agency

Service can be completed on the DMV by (a) "delivering a copy of the summons and of the complaint to its chief executive officer" or (b) "serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant." Fed. R. Civ. P. 4(j)(2)(A)–(B). Because there is nothing to indicate that Plaintiff complied with Rule 4(j)(2)(A) since there was no personal delivery nor was it to the chief executive officer, the Court's analysis is limited to Rule 4(j)(2)(B), which incorporates the CPLR.

*6 New York law provides:

1. Personal service upon the state shall be made by delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state.

2. Personal service on a state officer sued solely in an official capacity or state agency, which shall be required to obtain personal jurisdiction over such an officer or agency, shall be made by (1) delivering the summons to such officer or to the chief executive officer of such agency or to a person designated by such chief executive officer to receive service, or (2) by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by subdivision one of this section. Service by certified mail shall not be complete until the summons is received in a principal office of the agency and until personal service upon the state in

the manner provided by subdivision one of this section is completed. For purposes of this subdivision, the term "principal office of the agency" shall mean the location at which the office of the chief executive officer of the agency is generally located. Service by certified mail shall not be effective unless the front of the envelope bears the legend "URGENT LEGAL MAIL" in capital letters. The chief executive officer of every such agency shall designate at least one person, in addition to himself or herself, to accept personal service on behalf of the agency. For purposes of this subdivision the term state agency shall be deemed to refer to any agency, board, bureau, commission, division, tribunal or other entity which constitutes the state for purposes of service under subdivision one of this section.

CPLR § 307.

Defendants argue that "[c]ontrary to the requirements of CPLR § 307(2), the summons was not served by certified mail, return receipt requested, and there was no personal service upon the state in the manner provided by § 307(1)." Defs.' Mem. at 7. Once more, based on the current record, the Court agrees with Defendants and finds that Plaintiff's Affidavits of Service on Defendants DMV did not comply with CPLR § 307.

### 3. Result of Failure to Effect Proper Service

"Where service is deemed to have been insufficient, the Court has discretion to dismiss the action, but dismissal is not mandatory." Frezzell v. New York State Dep't of Lab., No. 14-CV-0729, 2016 WL 796063, at *2 (N.D.N.Y. Feb. 24, 2016) (quotation marks omitted and collecting cases) (Kahn, J.). If a complaint is dismissed, it is typically without prejudice absent unusual circumstances. Blasio v. N.Y. State Dep't of Corr. Servs., No. 04-CV-653S, 2005 WL 2133601, at *5 (W.D.N.Y. Aug. 31, 2005). "It is well established that pro se plaintiffs are not excused from complying with procedural rules." Frezzell, 2016 WL 796063, at *3; see McNeil v. United States, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.").

*7 However, instead of dismissing the case, the Court will employ the rationale in Trombetta v. Novocin, No. 18-CV-993, 2020 WL 7053301 (S.D.N.Y. Nov. 24, 2020), and grant Plaintiff "a sixty day extension to both obtain correct summonses from the Clerk of Court and properly

serve [the Defendants]." Trombetta, 2020 WL 7053301, at *3. This Court recognizes that "[t]he COVID-19 pandemic has indisputably been deeply tragic and disruptive to many aspects of life and legal practice." Hood v. Cath. Health Sys., Inc., No. 20-CV-673, 2020 WL 8371205, at *7 (W.D.N.Y. Sept. 28, 2020). The Court also notes that Plaintiff relied on Servico to effectuate service. Regardless of whether these circumstances amount to good cause under Rule 4(m) of the Federal Rules of Civil Procedure, an extension is warranted. See Meilleur, 682 F.3d at 61. No further extensions will be granted, and if Plaintiff fails to effect proper service on each of the defendants within sixty-days of this opinion, the case will be dismissed under Rule 12(b)(5).

### C. Rule 12(b)(6) Motion to Dismiss

Just as in Trombetta, this Court "is without jurisdiction to decide the remainder of the [ ] Defendants' claims, including that [Plaintiff] has failed to state a claim upon which relief can be granted." Trombetta, 2020 WL 7053301, at *3. "The Court will decide these issues if and when service of process has been properly executed." Id. [3]

[3]    Although Plaintiff only raised ADA claims in his Complaint, nothing would prevent this Court at a later juncture from reading the Complaint to raise the strongest possible legal arguments. See, e.g., Quadir v. New York State Dep't of Lab., 39 F. Supp. 3d 528, 537 (S.D.N.Y. 2014) (liberally construing pro se plaintiff's complaint to raise a claim under the Rehabilitation Act).

### V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 14) is **DENIED**;

**ORDERED**, that the Clerk of the Court shall reissue summonses for Defendants Karin Poitras, Elizabeth Romand, and the New York State Department of Motor Vehicles and provide them to Plaintiff so that he may serve these Defendants with a summons and a copy of the Complaint in accordance with Rule 4 of the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that Plaintiff shall have **sixty (60) days** from the date of this Memorandum-Decision and Order to serve Defendants; and it is further

**ORDERED**, that failure to properly serve each of the Defendants will result in the case's dismissal; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2022 WL 798271

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

652 Fed.Appx. 29
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Natasha SEDUNOVA, Plaintiff–Appellant,

v.

CITY OF NEW YORK, Matthew Collins,
Michael Hopkins, Defendants–Appellees,
Chris Andy Grary, Angela Myers, John and Jane
Does 1–10, (the names of John and Jane Doe
being fictitious as the true names are presently
unknown), Johne Doe 1–2, John or Jane Doe
3–7, Charles Hynes, Ed Purce, Defendants.

15–681
|
June 15, 2016
|
Corrected June 29, 2016

**Synopsis**
**Background:** Suspect brought § 1983 action against the
city, alleging that she was denied a fair trial because her
confession to murder was coerced and that the knowing use
of fabricated evidence constituted malicious prosecution. The
United States District Court for the Eastern District of New
York, Johnson, J., 2015 WL 541408, dismissed the action.
Suspect appealed.

**Holdings:** The Court of Appeals held that:

[1] the confession was not coerced, and

[2] suspect failed to state a malicious prosecution claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (2)

[1]    **Criminal Law**    Particular cases

Police detectives' alleged actions in trying to
convince suspect that it would "better for her"
and "good for her" if she confessed to murder
and that she would be free to leave if she
confessed, did not render suspect's confession
coerced as would violate suspect's civil rights;
such actions did not amount to circumstances
under which suspect could not have made a
knowing and voluntary decision to confess. U.S.
Const. Amend. 5; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[2]    **Civil Rights**    Criminal prosecutions

Suspect failed to produce evidence that her
confession to murder was coerced by police
detectives and thus failed to state § 1983
malicious prosecution claim against the city
based on the alleged knowing use of her
fabricated confession. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

*30    Appeal from a judgment of the United States District
Court for the Eastern District of New York (Johnson, J.).

UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED that the
judgment of the district court be **AFFIRMED**.

**Attorneys and Law Firms**

For Appellant: J. Andrew Kent, on the brief, Lincoln Square
Legal Services at Fordham Law School, New York, New
York. William J. Harrington, Goodwin Procter LLP, New
York, New York.

For Appellees: Ingrid R. Gustafson (with Richard Dearing and Devin Slack on the brief), for Zachary W. Carter, New York City Corporation Counsel, New York, New York.

PRESENT: DENNIS JACOBS, BARRINGTON D. PARKER, REENA RAGGI, Circuit Judges.

## SUMMARY ORDER

Plaintiff Natasha Sedunova appeals from the judgment of the United States District Court for the Eastern District of New York (Johnson, J.), dismissing her complaint for failure to state a claim. The complaint alleges, under 42 U.S.C. § 1983, that NYPD detectives Matthew Collins and Michael Hopkins, and seven John Doe defendants (collectively, the "defendants") violated her civil rights, specifically, (1) that she was denied a fair trial because her confession was fabricated, and (2) that the knowing use of fabricated evidence constituted a malicious prosecution.

We review de novo the dismissal of a complaint for failure to state a claim, and we accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff. N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC, 709 F.3d 109, 119 (2d Cir. 2013). We assume the parties' familiarity with the underlying facts, the procedural history, and the issues presented for review.

**\*31**   1. The plaintiff claims that her confession was fabricated because it was produced as the result of coercive interrogation techniques. When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, the accused's constitutional right to a fair trial is violated. See Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997). [1] Failure to administer Miranda warnings alone cannot serve as the basis of a § 1983 action; however, a § 1983 claim may arise if coercion was applied to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff in a criminal proceeding. Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998) (citing Weaver v. Brenner, 40 F.3d 527, 535 (2d Cir. 1994)); see also Jocks v. Tavernier, 316 F.3d 128, 138 (2d Cir. 2003) ("Miranda violations, absent coercion, do not rise to the level of constitutional violations actionable under § 1983.").

[1]   Although Sedunova attempts to plead a fabrication claim, she has not alleged that her confession was forged (she acknowledges that she made the videotaped confession and adopted the written confession), nor has she alleged any other circumstances that lead to a reasonable inference that any defendant knew her confession was false when made. See Ricciuti, 124 F.3d at 129–30. Accordingly, we analyze her claim as one alleging violations of the Fifth Amendment under § 1983.

A plaintiff alleging coercion must allege more than that police told her she was a suspect, suggested that it would be to her benefit to cooperate, or promised leniency in exchange for cooperation. See United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995). A plaintiff must point to circumstances indicating that she could not make a knowing and voluntary decision. See United States v. Taylor, 745 F.3d 15, 24 (2d Cir. 2014).

 [1]   The factual allegations in this case, even accepted as true and viewed in the light most favorable to Sedunova, do not amount to coercion sufficient to sustain a § 1983 claim. The salient allegations are that John Does 1 and 2 tried to "convince" her that it would be "better for her" and "good for her" if she confessed to the murder and claimed self-defense, and that she was told that she would be "free to leave" if she confessed. Am. Compl. ¶¶ 32–35. None of the allegations amount to circumstances under which the plaintiff could not make a knowing and voluntary decision.

 [2]   2. The complaint also alleges that the knowing use of the fabricated confession constituted a malicious prosecution. See Jocks, 316 F.3d at 138. However, as discussed above, the fabrication claim is rejected because the confession was not coerced. The use of the confession therefore was not the use of fabricated evidence.

For the foregoing reasons, and finding no merit in the plaintiff's other arguments, we hereby **AFFIRM** the judgment of the district court.

## All Citations

652 Fed.Appx. 29

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Newman v. Hoyt, Not Reported in Fed. Supp. (2018)

2018 WL 3730170

2018 WL 3730170
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John NEWMAN, Plaintiff,

v.

Richard HOYT and Scott Cook, Defendants.

3:17-CV-808 (TJM/DEP)
|
Signed 08/06/2018

**Attorneys and Law Firms**

John Newman, Rome, NY, pro se.

Katie E. Valder, Matthew P. Reed, New York State Attorney General, Albany, NY, for Defendants.

## DECISION & ORDER

Thomas J. McAvoy, Senior, U.S. District Judge

 **\*1** Plaintiff John Newman brings this *pro se* complaint pursuant to 42 U.S.C. § 1983. He alleges violations of his constitutional rights while in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). See Amended Complaint dkt. #36 ("Amend. Compl."). Defendants have filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The Court has determined to decide the matter without oral argument.

## I. INTRODUCTION

Plaintiff's Amended Complaint alleges that on January 12, 2017, DOCCS released Newman from incarceration into post-release supervision. Amend. Compl at Statement of Claim. Plaintiff had been incarcerated for violating the terms of an earlier release. Plaintiff alleges that Defendants Richard Hoyt and Scott Cook, who were parole officers, entered his residence without permission on February 13, 2017. Id. Defendants gained access via a key obtained from Plaintiff's landlord. Id. Without Plaintiff's express consent or permission, Defendants entered the residence before knocking on Plaintiff's locked bedroom door. Id. Plaintiff opened the door for Hoyt and Cook immediately detained Plaintiff while Hoyt searched the apartment. Id. Defendants did not provide Plaintiff Miranda warnings before arresting

him and taking him to jail. Id. Plaintiff was not arraigned, and he claims he did not receive "any other types of due process." Id. Plaintiff's Amended Complaint does not assign responsibility to any individual for the lack of the arraignment or deprivation of due process. Id. Plaintiff alleges that no judicial officer issued a warrant for the search of his apartment or his arrest. Id. Plaintiff's Amended Complaint also fails to assign responsibility for this failing.

Plaintiff had a preliminary hearing on February 23, 2017. The hearing officer found probable cause for a parole violation. Plaintiff was held by DOCCS until his final hearing on September 20, 2017 and he was represented by counsel. The Administrative Law Judge at the final hearing sustained seven parole violation charges against Plaintiff. Plaintiff was sentenced to incarceration for the remainder of his term of post-release supervision.

Plaintiff, while incarcerated, filed this civil complaint, *pro se*, against the Defendants. Plaintiff eventually filed an Amended Complaint which raises claims based on the conduct surrounding Plaintiff's arrest. He raises those claims pursuant to the Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments.

Defendants now move for judgment on the pleadings and dismissal of that Amended Complaint. In the alternative, they argue that they are entitled to qualified immunity.

## II. LEGAL STANDARD

When addressing a Rule 12(c) motion, the Court employs the same standard as for a Rule 12(b)(6) motion. Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d. Cir. 2001). In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). This tenet does not apply to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007) ). When, as here, the Plaintiff proceeds *pro se*, the Court must " 'construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.' " Weixel v. Bd. of Educ. of N.Y., 287 F.3d 138, 146 (2d Cir. 2002) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.

2000) ). "This is especially true when dealing with *pro se* complaints alleging civil rights violations." Id.

### III. Discussion

#### A. Fourth Amendment Claims

**\*2** Defendants first seek dismissal of Plaintiff's Fourth Amendment Claims. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. Making all inferences in Plaintiff's favor, the Amended Complaint asserts that Defendants violated his Fourth Amendment rights when they entered his private residence, detained him, searched his bedroom without a warrant, and arrested him.

Determining whether Defendants violated Plaintiff's Fourth Amendment rights depends on the reasonableness of Defendants' conduct. "The Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." United States v. Newton, 369 F.3d 659, at 664 (2d. Cir. 2004) (citing U.S. CONST. amend. IV; Kyllo v. United States, 533 U.S. 27, 33–34 (2001) ). Because the Fourth Amendment forbids "unreasonable searches and seizures," the "touchstone in evaluating the permissibility of any search is reasonableness." United States v. Barner, 666 F.3d 79, 82-83 (2d Cir. 2012) (quoting United States v. Lifshitz, 369 F.3d 173, 178 (2d Cir. 2004) ); Griffin v. Wisconsin, 483 U.S. 868, 873, (1987). "Reasonableness 'is determined by assessing, on the one hand, the degree to which a search intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " Barner, 666 F.3d at 83 (quoting United States v. Knights, 534 U.S. 112, 118–19 (2001) ) (internal citations omitted). "[T]he law recognizes certain exceptions to th[e] rule" that reasonableness "requires a warrant and probable cause." Barner, 666 F.3d at 83 (quoting Newton, 369 F.3d at 665).

Special circumstances can limit a person's reasonable expectations of privacy. Barner 666 F.3d at 83-85; see also United States v. Knights, 534 U.S. 112, at 117. The probation and parole system offers one such set of circumstances. "A parolee's reasonable expectations of privacy are less than those of ordinary citizens." Knights, 534 U.S. at 119–20, 122. "Indeed, the Supreme Court has found that 'parolees ... have severely diminished expectations of privacy by virtue of their status alone.' " Barner, 666 F.3d at 84 (citing Samson v.

California, 547 U.S. 843, 852 (2006) ). " 'Parole is meted out in addition to, not in lieu of, incarceration[,] ... ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.' " United States v. Grimes, 225 F.3d 254, at 258 (2d Cir. 2000) (quoting United States v. Cardona, 903 F.2d 60, 63 (1st Cir. 1990) ). Accordingly, "the Supreme Court has indicated that searches of probationers may be pursued without a warrant and under a standard lower than that of probable cause." Barner, 666 F.3d at 84 (quoting Lifshitz, 369 F.3d at 179). Furthermore, "allegation[s] [of a parole violation] and the resulting issuance of a warrant for retaking ... operate to remove a parolee one step farther from the constitutional protection enjoyed by ordinary citizens." Barner, 666 F.3d at 84 (quoting United States v. Polito, 583 F.2d 48, 55 (2d Cir. 1978) ).

Parolees therefore have a significantly diminished expectation of privacy, in part because they know the conditions of their release include permission to search.[1] See Samson v. California, 547 U.S. 843, 849 (2006) (holding that the Fourth Amendment does not prevent police from conducting warrantless, suspicion-less searches of parolees). Further, courts "ha[ve] repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." Id. at 853 (internal citations omitted). New York law requires that a person on supervised release "comply faithfully with all conditions specified in writing at the time of his release and with all other conditions and instructions, whether oral or in writing, given him by the board, a member, an authorized representative of the board or a parole officer." N.Y. Comp. Codes R. & Regs. tit. 9 § 8003.1(b). This includes that "[a] releasee will permit his parole officer to visit him at his residence and/or place of employment and will permit the search and inspection of his person, residence and property." N.Y.Comp. Codes R. & Regs. tit. 9 § 8003.2(d); see Samson v. California, 547 U.S. 843, 847 (2006) (holding that "a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment").

---

[1]    Plaintiff insists that he is "a citizen subject to supervision" and not "a custodial releasee who is subject to '[p]arole' supervision." Amend. Compl. at Statement of Claim.

2018 WL 3730170

**\*3** Plaintiff alleges that Defendants' search of his personal dwelling occurred without a warrant and without his consent. Plaintiff cites People v. Huntley, 43 N.Y.2d 175, 401 N.Y.S.2d 31 (1977), to argue that Defendants overstepped their boundaries and disrupted his personal life and affairs. He emphasizes that he did not consent to these actions. "[W]hat may be unreasonable with respect to an individual who is not on parole may be reasonable with respect to one who is." Id. at 181 (internal citations omitted). The Huntley court ultimately held that the intrusion into Huntley's life and residence was reasonable and permissible. Id. at 183. Further, "as we stated in Newton, 'neither Huntley nor Grimes holds that consent, whether obtained pursuant to parole regulation ... or otherwise, is required in addition to a reasonable relationship to the parole officer's duty to justify a warrantless parole search.' " Barner, 666 F.3d at 85 (2d Cir. 2012). "[T]he rule we approved in [ ] Grimes does not require a parolee's consent to permit parole officers to conduct a warrantless search reasonably related to their supervision responsibilities." Id. (quoting United States v. Newton, 369 F.3d 659, (2d. Cir. 2004) ).

Plaintiff gave consent pursuant to regulation when he agreed to allow parole searches of his person and residence as a condition of his release under New York law. Defendants did not need Plaintiff's additional express consent for their search. See Barner, 666 F.3d at 85 (2d Cir. 2012). Parole officer duties bear a rational and reasonable basis to the State's interest "in reducing recidivism and thereby promoting reintegration and positive citizenship." Samson, 547 U.S. at 849; see also Barner, 666 F.3d at 85; Huntley, 43 N.Y.2d at 181. Plaintiff's Amended Complaint does not allege that the events of February 13, 2017, were unrelated to Defendants' duties, nor does the Amended Complaint allege that the search was irrational.

Plaintiff alleges that Defendants violated his Fourth Amendment rights by placing him in handcuffs immediately before executing the search. The momentary intrusion upon his freedom was not unreasonable, however, as officers conducting a search have a limited "authority to detain the occupants of the premises while a proper search is conducted." Muehler v. Mena, 544 U.S. 93, 98 (2005) (quoting Michigan v. Summers, 452 U.S. 692, 705 (1981) ). [2] This authority includes using "reasonable force" to achieve the detention. See Graham v. Connor, 490 U.S. 386, 396 ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical

coercion or threat thereof to effect it"); Muehler, 544 U.S. at 94. Plaintiff does not allege that Defendants used any force while he was detained. Officers have the authority to detain individuals while searching to (1) prevent the flight of the individual if incriminating evidence is found, (2) minimize the risk of harm to the officers, and (3) facilitate orderly completion of the search. Muehler, 544 U.S. at 98 (citing Summers, 452 U.S. at 702-03). "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.' " Muehler, 544 U.S. at 98. Defendants could detain Plaintiff for a reasonable time to prevent flight, minimize harm, and facilitate an orderly search. They placed Plaintiff in handcuffs for a brief period. Plaintiff does not allege that this detention used unnecessary force or was of unreasonable duration. Plaintiff therefore fails to state a Fourth Amendment claim.

2    Summers and Muehler both involve the execution of a search warrant. Here, the search is permissible under the conditions of Plaintiff's post-release supervision under N.Y.Comp. Codes R. & Regs. tit. 9 § 8003.2(d).

Plaintiff also contends that the officers violated his rights by entering his private residence without permission in order to gain access to his personal room. According to Plaintiff, Defendants obtained this key from Plaintiff's landlord, the owner of the building. Plaintiff describes his living arrangement differently at different points in his Amended Complaint and response to Defendants' motion, but the type of home in which he resides is immaterial to the analysis. By the express conditions of his post-release supervision, Plaintiff gave consent for his home to be searched. N.Y.Comp. Codes R. & Regs. tit. 9 § 8003.2(d). Plaintiff admits he was present for the search, answered the knock on his bedroom door, and opened it for the Officers to enter. Had Plaintiff refused the search, he would have been in violation of the conditions of his release. Plaintiff makes no allegation that Defendants searched the area in which Defendants entered before alerting Plaintiff of their intent to search, or that they took any evidence from it.

**\*4** Due to the conditions of his post-release supervision, Plaintiff had a diminished expectation of privacy. Plaintiff knew that he had, by accepting the conditions of his release, consented to parole searches of his person and home. The consent given, in combination with Defendants' duty to prevent recidivism and assist the parole, demonstrates that the search was reasonable. Plaintiff fails to state a Fourth

2018 WL 3730170

Amendment claim for which he could recover and those claims will be dismissed.

### B. Fifth Amendment Claims

Defendants next seek dismissal of any Fifth Amendment claims. Plaintiff alleges Defendants violated his rights by failing to read Miranda warnings before detaining him, taking statements, searching his apartment, and arresting him. Plaintiff contends that when Defendants entered his bedroom they immediately placed him in mechanical restraints. "No person shall be ... compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. V. "[T]he safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " Berkemer v. McCarty, 468 U.S. 420, at 440 (1984) (quoting California v. Beheler, 463 U.S. 1121, at 1125 (1983) (per curiam) ). The Second Circuit has held that "[b]ecause Miranda's safeguards 'become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest,' ..., we must conclude that handcuffing ..., though reasonable to the officers' investigatory purpose under the Fourth Amendment, nevertheless placed him in custody for purposes of Miranda." United States v. Newton, 369 U.S. 659, 677 (2d. Cir. 2004) (internal citation omitted).

Plaintiff alleges Defendants immediately placed him into mechanical restraints upon opening the door for Defendants. The mechanical restraints significantly impaired Plaintiff's freedom to leave or refuse Defendants' orders. Subjectively, Plaintiff appears to view the application of mechanical restraints as comparable to an arrest. Plaintiff alleges that "I was immediately arrested ... by being placed into mechanical restraints." Amend. Compl. at Statement of Claim. The Court finds that Plaintiff was in custody for Miranda purposes.

However, the Second Circuit has recognized that, "the Miranda warnings are prophylactic only; they are not constitutional rights in themselves. The reading of (or failure to read) Miranda warnings only has a presumptive effect on whether or not an individual's Fifth Amendment rights may have been violated." Weaver v. Brenner, 40 F.3d 527, 534 (2d Cir. 1994). "[T]he failure of an officer to read an individual his Miranda rights could not be the grounds for a civil action under 42 U.S.C. § 1983." United States v. Gilkeson, 431 F.Supp.2d 270, 287 (N.D.N.Y 2006) (citing the plurality in Chavez v. Martinez, 538 U.S. 760, 772 (2003) ); see also Heyliger v. City of Binghamton Police Department, No.

311CV1293NAMDEP, 2016 WL 1048999, at *5, (N.D.N.Y. Mar. 11, 2016) ("[P]laintiffs cannot base a § 1983 claim solely on a law enforcement officer's failure to administer Miranda warnings[.]") (citing Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998) ).

Plaintiff alleges that he never received Miranda warnings during the events of February 23, 2017. Plaintiff, when placed in the mechanical restraints, was in custody for the purposes of Miranda. Plaintiff was owed Miranda warnings, and Defendants erred if they failed to provide them. At the same time, the missing Miranda warnings alone are not enough to state a Fifth Amendment claim. Plaintiff may have another claim, however.

**\*5** A Fifth Amendment violation could lie if Defendants coerced Plaintiff to obtain a waiver of his right against self-incrimination, or to elicit inculpatory statements, and the coerced statements were used against him in criminal proceedings. See Heyliger, 2016 WL 1048999, at *5, (citing Deshawn E. 156 F.3d at 346); see also Higazy v. Templeton, 505 F.3d 161, 171 (2d Cir. 2007); Chavez v. Martinez, 538 U.S. 760, 767 (2003) (finding by the plurality that compulsory questioning without criminal proceedings does not violate the Constitution). A high bar exists for such a claim, however, as the coercive conduct must "so shock[ ] the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." Moran v. Burbine, 475 U.S. 412, at 433 (1986).

Plaintiff's Amended Complaint does not allege any statements he may have made, or allege such statements were used against him during the hearings. In his answer, Plaintiff argues that "parolees still have a right to Miranda for criminal proceedings. Where [p]arole [r]evocation [t]ranscripts may be used as evidence. All citizens have the [r]ight to be free from being a witness against him/herself." Still, Plaintiff never claims that statements he made were coerced, nor used against him unfairly, despite showing some understanding of the rights Miranda warnings protect. In fact, Plaintiff agreed to the condition of release that he would "reply promptly, fully and truthfully to any inquiry or communication by his parole officer or other representative of the Division of Parole." N.Y.Comp. Codes R. & Regs. tit. 9 § 8003.2(e). Plaintiff was required to answer questions from Defendants honestly. Further, Plaintiff does not allege coercion was used to obtain statements, nor the use of those statements against him.

2018 WL 3730170

The missing <u>Miranda</u> warnings alone do not provide a basis for a § 1983 claim. In the Amended Complaint, no other claim exists for which Plaintiff could recover and Plaintiff does not allege any additional circumstances that would give rise to such a claim. Plaintiff's Fifth Amendment claims will be dismissed as well.

### C. Eighth Amendment Claims

Defendants also seek dismissal of Plaintiff's Eighth Amendment claims. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. The Amended Complaint contains little to no information about who violated Plaintiff's Eighth Amendment rights or how the violation occurred. Plaintiff does not allege any bail, fines, or conditions of imprisonment in the Amended Complaint.

The conduct of Defendants towards Plaintiff on February 13, 2017, does not implicate the Eighth Amendment. "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977). Plaintiff had not yet been adjudicated guilty at the time relevant to the Second Amended Complaint. "Where the State seeks to impose punishment [before a finding of guilty], the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." Id. The Plaintiff was on supervised release when the violations alleged in the complaint occurred, not incarcerated or institutionalized. "Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment." Bell v. Wolfish, 441 U.S. 520, 535 n. 16. (1979) (Citing Ingraham, 430 U.S. at 671 n. 40).

**\*6** A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest. [...] Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.

Wolfish, 441 U.S. at 536-537 (internal citations omitted).

The incidents that are the subject of the Amended Complaint occurred at a time when Plaintiff had not yet been sentenced. Plaintiff's Eighth Amendment claims will be dismissed.

### D. Ninth Amendment Claims

Defendants also seek to dismiss Plaintiff's Ninth Amendment claims. "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. CONST. amend. VIII. Plaintiff asserts that Defendants violated his Ninth Amendment rights. Plaintiff offers no factual allegations concerning this alleged violation. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). "The Ninth Amendment does not provide 'an independent source of individual rights; rather, it provides a 'rule of construction' that we apply in certain cases.' " Barnett v. Carberry, 420 Fed. Appx. 67, 69 (2d Cir. 2011) (citing Jenkins v. C.I.R., 483 F.3d 90, 92, 99 (2d Cir. 2007) ). The Ninth Amendment cannot be a basis for a § 1983 claim because it does not guarantee Plaintiff any specific rights. See Lloyd v. Lee, 570 F. Supp. 2d 556, 566 (S.D.N.Y. 2008).

Plaintiff concedes he cannot raise a Ninth Amendment claim. The Defendants' motion will be granted in this respect.

### E. Fourteenth Amendment Claims

Defendants also seek to dismiss Plaintiff's claims that he was denied "arraignment, or any other [t]ypes of [d]ue process" in violation of the Fourteenth Amendment. Plaintiff's Amended Complaint only contains the above statement, without further contextual or factual information to understand how his Fourteenth Amendment rights to due process were violated.

"No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Supreme Court has held that "the constitutional freedom of a parolee generated by statute is a liberty interest protected by the Due Process Clause of the Fourteenth Amendment which may not be terminated absent appropriate due process safeguards." Moody v. Daggett, 429 U.S. 78, 85-86 (1976) (citing Morrissey v. Brewer, 408 U.S. 471 (1972) ). These safeguards of due process include "the right to a hearing at which the court determines two issues: whether the [parolee] violated a condition of [parole]

as a matter of fact and, if so, whether this fact warrants revocation." United States v. Jetter, 577 Fed. Appx. 5, 7 (2d Cir. 2014) (citing United States v. Sanchez, 225 F.3d 172, 175 (2d Cir. 2000) ). "Due process requires that a person accused of violating the conditions of his supervised release receive a revocation hearing 'within a reasonable time after [the person] is taken into custody.' " Jetter, 577 Fed. Appx. at 7 (citing Morrissey v. Brewer, 408 U.S. 471, 488 (1972) ).

*7 The Supreme Court has outlined the basic requirements of this hearing: (1) "some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available."; (2) that the determination of revocation of parole be made by someone "not directly involved in the case."; and (3) that the parolee is given notice that the hearing will occur, with its purpose being "to determine whether there is probable cause to believe he has committed a parole violation." Morrissey, 408 U.S. at 485-87. In New York, unless a parolee (or individual under post-release supervision) is convicted of a new crime, a hearing for revocation of parole should generally occur within fifteen days of the parole warrant. See Exec. Law § 259-i(3)(c)(i). The alleged violator should be notified in writing within three days of the execution of the warrant. See Exec. Law § 259-i(3)(c)(iii).

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) ). Plaintiff alleges that "after a search of my residence, I was then taken directly to [j]ail without arraignment, or any other types of due process." In his response, Plaintiff acknowledges receiving a preliminary hearing, and taking advantage of his ability to cross-examine his accuser. Plaintiff's Amended Complaint and response only address the lack of arraignment, [3] however, and make no other claims about lack of process related to the written notice,

preliminary hearing, or revocation hearing. The Amended Complaint fails to connect Defendants to this alleged lack of due process. Assuming that Plaintiff was not arraigned or processed as required, Plaintiff fails to show that either Defendant was involved in this deprivation. As established above, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice to state a claim." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Factual allegations within Plaintiff's complaint do not plausibly establish that Defendants were directly involved in the claimed due process violations. Plaintiff makes no other factual allegations to address the claim of a Fourteenth Amendment violation and those claims will also be dismissed.

3   Plaintiff's Response at ¶¶ 13-15 addresses what Plaintiff sees as due process violations, but they simply mirror his Fourth Amendment violation allegations.

### F. Qualified Immunity

In the alternative, defendants Hoyt and Cook also assert they are entitled to qualified immunity. Plaintiff fails to state a claim upon which recovery may be granted under § 1983, and accordingly, the Court declines to address the issue of qualified immunity.

### IV. CONCLUSION

For the reasons stated above the Court will grant the Defendants' motion to dismiss, dkt. # 26. Because the Court finds that Plaintiff could not allege facts which would give him a right to relief, and because he has filed an Amended Complaint, the motion will be granted with prejudice.

### IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 3730170

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 29 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

2017 WL 2729084
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Martin TANKLEFF, Plaintiff,

v.

The COUNTY OF SUFFOLK, Theresa and Brett
McCready, as legal successors of K. James McCready,
Norman Rein, Charles Kosciuk, Robert Doyle, John
McElhone, John Doe Police Officers 1-10, and Richard
Roe Suffolk County Employees 1-10, Defendants.

09-CV-1207(JS)(AYS)
|
Signed 06/23/2017

**Attorneys and Law Firms**

For Plaintiff: Anna B. Hoffman, Esq., Barry C. Scheck, Esq.,
Emma Kate Freudenberger, Esq., Nick Joel Brustin, Esq.,
Amelia Green, Esq., Vanessa Michelle Buch, Esq., Neufeld
Scheck & Brustin, LLP, 99 Hudson Street, 8th Floor, New
York, NY 10013, Bruce A. Barket, Esq., Amy Beth Marion,
Esq., Barket Marion Epstein & Kearon LLP, 666 Old County
Road, Suite 700, Garden City, NY 11530, Barry J. Pollack,
Esq., Miller & Chevalier Chartered, 900 Sixteenth Street NW,
Washington, DC 20006.

For Defendants: Brian C. Mitchell, Esq., Susan A. Flynn,
Esq., Suffolk County Attorney's Office, 100 Veterans
Memorial Highway, H. Lee Dennison Building, Hauppauge,
NY 11788.

## MEMORANDUM & ORDER

Joanna Seybert, U.S.D.J.

**\*1** In 1990, Plaintiff Martin Tankleff ("Plaintiff") was
convicted of murdering his parents in the family home
in Belle Terre, New York. After his conviction was
vacated and the charges were dismissed, he commenced
this action against the County of Suffolk (the "County"),
Detective K. James McCready[1], Detective Norman
Rein, Detective Charles Kosciuk, Sergeant Robert Doyle,
Lieutenant John McElhone[2] and unknown police officers
and county employees (collectively "Defendants") alleging
that Defendants violated his constitutional rights under the

United States and New York State Constitutions. Currently
pending before the Court is Defendants' motion for partial
summary judgment. (Defs.' Mot., Docket Entry 180.) For the
following reasons, Defendants' motion is DENIED.

[1]    Detective McCready died while this action was
       pending. On June 2, 2016, Theresa and Brett
       McCready were substituted in their capacity as
       the legal successors of Detective McCready.
       (Substitution Order, Docket Entry 178.)

[2]    The Court agrees with Defendants that no claims
       remain against Lieutenant McElhone. (Defs.'
       Reply, Docket Entry 186, at 2-3.) Therefore, the
       Clerk of the Court is directed to TERMINATE
       Lieutenant McElhone as a defendant in this action.

## BACKGROUND

I. Factual Background[3]

[3]    The following material facts are drawn from
       Defendants' Local Civil Rule 56.1 Statement
       ("Defs.' 56.1 Stmt.," Docket Entry 180-2),
       Plaintiff's Local Civil Rule 56.1 Response ("Pl.'s
       56.1 Resp.," Docket Entry 183-2) and Plaintiff's
       Local Rule 56.1 Counterstatement ("Pl.'s 56.1
       Counterstmt.," Docket Entry 183-1). Any relevant
       factual disputes are noted. All internal quotation
       marks and citations have been omitted.

### A. The Crime and Preliminary Investigation

At approximately 6:11 a.m. on September 7, 1988, Plaintiff
called 911 from his father's office to report that he had
found his father, Seymour Tankleff ("Seymour"), with blood
"gushing" from his neck. (Defs.' 56.1 Stmt., ¶¶ 1, 3; Pl.'s
56.1 Resp., ¶¶ 1, 3.) While he waited for assistance, the 911
operator instructed Plaintiff to apply pressure to the wound
with a clean towel, lay him down and elevate his feet. (Defs.'
56.1 Stmt. ¶ 1; Pl.'s 56.1 Resp. ¶ 1.) In subsequent statements,
Plaintiff said that after he used the office phone to call 911,
he placed a pillow under Seymour's feet and a towel around
his throat. (Defs.' 56.1 Stmt. ¶¶ 4, 6; Pl.'s 56.1 Resp. ¶¶ 4, 6.)
He testified that while assisting his father, he got blood on
his hands, arms, shoulders, upper body, legs, and feet. (Defs.'
56.1 Stmt. ¶¶ 197-98; Pl.'s 56.1 Resp. ¶¶ 197-98.) Plaintiff
said that after doing this, he began looking for his mother,
Arlene Tankleff ("Arlene"), and opened the door to the garage
to see if her car was there.[4] (Defs.' 56.1 Stmt. ¶ 8; Pl.'s 56.1

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

Resp. ¶ 8.) After seeing his mother's car in the garage, he said he continued to look for her and eventually saw her body in the bedroom. (Pl.'s 56.1 Resp. ¶ 8; Trial Tr. (Tankleff), Defs.' Ex. B, 4119:21-4120:19.) [5] He said he saw her body from the doorway of the master bedroom but did not go past the alarm wall, a short wall near the entrance of the bedroom. (Defs.' 56.1 Stmt. ¶ 204; Pl.'s Ex. 42, Docket Entry 184-48.) He testified that after seeing her body, he ran into the kitchen and called his sister. (Pl.'s 56.1 Resp. ¶ 8; Trial Tr. (Tankleff) 4120:25-4121:4.) After talking to her, he testified that he checked on his father, who was "still breathing or gagging," ran back to the kitchen to answer a call from his sister and called his best friend to tell him he would not be picking him up on the way to school that morning. [6] (Defs.' 56.1 Stmt. ¶¶ 26-27; Pl.'s 56.1 Resp. ¶¶ 26-27; Trial Tr. (Tankleff) 4121:17-4123:23.)

[4]     At trial, he testified that when he got up that morning, he walked by his parents' bedroom but did not see anyone. (Defs.' 56.1 Stmt. ¶ 200.)

[5]     Citations to the trial transcript ("Trial Tr.") will include the name of the testifying witness for ease of reference. Additionally, Defendants' exhibits were separately filed with the Court and are not available on the Electronic Case File system.

[6]     Plaintiff admitted at trial that a photograph of the kitchen phone showed no blood on the phone. (Defs.' 56.1 Stmt. ¶ 219.)

**\*2** After making those calls, Plaintiff alleges that he went into his bedroom, wiped his hands on a towel and put on a sweatshirt before running next door to his neighbor's house. [7] (Defs.' 56.1 Stmt. ¶ 29; Pl.'s 56.1 Resp. ¶¶ 29-30.) His neighbor, Martin Hova ("Hova"), testified that he heard screaming and when he answered the door, he saw Plaintiff barefoot and wearing shorts and a sweatshirt. [8] (Defs.' 56.1 Stmt. ¶ 30.) Hova testified that he accompanied Plaintiff back to his house and encountered Officers James Crayne ("Officer Crayne") and Daniel Gallagher ("Officer Gallagher"), who were responding to the 911 call. (Defs.' 56.1 Stmt. ¶ 31.) Officers Crayne and Gallagher testified that when they arrived Plaintiff yelled "somebody murdered my parents." (Defs.' 56.1 Stmt. ¶ 31.) Officer Crayne later described Plaintiff as "agitated," and both officers observed blood on Plaintiff's "palms, the right side of his face, on his right calf and on his right foot." (Defs.' 56.1 Stmt. ¶ 32; Pl.'s 56.1 Resp. ¶ 32.)

[7]     Defendants emphasize that Plaintiff testified to only wiping his hands on the towel in his room. (Defs.' 56.1 Stmt. ¶ 208.) Plaintiff denies that he "specifically excluded the possibility that he wiped another part of his body on the towel on his bed." (Pl.'s 56.1 Resp. ¶ 208.)

[8]     Plaintiff admits that he was barefoot and wearing shorts and a sweatshirt at that time. (Pl.'s 56.1 Resp. ¶ 32.)

Hova testified that when they were in the office, he asked Plaintiff who had done this, and Plaintiff responded "my father's business partner, Jerry." (Defs.' 56.1 Stmt. ¶ 33.) Plaintiff was referring to Jerry Steuerman ("Steuerman"), a business associate of Seymour's who had been at the Tankleff home the previous night for a poker game. (Defs.' 56.1 Stmt. ¶¶ 66, 173.) Officer Crayne noticed that there was a towel over Seymour's neck and asked Seymour who was responsible. (Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Resp. ¶ 36.) Officer Crayne testified that Seymour did not respond, but Plaintiff said "it was Jerry Steuerman." (Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Resp. ¶ 36.)

Officer Gallagher testified that he asked Plaintiff to come into the kitchen and tell him what happened. (Pl.'s 56.1 Resp. ¶ 36.) According to Officer Gallagher, Plaintiff told him that "he woke up that morning, the lights were on in the house, the alarm was turned off and he found his father," and further stated that "the only person who had motive to do this was Jerry Steuerman." [9] (Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Resp. ¶ 36; Trial Tr. (Gallagher) 275:17-21.) Officer Gallagher testified that when he stood at the threshold of the bedroom, he saw Arlene's head on the floor "partially sticking out from the end of the bed," but it was not until he was standing directly over her that he was able to observe the extent of her injuries. (Defs.' 56.1 Stmt. ¶ 35; Trial Tr. (Gallagher) 260:7-10.)

[9]     When asked by the prosecutor whether he observed "any tearing on [Plaintiff's] eyes," Officer Gallagher indicated that he did not and described Plaintiff as "composed." (Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Resp. ¶ 36; Trial Tr. (Gallagher) at 276:5-7.)

Emergency medical personnel arrived at the Tankleff home at approximately 6:27 a.m. (Pl.'s 56.1 Resp. ¶ 3.) They found Seymour unresponsive and lying on the floor of his office "covered with dried blood." (Seymour Prehospital Care Report, Pl.'s Ex. 32, Docket Entry 184-38, at 2.) He

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 31 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

was transported to Mather Hospital immediately. (Seymour Prehospital Care Report at 2.) When they entered the bedroom, they found Arlene's body on the floor with her head near the foot of the bed, and medical personnel observed dried blood on her scalp and forehead. (Arlene Prehospital Care Report, Pl.'s Ex. 33, Docket Entry 184-39, at 2.)

Around the time that emergency medical personnel arrived, Officer Edward Aki ("Officer Aki"), Belle Terre Chief Constable Donald Hines ("Hines"), and Plaintiff's brother-in-law, Ron Rother ("Rother"), arrived at the residence. (Defs.' 56.1 Stmt. ¶ 37.) Shortly thereafter, Plaintiff was separated from Rother by officers and escorted to Officer Aki's police car. (Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Resp. ¶ 38.) Officer Aki later testified that he separated Plaintiff and Rother because they were both witnesses and separating them would prevent them from "contaminat[ing] each other's stor[ies]."[10] (Trial Tr. (Aki) 386:11-17.) Plaintiff alleges that when he was sitting in the back of Officer Aki's car, he became sick and began "gagging and spitting up because [he] had blood on [him]." (Pl.'s 56.1 Resp. ¶ 38 (alteration in original).) Plaintiff asked Officer Aki if he could go in the house or use the spigot on the side of the house to clean his hands, but Officer Aki said no. (Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Resp. ¶ 38.) Defendants allege that, a short time later, Officer Aki and Hines observed Plaintiff washing his hands in a puddle in front of Officer Aki's police car. (Defs.' 56.1 Stmt. ¶ 39.) Plaintiff alleges that Officer Aki gave him permission to clean his hands in the puddle and provided him with a tissue or a paper towel from his glove compartment. (Pl.'s 56.1 Resp. ¶ 39.)

[10]   Plaintiff alleges that he was only permitted to spend five minutes with Rother and that separating him from his brother-in-law left him "completely isolated from his family." (Pl.'s 56.1 Counterstmt. ¶ 20.)

 *3  Hines, who was also a family friend, testified that he had a series of conversations with Plaintiff after Plaintiff washed his hands. (Defs.' 56.1 Stmt. ¶¶ 37, 40.) Hines testified that during those conversations, Plaintiff reiterated his suspicions regarding Steuerman's involvement, said that his mother had discussed the possibility that Steuerman would do something terrible, and said that Steuerman was the last person to leave the card game the previous night. (Defs.' 56.1 Stmt. ¶ 40; Pl.'s 56.1 Resp. ¶ 40.) Hines testified that he told Plaintiff that Seymour was still alive, and if he recovered, he may be able to identify the perpetrator. (Defs.' 56.1 Stmt. ¶ 40; Pl.'s 56.1 Resp. ¶ 40; Trial Tr. (Hines) 506:22-507:2.) He testified that

when he said this to Plaintiff, Plaintiff "picked his head up and looked directly at [him]" and "[h]is eyes widened, he stopped talking and didn't say a word." (Defs.' 56.1 Stmt. ¶ 41; Trial Tr. (Hines) 507:15-17.) Plaintiff does not recall speaking with Hines. (Defs.' 56.1 Stmt. ¶ 42.)

John McNamara ("McNamara"), a friend of Seymour's, testified that he also had a series of conversations with Plaintiff that morning. (Defs.' 56.1 Stmt. ¶¶ 43-45.) McNamara testified that when he walked by the Tankleff residence, Plaintiff approached him and explained what happened when he woke up that morning. (Defs.' 56.1 Stmt. ¶ 43.) McNamara said that he asked Plaintiff why he did not have more blood on him, if he had, in fact, lifted his father from the chair to the floor. (Defs.' 56.1 Stmt. ¶ 43.) McNamara testified that Plaintiff looked at him and walked away without responding. (Defs.' 56.1 Stmt. ¶ 43.) During the second alleged conversation, McNamara testified that the sequence of events changed, and this time, Plaintiff allegedly said he was naked when he woke up that morning and put on shorts and a sweatshirt before finding his parents. (Defs.' 56.1 Stmt. ¶ 44.) McNamara also testified that during the second conversation, Plaintiff did not mention seeing his mother in the bedroom, but said that he checked the garage and then ran out of the house. (Defs.' 56.1 Stmt. ¶ 44.) McNamara also described a third conversation with Plaintiff and testified that during that conversation, Plaintiff said that after checking the garage, he did go into the bedroom, saw his mother, realized she was dead and then ran out of the house. (Defs.' 56.1 Stmt. ¶ 45.) Plaintiff denies that these conversations took place, and testified during his deposition and at trial that he did not remember having any conversations with McNamara or even seeing him at his home that morning. (Defs.' 56.1 Stmt. ¶ 46; Pl.'s 56.1 Resp. ¶¶ 43-46.)

The Mayor of Belle Terre, Vincent Bove ("Bove"), who was at the card game the previous night, also testified that he had a conversation with Plaintiff that morning. (Defs.' 56.1 Stmt. ¶ 47.) He testified that when he arrived at the scene, Plaintiff approached him and told him that "somebody murdered my mother and father" and that he suspected that Steuerman was responsible. (Defs.' 56.1 Stmt. ¶ 47.) Additionally, Bove testified that when he asked if Plaintiff saw Steuerman harm his parents, Plaintiff told him that he did not see Steuerman do it, but that Steuerman and his parents had been arguing. (Defs.' 56.1 Stmt. ¶ 47.) At his deposition, Plaintiff admitted that he had a conversation with Bove but did not recall the specifics of that conversation.[11] (Defs.' 56.1 Stmt. ¶ 48; Pl.'s 56.1 Resp. ¶ 48.) Finally, Dara Schaeffer ("Schaeffer"), a

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 32 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

neighbor and classmate, testified that she drove by Plaintiff's home that morning and asked him what happened. (Defs.' 56.1 Stmt. ¶ 49.) She testified that Plaintiff said "last night someone killed my mother and tried to kill my father and molested me." (Defs.' 56.1 Stmt. ¶ 49.) Plaintiff denies that he said this and maintains that he said "last night they murdered my mother, they murdered my father, and they must have missed me." (Pl.'s 56.1 Resp. ¶ 50.) Although Schaeffer testified that Plaintiff did not express "any emotions" and "just told [her] how it happened," in another conversation with Plaintiff's investigator, she stated that Plaintiff "appeared to be in shock." (Trial Tr. (Schaeffer) 553:8-10, 573:17-19; Defs.' 56.1 Stmt. ¶ 49; Pl.'s 56.1 Resp. ¶ 49.)

[11]   At trial, Plaintiff testified that he did not recall speaking with Bove. (Defs.' 56.1 Stmt. ¶ 210.)

**\*4** At approximately 7:20 a.m., Sergeant Robert Doyle ("Sergeant Doyle") of the Suffolk County Police Department's Homicide Bureau ordered Detectives Robert Anderson ("Detective Anderson"), Anthony Lahgezza ("Detective Lahgezza"), Michael Carmody ("Detective Carmody"), John Pfalzgraf ("Detective Pfalzgraf"), K. James McCready ("Detective McCready") and Norman Rein ("Detective Rein") to begin the investigation at the Tankleff home. (Defs.' 56.1 Stmt. ¶ 51.) Detective McCready arrived at the scene at 7:39 a.m. and walked through the home for approximately ten minutes. (Defs.' 56.1 Stmt. ¶ 52.) Thereafter, he talked to Plaintiff in his police car. [12] (Defs.' 56.1 Stmt. ¶ 52.) He testified that Plaintiff appeared "excited" and said that Steuerman was responsible because Steuerman and his father had been fighting. (Defs.' 56.1 Stmt. ¶ 52.) Thereafter, Detective McCready and Plaintiff discussed the events of that morning. (See Defs.' 56.1 Stmt. ¶ 53; Pl.'s 56.1 Resp. ¶ 53.) Detective McCready testified that Plaintiff told him he woke up at 5:35 a.m. when his alarm went off, but that he stayed in bed until 6:10 a.m. (Defs.' 56.1 Stmt. ¶ 53.) Detective McCready further testified that Plaintiff told him that he got out of bed at 6:10 a.m., put on a sweatshirt and shorts, looked into his parents' room, which was dark, and did not see anyone. (Defs.' 56.1 Stmt. ¶ 53.) Detective McCready said that at that point, Plaintiff told him that he walked to the office, saw his father and called 911 from the phone in the office. (Defs.' 56.1 Stmt. ¶ 53.) Detective McCready said that Plaintiff told him that after the call, he looked for his mother's car in the garage and eventually looked in the bedroom, saw his mother and ran into the kitchen to call his sister. (Defs.' 56.1 Stmt. ¶ 53.)

[12]   Detective McCready testified at his deposition that he was suspicious of Plaintiff immediately after speaking with him, due at least in part to Plaintiff's demeanor that morning. (Pl.'s 56.1 Counterstmt. ¶ 17.)

Plaintiff alleges that, consistent with his trial testimony, he got out of bed at 6:05 a.m. and put on underwear and shorts but was not wearing a sweatshirt. (Pl.'s 56.1 Resp. ¶ 53.) Other than this, Plaintiff's account of the events of that morning and Detective McCready's recollection of Plaintiff's initial statements are largely consistent. [13] (Compare Defs.' 56.1 Stmt. ¶ 53 with Pl.'s 56.1 Resp. ¶ 53.) During their conversation, Detective McCready observed blood on Plaintiff's right calf and right foot. (Defs.' 56.1 Stmt. ¶ 54.) He asked if Plaintiff got blood on him when he helped his father and testified that Plaintiff responded that "[his] hands were covered with blood" and that "[he] washed them in a puddle." [14] (Defs.' 56.1 Stmt. ¶ 54.)

[13]   Plaintiff offers several additional facts to bolster his account. For example, he alleges that he was not wearing glasses or contacts that morning and that sunrise on September 7, 1988 was at 6:25 a.m. (Pl.'s 56.1 Resp. ¶ 53.)

[14]   Plaintiff admits that this was Detective McCready's testimony at trial but notes that Detective McCready testified during his deposition that the location of the blood observed on Plaintiff's body by the first officers on the scene was consistent with Plaintiff's account of pulling his father from the chair by his feet. (Defs.' 56.1 Stmt. ¶¶ 32, 54; Pl.'s 56.1 Resp. ¶¶ 32, 54; McCready Dep. Tr., Pl.'s Ex. 9-1, Docket Entry 184-13, 121:7-122:13.)

After his initial conversation with Plaintiff, Detective McCready re-entered the home and made several observations. (Defs.' 56.1 Stmt. ¶ 54.) At trial, Detective McCready testified that he noticed that there was no blood on the three telephones in or near the kitchen, no blood on the garage door handle or dead bolt lock, and that the drapes in the bedroom were open. [15] (Defs.' 56.1 Stmt. ¶ 54.) Detective McCready also testified at trial that he observed unsmeared blood spatters on the telephone in the office from which Plaintiff said he called 911. (Defs.' 56.1 Stmt. ¶ 54.) However, at his deposition, when Detective McCready was asked to examine a photograph of the office phone, he testified that

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 33 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

there was something that could have been smeared blood. (Pl.'s 56.1 Resp. ¶ 54.)

15    Plaintiff denies that these are incriminating facts and refers to Detective McCready's testimony at his deposition that Plaintiff could have opened the garage door without getting blood on the handle or the lock. (Pl.'s 56.1 Resp. ¶ 54.)

At approximately 8:00 a.m., Sergeant Doyle arrived at the scene. (Defs.' 56.1 Stmt. ¶ 55.) He walked through the house and concluded that it was likely that there was a struggle in the bedroom. (Defs.' 56.1 Stmt. ¶ 55.) Later that morning, he also noticed that in the bathroom closest to Plaintiff's bedroom, the bathtub contained water droplets and there was a wet loofah sponge. (Defs.' 56.1 Stmt. ¶ 64.) Sergeant Doyle testified at trial that Plaintiff did not appear "upset" or "emotional" when he met with him shortly after exiting the home, but Plaintiff disputes his characterization. (Defs.' 56.1 Stmt. ¶ 55; Pl.'s 56.1 Resp. ¶ 55.) When Sergeant Doyle recounted his conversation with Plaintiff during his testimony at trial, he said that Plaintiff did not mention looking for his mother's car in the garage, but did say that, from the hallway outside the bedroom, he saw his mother's body and knew she was dead. (Defs.' 56.1 Stmt. ¶ 56.) Plaintiff disputes that Sergeant Doyle's account is accurate. (Pl.'s 56.1 Resp. ¶ 56.) Detective Rein arrived at the scene a short time later. (Defs.' 56.1 Stmt. ¶ 59.) He testified that when Plaintiff spoke to him, Plaintiff said that when he got up, he looked in the bedroom but did not see anyone, walked to the office and found his father, dialed 911 from the office, administered aid to his father per the 911 operator's instructions, looked for his mother's car in the garage, went into the bedroom and saw his mother, called his sister from the kitchen, and went back to the office and then back to the kitchen again to answer his sister's return call. (Defs.' 56.1 Stmt. ¶¶ 60-61.)

B. Plaintiff's Interview

*5  After Detective Rein's conversation with Plaintiff, he spoke with Detective McCready and Sergeant Doyle regarding alleged discrepancies in Plaintiff's statements and his demeanor. (Defs.' 56.1 Stmt. ¶ 62.) Sergeant Doyle directed Detective McCready to ask Plaintiff to come to police headquarters. (Defs.' 56.1 Stmt. ¶ 62.) Plaintiff denies that his accounts were inconsistent and alleges that the Detectives become suspicious because they "believed that [his] emotional response was not appropriate." [16] (Pl.'s 56.1 Resp. ¶ 62.)

16    Plaintiff further denies that his demeanor was inappropriate or that he was "emotionless." Plaintiff alleges that he "felt out of it," "like he was having a nightmare," was "in a state of shock and disbelief," and "lacked awareness of his surroundings." (Pl.'s 56.1 Counterstmt. ¶ 18.) He points to the 911 call, Dara Schaeffer's testimony that he appeared to be in shock and his testimony that the morning was a "nightmare" as indicators of his emotional state that morning. (Pl.'s 56.1 Resp. ¶ 62.)

Defendants allege that, around 8:40 a.m., Detective McCready asked Plaintiff to come to Police Headquarters and Plaintiff responded "fine" and got into Detective McCready's vehicle. (Defs.' 56.1 Stmt. ¶ 63.) Plaintiff alleges that he repeatedly requested to go to Mather Hospital to see his father, but Detective McCready refused to take him there until after he accompanied him to Police Headquarters. (Pl.'s 56.1 Counterstmt. ¶ 22.) Plaintiff also alleges that he "didn't think he had a choice about going with Detective McCready and believed that only by going with Detective McCready to the station would he be able to get to the hospital." [17] (Pl.'s 56.1 Counterstmt. ¶ 22.) During the drive to Headquarters, Detective McCready spoke with Detective Pfalzgraf, who was at Mather Hospital, and learned that Seymour had suffered serious head injuries and was being transferred to Stony Brook Hospital. (Defs.' 56.1 Stmt. ¶ 65.)

17    Detectives Rein and McCready testified at their depositions that Plaintiff never asked to go to the hospital. (Pl.'s 56.1 Counterstmt. ¶ 22.)

Detective McCready and Plaintiff arrived at Police Headquarters at approximately 9:20 a.m., and Detective McCready gave Plaintiff a cup of coffee while he waited. (Defs.' 56.1 Stmt. ¶ 67.) Plaintiff alleges that the coffee was the only thing he had to eat since he woke up that morning. (Pl.'s 56.1 Resp. ¶ 67.) At approximately 9:40 a.m., Detectives Rein and McCready (the "Detectives") entered the interview room and began making small talk with Plaintiff, and Plaintiff removed three tissues from his pockets and put them on a desk. (Defs.' 56.1 Stmt. ¶ 68.) The nature of the interview and the methods used by the Detectives are vigorously disputed. For example, the parties dispute whether Plaintiff volunteered information or whether he supplied information in response to questioning by the Detectives. (See, e.g., Defs.' 56.1 Stmt. ¶¶ 69-71; Pl.'s 56.1 Resp. ¶¶ 69-71.) The order in which the topics were discussed is also unclear. [18]

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 34 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

18     There is no audio or video recording of the interview.

Plaintiff alleges that the questions "never seemed to stop" and that he was "questioned almost continuously until he broke." (Pl.'s 56.1 Counterstmt. ¶ 24.) Additionally, Plaintiff alleges that he maintained his innocence throughout the Detectives' questioning and repeated his account of the events of that morning between six and twelve times, but they "refused to accept his truthful account." (Pl.'s 56.1 Counterstmt. ¶ 25.) Plaintiff further alleges that he asked to speak to Myron Fox, the family's attorney ("Fox"), approximately six times during the interview, and Detective McCready's response was "[i]f you want to speak with your Uncle Mike, you're a criminal, we're going to lock you up." [19] (Pl.'s 56.1 Counterstmt. ¶¶ 27-28.) Plaintiff also claims that Detective McCready prevented him from speaking with Fox that morning at the crime scene, although Detective McCready denied during his deposition that he was attempting to prevent Plaintiff from "lawyering up." (Pl.'s 56.1 Counterstmt. ¶ 28.) Detective McCready further denied that Plaintiff ever asked to speak with Fox. (Pl.'s 56.1 Counterstmt. ¶ 28.)

19     Plaintiff alleges that Detective McCready knew that Fox was an attorney for the Tankleff family and that if Fox indicated that he was Plaintiff's lawyer, he could not continue to question him. (Pl.'s 56.1 Counterstmt. ¶ 27.)

*6  The parties appear to be in agreement regarding the topics discussed during the interview. They discussed Seymour's business dealings, the horses Seymour owned with Steuerman, the fact that Steuerman and his parents were partners in a bagel store, and that there was a dispute regarding Seymour buying into one of Steuerman's bagel stores. (Defs.' 56.1 Stmt. ¶¶ 69-71; Pl.'s 56.1 Resp. ¶¶ 69-71.) Plaintiff also mentioned that Seymour had loaned Steuerman $400,000, and that the two men had a dispute over certain equipment. (Defs.' 56.1 Stmt. ¶ 221.) Plaintiff talked about his knowledge of Seymour's businesses and explained that Seymour was "grooming" him for a career in business. (Defs.' 56.1 Stmt. ¶ 83.) Plaintiff and the Detectives discussed his recent surgery and the fact that he had to wear glasses during his recovery, girls, his car, and that he loved to cook. (Defs.' 56.1 Stmt. ¶¶ 74-76.) Plaintiff said that he was adopted and talked about his family, including his parents' relationship, indicated that he had a good relationship with his mother and his father, and said that the family had a maid. (Defs.' 56.1 Stmt. ¶¶

77-81.) He mentioned that he had an aversion to blood. (Defs.' 56.1 Stmt. ¶ 80.) Plaintiff further explained that his parents' will specified that he would not receive anything until he has 25 and that under the will, he would get more than his sister. (Defs.' 56.1 Stmt. ¶ 84.) Plaintiff told the Detectives that the will provided that he would manage Seymour's business interests, including the deals Seymour had with Steuerman, and that he would inherit the family home. (Defs.' 56.1 Stmt. ¶ 222.)

Plaintiff and the Detectives discussed what occurred the night before the attacks. (Defs.' 56.1 Stmt. ¶ 72.) Plaintiff said that he took a shower before bed, and when he went into the master bedroom to say good night to his mother, she was sleeping on the side of the bed closest to a set of sliding glass doors. (Defs.' 56.1 Stmt. ¶¶ 72-73.) He said he could not recall if the sliding glass doors were usually locked. (Defs.' 56.1 Stmt. ¶ 78.) Plaintiff and the Detectives discussed the poker game, and Plaintiff told the Detectives the names of the players at the game that night. (Defs.' 56.1 Stmt. ¶ 81.) He also mentioned that Seymour and Steuerman "pretended to be good buddies" but "did not like each other anymore." (Defs.' 56.1 Stmt. ¶ 82.)

Plaintiff alleges that the Detectives told him that they did not believe his account of rendering aid to his father, and called Plaintiff's version of events "absurd" and "ridiculous." (Pl.'s 56.1 Counterstmt. ¶ 26.) The Detectives asked Plaintiff to demonstrate how he helped Seymour after calling 911, and Plaintiff demonstrated on Detective Rein while he sat in a chair. [20] (Defs.' 56.1 Stmt. ¶¶ 85, 92, 225.) Defendants point out that there was no blood on Plaintiff's shorts in the photograph taken of Plaintiff at headquarters, despite the fact that he made contact with Detective Rein during the demonstration. (Defs.' 56.1 Stmt. ¶¶ 93, 96.) Additionally, during the demonstration, Detective McCready noticed blood on Plaintiff's shoulder underneath his sweatshirt. [21] (Defs.' 56.1 Stmt. ¶ 91.)

20     Although Defendants allege that Plaintiff was not threatened with any physical harm during the interview up to this point, Plaintiff testified during his deposition that "nobody put a gun to my head ... but they took me away from my house [and] from my family." (Defs.' 56.1 Stmt. ¶ 87; Pl.'s 56.1 Resp. ¶ 87.)

21     Detective Rein further noted that Plaintiff's demeanor appeared to be "calm" and he did not appear to be in shock. (Defs.' 56.1 Stmt. ¶ 97.)

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 35 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

Plaintiff disputes that characterization. (Pl.'s 56.1 Resp. ¶ 97.)

At some point during the questioning, Plaintiff drew sketches of: (1) the cars of the card players in the driveway; (2) the general layout of the Tankleff home; and (3) his parents' bedroom. (Defs.' 56.1 Stmt. ¶¶ 88-90.) The sketch of his parents' bedroom showed the location of Arlene's body and indicated that he was standing near the alarm wall when he saw her. (Defs.' 56.1 Stmt. ¶¶ 88, 223.) Plaintiff testified during his deposition that because he was sleeping, he did not hear any screams or cries for help during the attacks. (Defs.' 56.1 Stmt. ¶ 58; Pl.'s 56.1 Resp. ¶ 58.)

The Detectives testified that they became accusatory around 11:15 a.m. [22] and confronted Plaintiff with alleged inconsistencies between his statements and their observations at the scene. [23] (Defs.' 56.1 Stmt. ¶¶ 98, 100; Pl.'s 56.1 Resp. ¶¶ 98, 100.) During the questioning, both Detectives raised their voices, and Detective McCready poked his fingers into Plaintiff's chest. (Defs.' 56.1 Stmt. ¶¶ 101, 132.) Plaintiff alleges that Detective McCready lied to him and told him that they found his hair in Arlene's hand. (Pl.'s 56.1 Counterstmt. ¶ 30.) However, Detective McCready later denied making this statement. (Pl.'s 56.1 Counterstmt. ¶ 30.) Plaintiff alleges that Detective McCready also told him that they did not believe that he did not shower that morning because a humidity test indicated that he had showered. (Pl.'s 56.1 Counterstmt. ¶ 32.) As Detective McCready admitted at his deposition, there was no humidity test. (Pl.'s 56.1 Counterstmt. ¶ 32.) Plaintiff alleges that he "believed what Detective McCready was telling him ... because [Plaintiff] was brought up to always believe in trusting cops." (Pl.'s 56.1 Counterstmt. ¶ 33.) Detective McCready testified at his deposition that he did not recall specifically making the statement about the humidity test, but said that he may have. (Pl.'s 56.1 Counterstmt. ¶ 34.)

[22]    Although he is unsure of the time, Plaintiff admitted at trial that the interview did not become confrontational until after the demonstration. (Defs.' 56.1 Stmt. ¶ 226.)

[23]    Plaintiff denies that there were any inconsistencies. (Pl.'s 56.1 Resp. ¶ 100.)

*7 At some point, Detective McCready left the interview room and pretended to take a phone call. (Defs.' 56.1 Stmt. ¶ 102; Pl.'s 56.1 Counterstmt. ¶ 36.) While Detective Rein was alone with Plaintiff, he pulled his chair "very

close" to Plaintiff, "put his hands on his knees" and told him "[he] [couldn't] accept that [Plaintiff] didn't have blood on [his] clothes" as a result of helping his father. (Defs.' 56.1 Stmt. ¶ 132; Pl.'s 56.1 Resp. ¶ 132; Trial Tr. (Rein) 3245:6-3247:13.) When Detective McCready came back, he told Plaintiff that Seymour was conscious and identified him as the perpetrator. [24] (Defs.' 56.1 Stmt. ¶ 102; Pl.'s 56.1 Counterstmt. ¶ 36.) In fact, Seymour never regained consciousness. (Defs.' 56.1 Stmt. ¶ 195; Pl.'s 56.1 Counterstmt. ¶ 37.) Plaintiff alleges that Detective McCready pointed his finger at him and said "they shot your father full of Adrenalin" and "[y]ou beat and stabbed him, Marty." (Pl.'s 56.1 Counterstmt. ¶ 36.) Plaintiff alleges that Detective McCready also said "[y]ou did it Marty" and "your father said just tell us what we want to hear and help us." [25] (Pl.'s 56.1 Counterstmt. ¶ 36.) Plaintiff responded that Seymour must have identified him because he saw him that morning when Plaintiff was administering first aid. Plaintiff volunteered to a take a polygraph exam. (Defs.' 56.1 Stmt. ¶ 102.) Plaintiff alleges that the Detectives "repeatedly told [him] that his father would not lie about this," and Plaintiff recalls being in shock and disbelief that his father would accuse him. (Pl.'s 56.1 Counterstmt. ¶ 39.) At his deposition, Detective McCready admitted to lying to Plaintiff about his father and acknowledged that the goal was to get Plaintiff to confess. [26] (Pl.'s 56.1 Counterstmt. ¶ 37.)

[24]    Defendants allege that the ruse occurred at approximately 11:54 a.m. Plaintiff disputes that it occurred at that time. (Defs.' 56.1 Stmt. ¶ 102; Pl.'s 56.1 Resp. ¶ 102.)

[25]    According to Plaintiff, Detective McCready also indicated that the conversation with Seymour had been recorded and they would play it for him later. (Pl.'s 56.1 Counterstmt. ¶ 36.)

[26]    Detective Rein testified at trial that initially, McCready's ruse seemed real to him. (Pl.'s 56.1 Counterstmt. ¶ 37.)

Plaintiff alleges that he began to believe he might have done it because his father never lied to him. (Defs.' 56.1 Stmt. ¶ 107; Pl.'s 56.1 Resp. ¶ 107.) Detective McCready testified that Plaintiff said that "whoever did this needs psychiatric help," "[m]aybe it wasn't him but another Marty Tankleff that killed them," and "could I have blacked out and done it?" [27] (Defs.' 56.1 Stmt. ¶ 103.) Plaintiff alleges that the Detectives encouraged him by saying "there's a Marty inside of you

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 36 of 105

Tanklett v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

that knows what happened" and that he should make "that Marty tell us what happened." (Pl.'s 56.1 Counterstmt. ¶ 43.) Then, Detective McCready asked Plaintiff "[d]id you kill your mother and did you hurt your father?" and Plaintiff said "Yeah I did it." [28] (Defs.' 56.1 Stmt. ¶ 108.) Plaintiff alleges that he "broke down and told the [D]etectives what they wanted to hear ... without considering what the consequences of this false confession would be because, in his shock and trauma, he 'thought it was all a nightmare and he was going to wake up and it would be all over.' " (Pl.'s 56.1 Counterstmt. ¶ 43.)

27      Defendants allege and Plaintiff admits that the possibility that Plaintiff could have blacked out was not suggested to him by the Detectives. (Defs.' 56.1 Stmt. ¶ 106; Pl.'s 56.1 Resp. ¶ 106.) Additionally, at trial, Plaintiff admitted to asking if he could have blacked out. (Defs.' 56.1 Stmt. ¶ 229.)

28      Defendants allege that after this admission, Plaintiff began to discuss his plans for college, traveling to Florida, and that he was annoyed that a family friend was coming to stay with him while his parents went on vacation. (Defs.' 56.1 Stmt. ¶¶ 109-110.) Plaintiff admits that he made such statements, but disputes that he did so at this point in the interview. (Pl.'s 56.1 Resp. ¶¶ 109-110.)

Plaintiff and the Detectives discussed how the crime occurred. The parties appear to agree that the Detectives made numerous suggestions to Plaintiff regarding the commission of the crime and that Plaintiff ultimately agreed with those suggestions. [29] (Defs.' 56.1 Stmt. ¶¶ 113, 118; Pl.'s 56.1 Resp. ¶¶ 113, 118.) However, there is some dispute whether Plaintiff initially denied the Detectives' suggestions before acquiescing. (Defs.' 56.1 Stmt. ¶¶ 114-17; Pl.'s 56.1 Resp. ¶¶ 114-17.) Plaintiff testified at his deposition that during the interview, he repeatedly told the Detectives that he was innocent. (Defs.' 56.1 Stmt. ¶¶ 124-125; Pl.'s 56.1 Resp. ¶¶ 124-25.) He also alleges that he "repeatedly told [the] [D]etectives that he could not provide details of his parents' murders by stating, for example, 'I don't know. I didn't do this.' " (Pl.'s 56.1 Counterstmt. ¶ 45.) Plaintiff explained that "the detectives would ask a question, and I would say, I don't know what you are talking about; I didn't do anything. And they would once again re-ask the question or make a statement to me, and I would say, well, you know, I don't remember doing anything. I didn't do anything. If you're saying I did something, then I would just acquiesce to what they were saying." (Pl.'s 56.1 Resp. ¶ 125.) Plaintiff alleges that the

details in the alleged confession "conveniently matched the observations" the Detectives made at the scene and "the theory they had formulated ... during and after the walk-throughs," including the sequence of the attacks and the weapons. [30] (Pl.'s 56.1 Counterstmt. ¶ 54.)

29      For purposes of this motion, Defendants do not dispute the veracity of certain portions of Plaintiff's deposition and trial testimony, including that he acquiesced to suggestions by the Detectives. (Defs.' 56.1 Stmt., at 1 n.1.) However, Defendants have previously maintained that Plaintiff "respond[ed] to open-ended questions" and "volunteered a detailed narrative confession." (Pl.'s 56.1 Counterstmt. ¶ 52.)

30      Plaintiff alleges that the prosecution relied heavily on the alleged confession at trial, and pointed to the correlation between Plaintiff's statements and the crime scene as an indication of its reliability. (Pl.'s 56.1 Counterstmt. ¶ 78.)

*8  Plaintiff agreed with the Detectives' suggestion that he was naked during the attacks and began by hitting his mother with a dumbbell. (Defs.' 56.1 Stmt. ¶¶ 112, 120.) The Detectives suggested and Plaintiff agreed that after he hit her, he grabbed a knife from the kitchen that was lying on the counter next to watermelon rinds and cut her throat with it. (Defs.' 56.1 Stmt. ¶ 112.) The Detectives suggested and Plaintiff agreed that then his mother was on her back, and he continued to stab her, but could not remember how many times. (Defs.' 56.1 Stmt. ¶ 112.) He also agreed that he hit her four to five times on the head. (Defs.' 56.1 Stmt. ¶ 112.) Next, he agreed that "she was moving a little bit when he ran out of the bedroom to kill his father." (Defs.' 56.1 Stmt. ¶ 119.) Plaintiff acquiesced and agreed that he entered the office with a dumbbell and the knife behind his back, saw his father in his chair and hit him from behind with the dumbbell first. (Defs.' 56.1 Stmt. ¶¶ 120-21.) He agreed that, after his father asked him what he was doing, he "knocked him silly" and cut his neck. (Defs.' 56.1 Stmt. ¶¶ 121-22.) The Detectives suggested and Plaintiff agreed that he was not sure how many times he hit or stabbed his father and that he was shocked by the amount of blood. (Defs.' 56.1 Stmt. ¶ 122.) He further agreed that, afterward, he cleaned the dumbbell and the knife in the shower, returned the dumbbell to his bedroom, and laid in bed before getting up at 6:10 a.m. (Defs.' 56.1 Stmt. ¶ 123.)

Plaintiff alleges that he never received Miranda warnings, but admits that he signed a waiver of rights card (the "Waiver

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 37 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

Card") after the alleged confession. (Defs.' 56.1 Stmt. ¶ 126; Pl.'s 56.1 Resp. ¶ 126; Pl.'s 56.1 Counterstmt. ¶ 29.) The Detectives testified at their depositions that Plaintiff was not advised of his rights or told he was a suspect when he was first brought to the station. (Pl.'s 56.1 Counterstmt. ¶ 29.) However, they claimed that Detective McCready provided Plaintiff with the "Waiver Card" and advised him of his rights just minutes before he said that he had done it. (Pl.'s 56.1 Counterstmt. ¶ 29.)

Plaintiff signed a consent form to allow them to take samples of his fingernail scrapings and any dried blood on his body, and investigators took several photographs of Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 128-29.) Defendants note that in the photographs, there is no blood on Plaintiff's shorts or sweatshirt, and Plaintiff acknowledged this fact at trial. (Defs.' 56.1 Stmt. ¶ 224.) At approximately 1:22 p.m., Fox called and directed the Detectives to stop their questioning. (Defs.' 56.1 Stmt. ¶ 130.) Plaintiff alleges that beginning with his first conversation with Detective McCready around 7:55 a.m., he "was effectively confined for five-and-a-half hours." (Pl.'s 56.1 Counterstmt. ¶ 21.) Plaintiff testified on cross-examination during the trial that, sometime after the alleged confession, he was in a room with Detective Rein, Detective McCready, and Sergeant Doyle, and Detective McCready choked him. (Defs.' 56.1 Stmt. ¶ 232.) This was the first time Plaintiff made such an allegation. (Defs.' 56.1 Stmt. ¶ 233.)

Plaintiff remained in the interview room while his arrest was processed, and later that day, he asked to speak with his sister, Shari Rother ("Shari").[31] (Defs.' 56.1 Stmt. ¶ 135.) During the call with Shari, Plaintiff told her he was sorry, and when Shari asked if Plaintiff told the police that he was responsible, Plaintiff responded "yes, they made me." (Defs.' 56.1 Stmt. ¶ 136; Tankleff 50-h Examination, Defs.' Ex. KK, 63:23-24.) Additionally, at trial, Plaintiff admitted that during that conversation, he also said that he needed psychiatric help and told Shari he needed to see her. (Defs.' 56.1 Stmt. ¶ 231.)

[31]    Plaintiff alleges that he asked the Detectives if he could talk to Shari numerous times that day. (Pl.'s 56.1 Resp. ¶ 135.)

Detective McCready subsequently drafted a report summarizing Plaintiff's alleged confession, which Plaintiff alleges is more detailed than the Detectives' handwritten notes from the interview itself. (Pl.'s 56.1 Counterstmt. ¶ 66.) Plaintiff alleges that the purported confession only contained the information known to Detectives at the time they questioned Plaintiff and did not include details that would come to light later in the investigation, including that Arlene had wounds on her back indicating she may have been attacked from behind and that the perpetrator(s) wore gloves. (Pl.'s 56.1 Counterstmt. ¶ 69-70.)

## C. The Evidence

**\*9** Several detectives remained at the home after Detectives McCready and Rein transported Plaintiff to Police Headquarters. Detective James Barnes ("Detective Barnes") examined all of the doors and windows and found no sign of forced entry, although Plaintiff alleges that the front door was open when he woke up that morning. (Defs.' 56.1 Stmt. ¶ 137; Pl.'s 56.1 Resp. ¶ 137.) Detective Chuck Kosciuk ("Detective Kosciuk") also made several observations. In Plaintiff's bathroom, Detective Kosciuk testified that he observed water in the bathtub, including near the drain, along one side of the tub, and under a wet loofah sponge. (Defs.' 56.1 Stmt. ¶ 138.) In Plaintiff's bedroom, Detective Kosciuk testified that he saw blood on the door knob, the light switch, and the wall next to the light switch.[32] (Defs.' 56.1 Stmt. ¶ 138.) He testified that he also observed a "slightly damp" towel and a set of dumbbells in Plaintiff's room. (Defs.' 56.1 Stmt. ¶ 138.) Plaintiff notes that a red substance was observed on the dumbbells, and alleges that this fact, in combination with the water in the bathtub led detectives to surmise that the dumbbells were used in the murders and that Plaintiff washed them off in the shower. (Pl.'s 56.1 Resp. ¶ 138.) Detective Kosciuk also saw a knife on the kitchen counter next to watermelon rinds, which according to one witness, appeared to be in a different position than it was during the poker game. (Defs.' 56.1 Stmt. ¶ 139.) Plaintiff alleges that this observation led detectives to believe that the knife, referred to as the "Watermelon Knife," was used by the perpetrator. (Pl.'s 56.1 Resp. ¶ 139.)

[32]    During the trial, Plaintiff testified that he did not recall if he turned on the light in his bedroom. (Defs.' 56.1 Stmt. ¶ 209.)

### 1. Arlene and Seymour's Injuries

Dr. Vernard Adams, Deputy Medical Examiner for Suffolk County ("Dr. Adams"), arrived at the home at around 4:00 p.m. and examined Arlene's injuries. (Defs.' 56.1 Stmt. ¶ 140.) Based on his preliminary examination of her body

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 38 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

and the blood stains, he concluded that she sustained head injuries, had moved, and then the perpetrator inflicted stab wounds. [33] (Defs.' 56.1 Stmt. ¶ 140.) Dr. Adams performed Arlene's autopsy and testified at trial that Arlene sustained five depressed skull fractures, cuts to her hands and forearms, four slash wounds to her back and stab wounds to her neck caused by a sharp blade. [34] (Defs.' 56.1 Stmt. ¶ 142; Pl.'s 56.1 Counterstmt. ¶ 96.) He further testified that the skull fractures were consistent with having been caused by the dumbbell from Plaintiff's room. [35] (Defs.' 56.1 Stmt. ¶ 142.)

[33]    Plaintiff acknowledges that "the position of Arlene's body suggested [this] to an initial observer" but denies that Dr. Adams' observations were accurate. (Pl.'s 56.1 Resp. ¶ 140.)

[34]    Defendants characterize the wounds to her hands and forearms as "defensive wounds," but Plaintiff disputes that description. (Defs.' 56.1 Stmt. ¶ 142; Pl.'s 56.1 Resp. ¶ 142.)

[35]    Plaintiff admits that this was Dr. Adams' testimony, but disputes that the skull fractures were caused by the dumbbell. (Pl.'s 56.1 Resp. ¶ 142.)

A surgeon at Stony Brook Hospital who operated on Seymour testified at trial that Seymour suffered "several depressed [skull] fractures," including "fracture[s] in which pieces of the bone [were] ... driven inward" which "appeared to [have been] produced by a small pointed blunt object of which a hammer would be a good example." (Defs.' 56.1 Stmt. ¶ 141.) The surgeon testified that Seymour's neck wound was "unusual and extensive," and believed that "it would have taken a great deal of energy and determination to produce a wound [that] deep and extensive." [36] (Trial Tr. (Tyson) 4349:2-22.) On October 6, 1988, Seymour succumbed to his injuries. (Defs.' 56.1 Stmt. ¶ 195.) Dr. Adams' autopsy revealed that the perpetrator inflicted several blows to Seymour's head and that the cause of death was "head trauma and incised wounds of the neck." (Defs.' 56.1 Stmt. ¶ 195.)

[36]    In response to questions from the prosecutor at trial, Dr. Tyson agreed that Seymour's neck wound was consistent with having been caused by a knife, the perpetrator was likely "very angry," and an individual who was able to lift Seymour from that chair would have the physical strength to cause Seymour's injuries. (Defs.' 56.1 Stmt. ¶ 141.)

2. Investigation of the Poker Players and Steuerman

As discussed, Detective Robert Anderson ("Detective Anderson") and Detective Anthony Laghezza ("Detective Laghezza") were assigned to interview the card players, including those that attended the poker game at the Tankleff home on September 6th. (Defs.' 56.1 Stmt. ¶ 167.) Bove, the Mayor of Belle Terre, told Detectives Anderson and Laghezza that nothing unusual occurred at the game and that he was not aware of a conflict between Steuerman and Seymour, although he admitted that he had no personal knowledge of their business dealings. (Defs.' 56.1 Stmt. ¶ 168.) Other players at the game, including Robert Montefusco ("Montefusco"), Albert Raskin ("Raskin"), Peter Capobianco ("Capobianco"), and Joseph Cecere ("Cecere"), also reported that they did not recall tension between Steuerman and Seymour. (Defs.' 56.1 Stmt. ¶¶ 169-172.) Plaintiff alleges that two of the players, Montefusco and Cecere, told detectives that they believed that Steuerman was the last one to leave the game. [37] (Pl.'s 56.1 Resp. ¶¶ 169, 172.) Detectives Anderson and Laghezza interviewed Steuerman on September 7th. (Defs.' 56.1 Stmt. ¶ 173; Anderson Supp. Rep., Defs.' Ex. V.) At the time of the interview, Steuerman knew that Plaintiff had accused him of being responsible for the attacks. [38] (Defs.' 56.1 Stmt. ¶ 173.) Steuerman told them that he had been a player in the poker game for about two years and did not recall anything out of the ordinary during the game on September 6th. (Defs.' 56.1 Stmt. ¶ 173.) He described his business dealings with Seymour. (Defs.' 56.1 Stmt. ¶ 173.) Additionally, Steuerman said that he left the card game and arrived at his daughter's house, where he was living at the time, at approximately 3:15 a.m. [39] and found out about the attacks the next morning. (Defs.' 56.1 Stmt. ¶ 173.) After speaking with Steuerman, Detectives Anderson and Laghezza concluded that Steuerman should not be considered a suspect. (Defs.' 56.1 Stmt. ¶ 173.)

[37]    Montefusco said that when the other players were leaving, Steuerman remained inside to talk to Seymour, and Cecere said that when he left, Steuerman was sitting in his car and was still sitting there when Cecere drove away. (Pl.'s 56.1 Resp. ¶¶ 169, 172; Pl.'s 56.1 Counterstmt. ¶ 134.)

[38]    Plaintiff alleges that he was not the only individual to accuse Steuerman. (Pl.'s 56.1 Counterstmt. ¶ 129.) For example, he alleges that his brother-

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)
Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 39 of 105
2017 WL 2729084

in-law, the family attorney and a cousin all told detectives that Steuerman could be involved or referred to tension between Steuerman and Seymour. (Pl.'s 56.1 Counterstmt. ¶¶ 129-31.)

39    Plaintiff alleges that Steuerman's account of when he left the card game is inconsistent with the testimony of the other card players and that the inconsistency was overlooked. (Pl.'s 56.1 Counterstmt. ¶ 136.)

**\*10** Detectives Rein and McCready conducted a second interview of Steuerman on September 10th. (Defs.' 56.1 Stmt. ¶ 174.) Steuerman discussed the card game and his relationship with the Tankleff family. (Defs.' 56.1 Stmt. ¶ 174.) At trial, Steuerman's daughter testified that he arrived at her house around 3:16 a.m. (Defs.' 56.1 Stmt. ¶ 175.) His daughter testified that she remembered the time because she had to get up and let her father in because he had forgotten his keys. (Defs.' 56.1 Stmt. ¶ 175.) She also said that the drive from Belle Terre to her home takes about fifteen minutes. (Defs.' 56.1 Stmt. ¶ 175.)

On September 14, 1988, Steuerman withdrew $15,000 from an account he shared with Seymour, faked his own death, and traveled under a fictitious name to Los Angeles, California. (Defs.' 56.1 Stmt. ¶ 177; Pl.'s 56.1 Resp. ¶ 177.) During three days of testimony at Plaintiff's trial, Steuerman explained that he fled to California due to various personal and financial problems and the accusations against him in connection with the attacks on the Tankleffs. (Defs.' 56.1 Stmt. ¶ 178.) The homicide department ultimately investigated Steuerman's disappearance, presumably given the connection to the ongoing investigation. (Pl.'s 56.1 Counterstmt. ¶ 139; Missing Person Report, Pl.'s Ex. 24, Docket Entry 184-30.) The Missing Person Report refers to an anonymous call authorities received indicating that Steuerman "finance[d] his son ... in major cocaine dealings." (Pl.'s 56.1 Counterstmt. ¶ 142; Missing Person Report at 5.) On September 26th, Detective McCready, Sergeant Doyle, and Assistant District Attorney Edward Jablonski ("ADA Jablonski") traveled to California, and Steuerman returned to Suffolk County with them on September 30th. (Pl.'s 56.1 Counterstmt. ¶¶ 152, 155; Missing Person Report at 26-28.) Plaintiff alleges that the purpose of the trip was not to further investigate Steuerman, but to convince him to return to Suffolk County. (Pl.'s 56.1 Counterstmt. ¶ 154.)

During the investigation and trial, authorities learned more about Steuerman and Seymour's business relationship.[40]

Steuerman testified at trial that his relationship with Seymour deteriorated beginning in July and August 1988. (Trial Tr. (Steuerman) 1080:17-23.) Although Steuerman maintained that his financial obligations to Seymour continued after Seymour's death, he also testified that he needed Seymour's approval to pursue new ventures and would have had to split the profits with Seymour while Seymour was alive. (Defs.' 56.1 Stmt. ¶ 176; Pl.'s 56.1 Resp. ¶ 176; Trial Tr. (Steuerman) 1080:24-1081:25.)

40    For example, Plaintiff alleges that certain detectives, including Detective McCready and Sergeant Doyle, were aware that Steuerman owed money to Seymour. (Pl.'s 56.1 Counterstmt. ¶ 140.)

Plaintiff alleges that the fact that Steuerman was ruled out as a suspect based on "two brief interviews in public places" and alibi testimony from his daughter illustrates that the investigation of Steuerman was "wholly inadequate." (Pl.'s 56.1 Resp. ¶ 175; Pl.'s 56.1 Counterstmt. ¶¶ 148-49.) Plaintiff further alleges that Defendants failed to adequately investigate Steuerman's finances or his connection to his son's alleged drug dealing.[41] (Pl.'s 56.1 Counterstmt. ¶¶ 148-149.) Defendants point out that Steuerman was questioned extensively during his trial testimony about his alleged involvement in the crime, and Detective McCready was subject to lengthy cross-examination regarding the adequacy of the investigation into Steuerman. (Defs.' 56.1 Stmt. ¶¶ 179-80.)

41    Plaintiff alleges that detectives falsely represented in the Missing Persons Report and to Lieutenant McElhone that the investigation into Steuerman had been thorough. (Pl.'s 56.1 Counterstmt. ¶¶ 150-51.)

### 3. Blood Stain Analysis

**\*11** Robert Baumann ("Baumann"), a forensic serologist for Suffolk County, analyzed blood stains from several locations in the Tankleff home. (Defs.' 56.1 Stmt. ¶ 188.) Other than a smudge on the exterior doorknob of Plaintiff's bedroom, Baumann noted that there was no blood near the entrance of any room in the home. (Defs.' 56.1 Stmt. ¶ 188; Pl.'s Resp. ¶ 188.) Testing of that smudge did indicate the presence of blood, but no further tests, including to identify the source of the blood, were ever performed. (Defs.' 56.1 Stmt. ¶ 188; Pl.'s Resp. ¶ 188; Baumann Dep. Tr., Pl.'s Ex. 12, Docket

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

Entry 184-18, 201:17-202:11.) In the master bedroom, a bloodstain on the wall was found to be consistent with Seymour's blood. (Defs.' 56.1 Stmt. ¶ 189.) Blood detected on Arlene's fingernails was consistent only with Arlene's blood. (Defs.' 56.1 Stmt. ¶ 189; Trial Tr. (Baumann) 2213:3-11.) Baumann also analyzed the bedsheets, pillowcases, and shams from the master bedroom. (Defs.' 56.1 Stmt. ¶ 189.) On those items, one bloodstain was consistent with Seymour's blood, some bloodstains were consistent only with Arlene's blood, and others were consistent with either Arlene or Plaintiff's blood. (Defs.' 56.1 Stmt. ¶ 189; Trial Tr. (Baumann) 2178:4-2199:17.) The bloodstains in the office were consistent only with Seymour's blood, and the bloodstains on a towel in Plaintiff's bedroom were consistent only with Seymour's blood. (Defs.' 56.1 Stmt. ¶¶ 189-90.) The bloodstain on the light switch and the adjacent wall in Plaintiff's bedroom was consistent with either Arlene's blood or Plaintiff's blood. (Trial Tr. (Baumann) 2272:18-2275:17.) Analysts also noticed that a "chain link" or "honeycomb" pattern consistent with latex, fabric or rubber gloves appeared in several of the bloodstains, including bloodstains on the bedding in the master bedroom and next to the light switch in Plaintiff's bedroom. (Defs.' 56.1 Stmt. ¶¶ 190-91; Pl.'s 56.1 Resp. ¶¶ 190-91.)

No blood was detected on Plaintiff's shorts or underwear. (Defs.' 56.1 Stmt. ¶ 192.) However, there was a stain on the inside right shoulder of Plaintiff's sweatshirt that tested positive for the presence of blood. (Defs' 56.1 Stmt. ¶ 192.) Due to the size of stain, no further testing could be conducted. (Defs.' 56.1 Stmt. ¶ 192.) As discussed, Detectives McCready and Rein noticed a bloodstain on Plaintiff's right shoulder during the interview, and that stain was tested and determined to be consistent only with Seymour's blood. (Defs.' 56.1 Stmt. ¶ 192; Trial Tr. (Baumann) 2266:23-2268:9.) No blood was detected on the dumbbells, kitchen knives, traps, drains, or on a loofah sponge in the bathroom, although the loofah sponge did have a "five inch slit" of unknown origin. (Defs.' 56.1 Stmt. ¶ 193; Pl.'s 56.1 Resp. ¶ 193.) Nor was any blood detected on the Watermelon Knife. (Baumann Dep. Tr. 142:18-145:20.) Finally, two of the tissues Plaintiff removed from his pocket at Police Headquarters tested positive for the presence of blood; the stains on one were consistent only with Plaintiff's blood, and the stains on the second tissue were consistent only with Arlene's blood. (Defs.' 56.1 Stmt. ¶ 193; Trial Tr. (Baumann) 2277:5-23.) Plaintiff alleges that he could have gotten Arlene's blood on his hand when he turned on the light in his bedroom that morning, and Detective McCready agreed during his deposition that this

was a possible explanation for her blood being on the tissue. (Pl.'s 56.1 Resp. ¶ 193.)

#### 4. The Watermelon Knife

As discussed, Dr. Adams conducted both Arlene and Seymour's autopsies. (Pl.'s 56.1 Counterstmt. ¶ 93.) During Arlene's autopsy, Dr. Adams observed four sharp impact stab wounds on her back. (Pl.'s 56.1 Counterstmt. ¶ 96; Arlene Autopsy Diagram, Pl.'s Ex. 13, Docket Entry 184-19, at 10.) Dr. Adams' autopsy report described them as "four stab wounds ... with a small abrasion to the left of [each] stab wound" measuring "from one-quarter of an inch to five-eighths of an inch." (Adams Dep. Tr., Defs.' Ex. BBB, 183:6-13.) In connection with the autopsies, Dr. Adams was provided with the Watermelon Knife. (Pl.'s 56.1 Counterstmt. ¶ 97; Adams. Dep. Tr. 179:24-180:15.)

During his deposition in 2014, Dr. Adams testified that there was no "reasonable possibility" that the Watermelon Knife caused the stab wounds on Arlene's back. (Adams Dep. Tr. 191:12-192:8; see also Pl.'s 56.1 Counterstmt. ¶ 98.) He further testified that he believed those wounds were inflicted by a short knife that "had some kind of projection that could cause an abrasion," such as a utility knife. (Adams. Dep. Tr. 193:2-194:10.) Although the parties agree that Dr. Adams did not communicate his conclusion to the prosecutors either before or during Plaintiff's trial, they dispute whether Dr. Adams ever shared his conclusion with any of the detectives. (Defs.' 56.1 Stmt. ¶ 144; Pl.'s 56.1 Resp. ¶ 144; Pl.'s 56.1 Counterstmt. ¶¶ 114-15.) Defendants deny that Dr. Adams ever communicated his opinion to detectives. (Defs.' 56.1 Stmt. ¶ 144.) Plaintiff alleges that Dr. Adams discussed this information with detectives based on his deposition testimony and testimony from other witnesses indicating that it was an established practice in the Suffolk County Police Department to have a detective present at an autopsy.[42] (Pl.'s 56.1 Counterstmt. ¶¶ 93, 101.) It is undisputed that Plaintiff's defense attorney, Robert Gottlieb, never learned this information. (Pl.'s 56.1 Counterstmt. ¶ 116; Gottlieb Dep. Tr., Defs.' Ex. JJJ, 88:5-13.)

[42]    Dr. Adams testified that it was "usual and customary" for the detectives to attend the autopsy. (Adams Dep. Tr. 40:22-8.) Lieutenant John McElhone testified that autopsies would be "covered" by a detective. (McElhone Dep. Tr., Pl.'s

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 41 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

Ex. 8, Docket Entry 184-12, 91:20-23.) Assistant District Attorneys Collins and Jablonski gave similar testimony. (See Collins Dep. Tr., Defs.' Ex. HHH, 97:18-98:7 (agreeing that it was "the practice of the Homicide Squad to attend autopsies ... and they would generally assign a detective, if not more than one, to attend the autopsy" and "most of the time" they would take notes); Jablonski Dep. Tr., Defs.' Ex. III, 51:16-24 (testifying that "a lot of times" a detective attended the autopsy).)

**\*12** Detective McCready, Detective Carmody, Detective Kosciuk, and Detective Rein have all denied being present at Arlene's autopsy; Sergeant Doyle does not recall if he was at Arlene's autopsy but admitted to being at the medical examiner's office on the day of her autopsy. [43] (Pl.'s 56.1 Counterstmt. ¶ 102; McCready Aff., Defs.' Ex. FFF, ¶ 9; Doyle Aff., Defs.' Ex. DDD, ¶ 9; Carmody Aff., Defs.' Ex. CCC, at ¶ 9; Kosciuk Aff., Defs.' Ex. EEE, ¶ 10; Rein Aff., Defs.' Ex. GGG, at ¶ 9.) Detective Carmody admitted that he had a meeting with Dr. Adams the day after Arlene's autopsy. (Pl.'s 56.1 Counterstmt. ¶ 102.) That meeting appears to be documented in Detective Carmody's handwritten notes, which refer to a meeting with Dr. Adams on September 9, 1988. (Pl.'s 56.1 Counterstmt. ¶ 123; Carmody Notes, Pl.'s Ex. 19, Docket Entry 184-25, at 27.) In those notes, Detective Carmody wrote "clear knife issue," and there is a drawing of what appears to be a shorter knife blade and a longer knife blade. (Pl.'s 56.1 Counterstmt. ¶ 123; Carmody Notes at 27; Carmody Dep. Tr., Pl.'s Ex. 20, Docket Entry 184-26, 68:20-23 (responding that the drawings "appear to be" knife shapes).) At his deposition, Detective Carmody testified that he did not know what he meant by "clear knife issue" and that he did not "remember why [he] even drew those shapes." (Carmody Dep. Tr. 68:15-69:11.)

[43]   Detective Rein admitted to being at Seymour's autopsy. (Pl.'s 56.1 Counterstmt. ¶ 102; Rein Aff. ¶ 10.)

Dr. Adams testified at his deposition that he "must have communicated" that he did not believe that the Watermelon Knife was the weapon "in some sense, if not those words." (Adams Dep. Tr. 193:9-21.) When asked if he would have communicated this at Arlene's autopsy, he testified that he did not "have any recollection of what we actually communicated" but it "seems reasonable" that he would have communicated his opinion during the autopsy. (Adams Dep. Tr. 192:22-193:8.) Plaintiff alleges that Detective Rein was most likely present at Arlene's autopsy, based in part on

several pages of handwritten notes and a drawing of the wounds on Arlene's back, which have been identified as belonging to Detective Rein by one witness. [44] (Pl.'s 56.1 Counterstmt. ¶ 103.) The notes include several pages of diagrams from Seymour's autopsy, and both Dr. Adams' and Detective Rein's name appear on the first diagram. (Seymour Autopsy Diagram, Pl.'s Ex. 17, Docket Entry 184-23, at 1.) After the diagrams, there is what appears to be a drawing of the wounds on Arlene's back, including measurements of each cut and a sketch of a knife with a short blade. (Seymour Autopsy Diagram, at 5.) When Dr. Adams was asked about the document, he testified that the handwriting did not look like his, but he believed the drawing was made by "someone who was at the autopsy and making a diagram of their own at the same time I was making my notes." (Pl.'s 56.1 Counterstmt. ¶ 104; Adams. Dep. Tr. 189:21-190:3.) Plaintiff alleges that the wound measurements on that drawing match the measurements documented by Dr. Adams in his notes. (Pl.'s 56.1 Counterstmt. ¶ 105.)

[44]   When Assistant District Attorney Collins ("ADA Collins") was shown the document, he identified the handwriting on the diagrams as Detective Rein's. (Pl.'s 56.1 Counterstmt. ¶ 103; Collins Dep. Tr. 99:9-19.)

Since Plaintiff's conviction, several detectives have stated that they came to the conclusion that the Watermelon Knife was not the weapon used in the attacks. (See Pl.'s 56.1 Counterstmt. ¶¶ 122-27.) At his deposition, Detective Rein testified that he came to the conclusion that the Watermelon Knife was not the murder weapon and that "it would have been a shorter knife [or] a different kind of knife," although he was unsure when he came to believe that. (Pl.'s 56.1 Counterstmt. ¶ 122; Rein Dep. Tr., Defs.' Ex. XX, 197:17-198:4.) Detective Rein testified that Sergeant Doyle also believed that the Watermelon Knife was not the murder weapon and that they discussed it. (Rein Dep. Tr. 197:11-198:4.) During subsequent interviews, Detectives Kosciuk, Detective Pfalzgraf, and Sergeant Doyle all stated that they did not believe the Watermelon Knife caused Arlene and Seymour's injuries. (Pl.'s 56.1 Counterstmt. ¶¶ 125-27; Kosciuk Interview Summary, Pl.'s Ex. 21, Docket Entry 184-27, at 3; Pfalzgraf Interview Summary, Pl.'s Ex. 22, Docket Entry 184-28, at 4; Doyle Interview Summary, Pl.'s Ex. 23, Docket Entry 184-29, at 5.) Detective Kosciuk said he thought a "utility-type knife" caused the wounds, Detective Pfalzgraf said he thought he was a "Exacto knife or razor knife," and Sergeant Doyle stated that he believed it was a

Case 9:21-cv-00791-AMN-TWD Document 32 Filed 06/01/22 Page 42 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

"utility knife." (Kosciuk Interview Summary at 3; Pfalzgraf Interview Summary at 4; Doyle Interview Summary at 5.)

### D. Indictments, Conviction, and Post-Conviction Proceedings

**\*13** On September 9, 1988, Plaintiff was indicted for the murder of his mother and the assault on his father. (Defs.' 56.1 Stmt. ¶ 181; First Am. Compl., Docket Entry 145-1, ¶ 113.) On October 27, 1988, Plaintiff was indicted for the murder of his father. (Defs.' 56.1 Stmt. ¶ 182; First Am. Compl. ¶ 115.) Plaintiff moved to suppress his alleged confession, and the trial judge conducted a Huntley hearing in March 1989. The trial judge denied the suppression motion, and Plaintiff's confession was introduced as evidence. (First Am. Compl. ¶ 119.) The trial began on April 23, 1990 and ended on June 20, 1990. (First Am. Compl. ¶ 120.) The jury found Plaintiff guilty of the first-degree murder of Seymour and the second-degree murder of Arlene, and he was sentenced to two consecutive terms of twenty-five years to life. (First Am. Compl. ¶ 128.)

Plaintiff appealed his conviction to the Appellate Division, Second Department and challenged the voluntariness of his confession, the administration of Miranda warnings, and other tactics employed the Detectives during the interview. (Defs.' 56.1 Stmt. ¶ 235.) Based on the determinations by the trial judge at the Huntley hearing, the Appellate Division affirmed Plaintiff's conviction. (Defs. 56.1 Stmt. ¶ 235; Pl.'s 56.1 Resp. ¶ 235.) He appealed that decision to the Court of Appeals, which affirmed the Appellate Division's decision and, based on the determinations of the trial judge at the Huntley hearing, held that the confession was voluntary. (Defs.' 56.1 Stmt. ¶ 236; Pl.'s 56.1 Resp. ¶ 236.) Plaintiff subsequently filed a Writ of Habeas Corpus in this district, which was denied. (Defs.' 56.1 Stmt. ¶ 237.) He appealed that denial to the Second Circuit Court of Appeals, and the Second Circuit held that while the Detectives should have administered Miranda warnings earlier and statements made before the warnings were given should have been suppressed, the statements given by Plaintiff subsequent to the waiver of rights were properly admitted. (Defs.' 56.1 Stmt. ¶ 238; Pl.'s 56.1 Resp. ¶ 238.)

On October 3, 2003, Plaintiff filed a motion for a new trial pursuant to New York State Criminal Procedure Law § 440.10 in Suffolk County Court and the judge conducted a hearing (the "440.10 Hearing") to consider new evidence presented by Plaintiff. People v. Tankleff, 49 A.D.3d 160, 164, 848 N.Y.S.2d 286, 290 (2d Dep't 2007). Plaintiff presented

evidence that the attacks on his parents were committed by Joseph Creedon, Peter Kent, and Glen Harris, three men who were allegedly hired by Steuerman. (Defs.' 56.1 Stmt. ¶ 240; Pl.'s 56.1 Counterstmt. ¶¶ 157-60.) After a lengthy hearing, the trial judge denied Plaintiff's motion for new trial. Tankleff, 49 A.D.3d at 176, 848 N.Y.S.2d at 298. Plaintiff appealed the decision, and on December 18, 2007, the Appellate Division vacated the convictions and held that the newly discovered evidence warranted a new trial. (Defs.' 56.1 Stmt. ¶ 239.) However, the Appellate Division held that Plaintiff "did not establish entitlement to ... relief" on the grounds of actual innocence. (Defs.' 56.1 Stmt. ¶ 239; Pl.'s 56.1 Resp. ¶ 239.) The Appellate Division ultimately declined to address the admissibility of the confession, but held that "when the evidence presented at the CPL article 440 hearing is evaluated against the backdrop of the trial evidence, including the defendant's confession, how the confession was obtained, and the fact that the defendant almost immediately recanted the confession," a new trial was warranted. Tankleff, 49 A.D.3d at 182, 848 N.Y.S.2d at 302.

In January 2008, the Suffolk County District Attorney announced that he would drop the charges against Plaintiff and ask Governor Eliot Spitzer to appoint a special prosecutor to review the case. (Defs.' 56.1 Stmt. ¶ 246; Pl.'s 56.1 Resp. ¶ 246; Jan. 2, 2008 Article, Pl.'s Ex. 48, Docket Entry 184-54.) A short time later, Governor Spitzer appointed Attorney General Andrew Cuomo (the "Attorney General") to investigate the case. (Defs.' 56.1 Stmt. ¶ 246; Pl.'s 56.1 Resp. ¶ 246; Press Release, Pl.'s Ex. 47, Docket Entry 184-53.) At the conclusion of the investigation, the Attorney General moved to dismiss the indictments against Plaintiff in the interests of justice pursuant to New York Criminal Procedure Law § 210.40, and that motion was granted on July 22, 2008. (Defs.' 56.1 Stmt. ¶ 247.)

**\*14** Later that year, in December 2008, the New York State Commission of Investigation (the "Commission") released its report examining the Suffolk County Police Department's investigation of the case. (Defs.' 56.1 Stmt. ¶ 250.) The Commission concluded, among other things, that the investigation was "comprehensive, extensive and methodical," the procedures used during Plaintiff's interview were "proper in all respects" and "within the confines of the law," and the alleged confession was not the result of "force or coercion." (Defs.' 56.1 Stmt. ¶ 250.) Plaintiff admits that these were the Commission's conclusions but denies that the conclusions are true. (Pl.'s 56.1 Resp. ¶ 250.) Plaintiff also disputes that the Commission relied on "a complete

Case 9:21-cv-00791-AMN-TWD Document 32 Filed 06/01/22 Page 43 of 105
Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)
2017 WL 2729084

and accurate account of the process used to obtain the confession." (Pl.'s 56.1 Resp. ¶ 250.)

II. Procedural History

Plaintiff commenced this lawsuit on March 24, 2009. (Compl., Docket Entry 1.) The Complaint alleged the following causes of action under 42 U.S.C. § 1983: (1) malicious prosecution against Detective McCready, Detective Rein, and John Doe police officers; (2) fabrication of evidence against Detective McCready and Detective Rein; (3) failure to investigate against Detective McCready and Detective Rein; (4) suppression of evidence against Detective McCready, Detective Rein, and Detective Kosciuk; (5) coercion and violation of Plaintiff's right to counsel against Detective McCready, Detective Rein, and John Doe police officers; (6) civil rights conspiracy against Detective McCready, Detective Rein, Sergeant Doyle, Lieutenant McElhone, John Doe police officers, and Richard Roe county employees; (7) supervisory liability against Sergeant Doyle, Lieutenant McElhone, and Richard Roe county employees; and (8) an unconstitutional custom or policy and a failure to supervise and train pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), against the County of Suffolk. (Compl. ¶¶ 147-182.) Additionally, the Complaint alleged the following state law causes of action: (1) malicious prosecution against Detective McCready, Detective Rein, Sergeant Doyle, John Doe police officers, and Richard Roe county employees; (2) false imprisonment against Detective McCready, Detective Rein, Sergeant Doyle, John Doe police officers, and Richard Roe county employees; and (3) intentional or negligent infliction of emotional distress against Detective McCready and Detective Rein. (Compl. ¶¶ 183-194.) Defendants filed their Answer on July 24, 2009. (Answer, Docket Entry 22.)

On April 6, 2010, Defendants filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Defs.' 12(c) Mot., Docket Entry 38.) On December 21, 2010, the Court granted Defendants' motion in part and denied it in part. Tankleff v. County of Suffolk, No. 09-CV-1207, 2010 WL 5341929 (E.D.N.Y. Dec. 21, 2010). Specifically, the Court dismissed Plaintiff's conspiracy, supervisory liability, false imprisonment, suppression of evidence, failure to investigate, and intentional or negligent infliction of emotional distress claims. Tankleff, 2010 WL 5341929, at *1. The Court permitted Plaintiff's Section 1983 malicious prosecution, state law malicious prosecution, fabrication of evidence, coercion, and Monell claims to proceed. Id. at *5-10, 12. Thereafter, the parties engaged in extensive discovery and argued numerous discovery motions.

On December 9, 2014, Plaintiff filed a motion to amend the Complaint, which this Court referred to Magistrate Judge Steven I. Locke. (Pl.'s Mot. to Amend, Docket Entry 145; Referral Order, Docket Entry 151.) Plaintiff sought leave to add a suppression of evidence claim against Detective McCready, Detective Rein, Sergeant Doyle, and Detective Kosciuk. (Pl.'s Mot. to Amend at 1.) Plaintiff alleged that Detective McCready, Detective Rein, Sergeant Doyle, and Detective Kosciuk withheld exculpatory evidence by failing to disclose the medical examiner's conclusion that the Watermelon Knife could not have been the murder weapon. (Pl.'s Mot. to Amend at 1.) By Order dated May 5, 2015, Magistrate Judge Anne Y. Shields granted Plaintiff's motion to amend.[45] (Mot. to Amend Order, Docket Entry 157.) As a result, the Court considers the First Amended Complaint at Docket Entry 145-1 to be the operative complaint in this action. (First Am. Compl., Docket Entry 145-1.) The Court subsequently allowed discovery to be re-opened on a limited basis to gather evidence related to the suppression claim. (Electronic Discovery Order, May 14, 2015.)

[45]     After the Court referred the motion to Judge Locke, the matter was reassigned to Judge Shields. (Reassignment Order, Docket Entry 155.)

*15 On January 14, 2016, Defendants notified the Court that Detective McCready died. (Suggestion of Death, Docket Entry 167.) Theresa McCready and Brett McCready were substituted as Detective McCready's legal successors on June 2, 2016. (Substitution Order, Docket Entry 178.)

On June 10, 2016, Defendants filed a motion for partial summary judgment on the Section 1983 and state law malicious prosecution claims, the coercion claim, and the recently added suppression claim. (Defs.' Mot., Docket Entry 180.) Defendants are not moving for summary judgment on Plaintiff's fabrication of evidence or Monell claims. (Defs.' Mem., Docket Entry 180-3, at 1 n.1.) Plaintiff filed his opposition on August 17, 2016, and Defendants filed their reply on September 23, 2016. (Pl.'s Opp., Docket Entry 183; Defs.' Reply, Docket Entry 186.)

DISCUSSION

I. Legal Standard

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 44 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986). In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, " 'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.' " Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

## II. Coercion Claim

Defendants argue that the Court should grant summary judgment on Plaintiff's coercion claim because the confession was not coerced as a matter of law. (Defs.' Mem. at 4.) Without citing to the parties' 56.1 Statements, Defendants describe the events surrounding Plaintiff's interview and point out that, for example, there is no "evidence that [Plaintiff] was subjected to any kind of physical or verbal threats by Detective McCready on the way to Headquarters," and at the beginning of the interview, "the questions and answers ... were conversational and the [P]laintiff answered the questions in a completely narrative fashion." (Defs.' Mem. at 5-6.) Defendants argue that Plaintiff admits that he and the Detectives discussed a variety of topics including his father's businesses, his family and his personal life, and that he provided information on these topics. (Defs.' Mem. at 6.) Defendants also contend that Plaintiff was "not threatened with any physical harm" other than Detective McCready allegedly screaming at him and "jamming his finger into [his] chest" after the questioning became accusatory. (Defs.'

Mem. at 6, 8.) Defendants maintain that at some point during the interview, Plaintiff volunteered to draw sketches of the house, his parents' bedroom, and the card player's cars in the driveway. (Defs.' Mem. at 7.) They also argue that "[P]laintiff has produced no evidence that he exhibited any outward signs of being in shock." (Defs.' Mem. at 7.)

**\*16** Defendants contend that Plaintiff's ultimate admission, "Yeah I did it," was "the result of a non-accusatory question" and "in the wake of the [P]laintiff having been told that his father had regained consciousness, thereby enhancing its reliability." (Defs.' Mem. at 9.) Defendants acknowledge that there is a genuine issue of fact whether, during the discussion of the crime, Plaintiff acquiesced to the Detectives' suggestions or spoke in a narrative fashion. (Defs.' Mem. at 9.) However, they argue that Plaintiff's testimony—that when the Detectives made a suggestion, he would initially deny the suggestion—reflects that "[Plaintiff] knew what he was doing, and what he was saying, and voluntarily chose to go along with their suggestions." (Defs.' Mem. at 12-13.) They argue that given the length and nature of the interrogation, it "can hardly be viewed as an interrogation that was repetitive, prolonged or relentless." (Defs.' Mem. at 11.) Moreover, Defendants point out that the courts that previously reviewed Plaintiff's conviction found the confession to be voluntary and the tactics used by the Detectives to be permissible. (Defs.' Mem. at 12-13.) Regarding the Waiver Card, Defendants argue that there is no "evidence that [Plaintiff] did not understand his Miranda rights ... or that he lacked the requisite level of comprehension to make an effective waiver...." (Defs.' Reply at 11.) Finally, Defendants argue that they are entitled to qualified immunity. (Defs.' Mem. at 14-17.)

Plaintiff argues that there are issues of material fact as to whether the confession was coerced. (Pl.'s Opp. at 9-19.) Plaintiff contends that he was only seventeen years old and "just experienced the profound trauma of finding his parents the victims of gruesome deadly attacks." [46] (Pl.'s Opp. at 10.) He alleges that he was in shock that morning and "believed ... that he was in some sort of nightmare." (Pl.'s Opp. at 10.) Plaintiff maintains that he was "interrogated in a coercive environment under coercive conditions" and that he was particularly susceptible to coercion due to his "youth, psychological and emotional fragility, and inexperience with law enforcement." (Pl.'s Opp. at 11.) For example, Plaintiff alleges that the Detectives intentionally isolated him from family members and his family's attorney, despite multiple requests to speak to the attorney at his home that morning

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 45 of 105

Tanklett v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

and during the interview. (Pl.'s Opp. at 11-12.) Further, he maintains that during the five-and-a-half hours that he was interrogated, he was not offered anything to eat besides a cup of coffee when he arrived. [47] (Pl.'s Opp. at 12.) He also argues that he was not advised of his Miranda rights when the questioning began. [48] (Pl.'s Opp. at 12.)

[46]    Defendants argue that at seventeen, Plaintiff was considered an adult pursuant to New York Penal Law, and the District Court that considered his habeas petition described him as "sophisticated" and an "above average high school student." (Defs.' Reply at 7.)

[47]    Defendants contend that he was "only subjected to questions of an accusatory nature for approximately 40 minutes." (Defs.' Reply at 8.) Additionally, they argue that there is no evidence in the record that Plaintiff requested and was denied food. (Defs.' Reply at 9.)

[48]    Plaintiff points out that he has not alleged separate claims for violations of his Miranda rights or his right to counsel, but has proffered evidence of these alleged violations to demonstrate coercion. (Pl.'s Opp. at 9, n.5.)

Plaintiff also alleges that the Detectives screamed and cursed at him, and Detective McCready jammed his finger into Plaintiff's chest. (Pl.'s Opp. at 13.) Further, Plaintiff contends that the Detectives made him repeat "his story 6 to 12 times," "refused to accept his truthful account" and then lied to him about his hair being found in his mother's hand, a humidity test the police purportedly conducted, and that Plaintiff's father had implicated him. (Pl.'s Opp. at 13-14.) After the Detectives allegedly had Plaintiff believing that he committed the crime, Plaintiff alleges that the Detectives "fed him gruesome, nonpublic details about how his parents had been murdered [and] ... coerced the traumatized teen into adopting these statements as his own." (Pl.'s Opp. at 14-15.) Finally, Plaintiff argues that the Detectives are not entitled to qualified immunity.

A plaintiff may bring a Section 1983 coercion claim "if coercion was applied to obtain a waiver of the plaintiff's rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff in a criminal proceeding." Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998). To establish a violation of the accused's Fifth Amendment

right against self-incrimination, "[a] plaintiff must point to circumstances indicating that [ ]he could not make a knowing and voluntary decision." Sedunova v. City of N.Y., 652 Fed.Appx. 29, 31 (2d Cir. 2016). "The test for whether a statement was improperly obtained by coercion is determined by the totality of the circumstances." Higazy v. Templeton, 505 F.3d 161, 170 (2d Cir. 2007) (internal quotation marks and citation omitted); see also Safir, 156 F.3d at 347-48 (explaining that factors to consider include, "whether Miranda warnings were properly administered or waived, whether counsel was present, whether the defendant knew the nature of the offense with which he was charged, ... the time elapsing between arrest and the confession, ... the characteristics of the accused[,] the conditions of interrogation and[,] the conduct of the law enforcement officials."). The assessment of voluntariness is a "fact-intensive inquiry" during which the court should consider " 'the accused's characteristics, the conditions of [the] interrogation, and the conduct of law enforcement officials.' " Thomsen v. City of N.Y., No. 15-CV-2668, 2016 WL 590235, at *9 (S.D.N.Y. Feb. 11, 2016) (quoting United States v. Taylor, 745 F.3d 15, 24 (2d Cir. 2014)). When a confession is "obtained under circumstances that overbear the defendant's will at the time it is given," it is not voluntary. Thomsen, 2016 WL 590235, at *9.

 *17  "Qualified immunity shields government officials from civil suits for damages" if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Higazy, 505 F.3d at 169 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L.Ed. 2d 396 (1982)). To determine whether qualified immunity applies, courts consider "whether the facts shown make out a violation of a constitutional right and whether the right at issue was clearly established at the time of the defendant's alleged misconduct." Estate of Devine v. Fusaro, ––– Fed.Appx. ––––, at *1 (2d Cir. 2017) (internal quotation marks and citation omitted). Whether a right was clearly established should be analyzed from the perspective of a reasonable law enforcement officer, and the relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Devine, 2017 WL 362685, at *1. When there are issues of fact that bear on the issue of qualified immunity, summary judgment on qualified immunity grounds must be denied. See Clark v. City of N.Y., No. 09-CV-2533, 2015 WL 5719612, at *7 (E.D.N.Y. Sept. 29, 2015).

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 46 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)
2017 WL 2729084

The Court finds that there are issues of material fact that preclude summary judgment on Plaintiff's coercion claim. For example, Plaintiff alleges that during the interview, the questions "never seemed to stop" and that he was "questioned almost continuously until he broke," while Defendants maintain that the interview was conversational and Plaintiff spoke in a narrative fashion. (Pl.'s 56.1 Counterstmt. ¶ 24; Defs.' 56.1 Stmt. ¶ 99.) Additionally, Plaintiff claims that the Detectives prevented him from talking to Fox, the family attorney, at the crime scene that morning and denied his requests to speak to Fox during the interview. (Pl.'s 56.1 Counterstmt. ¶¶ 27-28.) In contrast, Detective McCready denied that Plaintiff ever asked to speak to Fox. (Pl.'s 56.1 Counterstmt. ¶ 28.) Examining the facts in the light most favorable to Plaintiff, including his age and the events of that morning, a reasonable jury could find that the Detectives obtained the confession by coercion and violated Plaintiff's constitutional rights.[49] See Weaver v. Brenner, 40 F.3d 527, 537 (2d Cir. 1994) (holding that there were issues of fact on coercion claim when officers allegedly told the accused that if he told them what he did they would "keep [it] out of the newspapers" and that if he did not cooperate it would be difficult on his family and lied regarding statements from others implicating him) (internal quotation marks omitted); Thomsen, 2016 WL 590235, at *9 (holding that plaintiff stated a coercion claim at motion to dismiss stage when officer allegedly promised him leniency, lied to him about the existence of video tapes depicting him committing the crime, and manipulated him).

[49]    Defendants argue that this Court should adopt the reasoning of the state and federal courts that held that Plaintiff's confession was admissible, because "the reasoning and analysis of these Courts is beyond challenge." (Defs.' Mem. at 13.) However, those prior decisions, which are not binding, evaluated whether Plaintiff's confession was voluntary based on the evidence presented during a pre-trial hearing—not on the record before this Court.

Nonetheless, the Court may still grant summary judgment for Defendants if "[they] can demonstrate that they are entitled to qualified immunity." Clark, 2015 WL 5719612, at *7 (citation omitted); see also Deskovic v. City of Peekskill, 894 F. Supp. 2d 443, 451 (S.D.N.Y. 2012) ("Summary judgment may be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness [if] the defendant show[s] that no reasonable jury, viewing the evidence in

the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law.") (quoting O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003)) (internal quotation marks omitted) (alteration in original). The Second Circuit has held that in 1989, shortly after the events at issue here, "it was clearly established ... that criminal suspects had a due process right to be free from official conduct designed to overcome the accused's will and produce an involuntary incriminating statement." Weaver, 40 F.3d at 536. Thus, this right was clearly established when Plaintiff was questioned by the Detectives.[50] The more complex question is whether a reasonable officer would understand the conduct to be a violation of Plaintiff's rights. If the interview proceeded as Plaintiff described—particularly, if the Detectives denied his repeated requests for counsel—the factfinder could determine that a reasonable officer would understand that conduct to be unlawful. Therefore, at this juncture, Defendants are not entitled to qualified immunity. See Weaver, 40 F.3d at 537 ("Review of this record leads us to conclude that there are genuine issues of material fact as to whether defendants engaged in the alleged coercive conduct. Since defendants hotly dispute plaintiff's allegations, a factual determination of their conduct is needed to resolve the issue of qualified immunity."); Higazy, 505 F.3d at 174 ("Where there is a dispute about the material facts, th[e] question [of whether the officer's conduct was objectively reasonable] must be resolved by the factfinder.").

[50]    Defendants again point to the decisions of prior state and federal courts to support their argument that "it cannot be said that at the time of the claim it was clearly established that such conduct would be violative of a plaintiff's constitutional rights." (Defs.' Mem. at 16.) This argument is belied by the Second Circuit's holding in Weaver. Further, the decisions referred to by Defendants were based on the record in the criminal proceeding. See supra note 49. The Court finds that there are genuine issues of material fact in this record that preclude dismissal of this claim on qualified immunity grounds.

*18   Therefore, Defendants' motion for summary judgment on the coercion claim is DENIED.

III. Malicious Prosecution Claims
Defendants argue that Plaintiff's malicious prosecution claim under Section 1983 and New York law must be dismissed

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 47 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

for several reasons. (Defs.' Mem. at 17-27.) First, they argue that there was probable cause to commence and continue the prosecution against Plaintiff. (Defs.' Mem. at 19-24.) Defendants acknowledge that there is a dispute regarding the manner in which Plaintiff's alleged confession was obtained but contend that "the existence of probable cause independent of the allegedly falsified evidence is a defense" to a malicious prosecution claim. (Defs.' Mem. at 20.) Defendants point to the Court's prior Order, which dismissed Plaintiff's false arrest claim based on the existence of probable cause, as support for their argument.[51] See Tankleff, 2010 WL 5341929, at *13-14 (describing evidence independent of the confession that provided probable cause for Plaintiff's arrest). Second, Defendants maintain that Plaintiff cannot establish that the charges against him terminated in a favorable manner. (Defs.' Mem. at 25-27.) Defendants appear to argue that Plaintiff's Section 1983 malicious prosecution claim is barred by Heck v. Humphrey, 512 U.S. 477 (1994), because Plaintiff has not "produce[d] any evidence beyond that alleged in the complaint which would more strongly establish his actual innocence." (Defs.' Mem. at 26.) Third, Defendants argue that they are entitled to qualified immunity because there was "arguable probable cause" to initiate and continue the prosecution. (Defs.' Mem. at 27.)

51    Defendants also argue that if the Court grants summary judgment on Plaintiff's coercion claim, it should consider Plaintiff's admissions in the probable cause analysis, and that those admissions further support the existence of probable cause. (Defs.' Mem. at 24-25.) Because the Court has denied summary judgment on the coercion claim, see supra section II, it declines to consider this argument.

Plaintiff argues that whether there was probable cause to initiate or continue the prosecution against Plaintiff should be decided by a jury, particularly in light of the "factual dispute as to whether Defendants fabricated Plaintiff's confession, ... misrepresented to prosecutors that the narrative of the crime originated with Plaintiff [and] taint[ed] the grand jury process." (Pl.'s Opp. at 20.) Regarding Defendants' argument that the Court's prior Order supports a dismissal of the malicious prosecution claim on similar grounds, Plaintiff argues that "probable cause to arrest is different than probable cause to prosecute." (Pl.'s Opp. at 21.) While an indictment creates a presumption of probable cause, Plaintiff contends that he has presented sufficient evidence to rebut that presumption. (Pl.'s Opp. at 22-23.) Plaintiff further argues

that even if the Court were to find that there was probable cause to initiate the prosecution, probable cause dissipated after Plaintiff's indictment, including because of "powerful later evidence that [Plaintiff's] statement was not true, and that another perpetrator was likely involved." (Pl.'s Opp. at 24.) Finally, Plaintiff maintains that he has established the favorable termination element of his claim because the indictments were dismissed based largely on evidence of his innocence. (Pl.'s Opp. at 29-31.)

*19  To sustain a section 1983 malicious prosecution claim, plaintiff must show "a violation of his rights under the Fourth Amendment" and establish "the elements of a malicious prosecution claim under state law." Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010) (internal citations omitted). "[U]nder New York law, a plaintiff must prove: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Id. (internal quotation marks and citations omitted); see also Colon v. City of N.Y., 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 1250, 468 N.Y.S.2d 453 (1983). Setting aside the requirement that Plaintiff demonstrate a violation of his Fourth Amendment rights, the elements of Plaintiff's Section 1983 and state law malicious prosecution claims are identical. See Genovese v. Cty. of Suffolk, 128 F. Supp. 3d 661, 668 (E.D.N.Y. Sept. 8, 2015) ("[T]he distinction between state and federal claims of malicious prosecution does not affect the Court's analysis, because the elements of a malicious prosecution claim are identical under Section 1983 and New York law."). As a result, the Court will analyze Plaintiff's malicious prosecution claims together.[52]

52    Because Defendants do not address the initiation or malice elements, the Court presumes that they have conceded those elements and declines to address them.

A. Heck and Favorable Termination[53]

53    Analyzing whether Plaintiff's claims are barred by Heck and whether he obtained a favorable termination of the charges under state law requires an examination of the same underlying facts. However, the two analyses are distinct. See Spak v. Phillips, 857 F.3d 458, 462 (2d Cir. 2017) ("While the same phrase—'favorable termination'—is used in both the accrual analysis and the merits analysis

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 48 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

of a Section 1983 suit, it is analyzed under a different legal standard in each context. When the question before a federal court is at what point a malicious prosecution claim accrued, 'favorable termination' is analyzed under federal common law.... When, by contrast, a federal court is analyzing the merits of a plaintiff's claim, the definition of 'favorable termination' is analyzed under state law.") (internal citations omitted).

In Heck, the Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, ... a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." Heck, 512 U.S. at 486-87, 114 S. Ct. 2364, 2372, 129 L.Ed. 2d 383. Relying on an analogy to malicious prosecution's favorable termination requirement, the Supreme Court explained that if a claim requires that the Plaintiff prove "the unlawfulness of his conviction or confinement ... the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Id. Thus, Heck operates as a bar to section 1983 malicious prosecution claims unless the conviction or sentence has been invalidated by one of the four methods specified by the Supreme Court. The Second Circuit recently clarified the application of Heck to malicious prosecution and other Section 1983 claims in Poventud v. City of N.Y., 750 F.3d 121 (2d Cir. 2014) (en banc). The Court explained that "[i]n the context of § 1983 malicious prosecution cases, Heck's bar is coextensive with the favorable termination requirement," and "the tort cannot stand unless the underlying criminal case[ ] 'finally end[s] in failure.' " Poventud, 750 F.3d at 131 (quoting DeBlasio v. City of N.Y., 102 F.3d 654, 657 (2d Cir. 1996)) (internal citations omitted).

To determine whether Plaintiff has established the favorable termination element of his claim, the Court must look to New York law. Clark, 2015 WL 5719612, at *10; see also Negron v. Wesolowski, 536 Fed.Appx. 151, 152 (2d Cir. 2013) (" 'Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law—in this case New York state law—for such rules.' ") (quoting Conway v. Vill. of Mount Kisco, 750 F.2d 205, 214 (2d Cir. 1984)) (alteration in original). Under New York law, a plaintiff is not "require[d]

to prove [his] innocence," but rather to "demonstrate a final termination that is not inconsistent with innocence." Clark, 2015 WL 5719612, at *9 (alteration in original) (internal quotation marks and citation omitted); see also Smalls v. City of N.Y., 181 F. Supp. 3d 178, 188 (E.D.N.Y. 2016) ("[T]he reversal need not affirmatively demonstrate the accused's innocence."). Further, "any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination...." Poventud, 750 F.3d at 130 (quoting Smith-Hunter v. Harvey, 95 N.Y.2d 191, 195, 734 N.E.2d 750, 753, 712 N.Y.S.2d 438 (2002)). When charges are dismissed in the interests of justice, the New York Court of Appeals has declined to establish a per se rule, but rather directed courts to consider " 'whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused.' " Genovese, 128 F. Supp. 3d at 672 (quoting Cantalino v. Danner, 96 N.Y.2d 391, 396, 754 N.E.2d 164, 168, 729 N.Y.S.2d 405 (2001)). Moreover, when a prosecutor formally or voluntarily abandons the charges, the abandonment "can constitute a favorable termination, as long as the abandonment did not result from a compromise, an act of mercy requested by or accepted by the accused, or misconduct by the accused." Clark, 2015 WL 5719612, at *10.

**20** In light of the particular circumstances in this case, the Court finds that the disposition of the charges against Plaintiff constitute a favorable termination. Plaintiff's convictions were vacated by the Appellate Division based upon newly discovered evidence presented by Plaintiff at the 440.10 Hearing. Tankleff, 49 A.D.3d at 162, 848 N.Y.S.2d at 288. Subsequently, the Attorney General moved to dismiss the indictments in the interests of justice. (N.Y.S. Mot. to Dismiss, Pl.'s Ex. 40, Docket Entry 184-46.) The Attorney General moved to dismiss the indictments for several reasons, including changes in the law, the passage of time, and "evidence of problematic conduct" by Detective McCready. (N.Y.S. Mot. to Dismiss at 5.) However, relevant to this inquiry, the Attorney General also moved to dismiss because "there is no biological or physical evidence strongly linking the defendant to the crimes, even after a renewed set of forensic tests using the most up-to-date technology," and "there is some evidence that others may have committed the killings." (N.Y.S. Mot. to Dismiss at 5.) The Attorney General's investigation also led to the discovery of a "previously unnoticed bloody imprint" of a knife on the bed sheets in the master bedroom which did not match the Watermelon Knife or any other knife in the home.

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 49 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

(N.Y.S. Mot. to Dismiss at 5-6.) Because the indictments were dismissed in part based on evidence that tends to show that another individual was responsible, the disposition is not inconsistent with Plaintiff's innocence. See Genovese, 128 F. Supp. 3d at 672. Moreover, the charges cannot be brought again and the abandonment of the charges was not the result of a compromise with Plaintiff. See Poventud, 750 F.3d at 131; Clark, 2015 WL 5719612, at *10. The favorable termination element of Plaintiff's malicious prosecution claims is satisfied. See Clark, 2015 WL 5719612, at *10 (holding that the prosecutor's abandonment of the charges based on "evidence that could or would be elicited and explored at trial" was a favorable termination); Smalls, 181 F. Supp. 3d 178, 188 (holding that criminal proceedings terminated favorably based on reversal of conviction by Appellate Division).

Further, because the charges against Plaintiff terminated in his favor, Plaintiff's Section 1983 malicious prosecution claim is not barred by Heck. As discussed, Plaintiff's conviction was vacated by "a state tribunal authorized to make such determination." See Heck, 512 U.S. at 486-87, 114 S. Ct. 2364, 2372, 129 L.Ed. 2d 383. Additionally, the proceedings ultimately terminated in Plaintiff's favor when the indictments were dismissed. [54] See Spak, 857 F.3d at 464 ("So long as a particular prosecution has been 'conclusively' terminated in favor of the accused, such that the underlying indictment or criminal information has been vacated and cannot be revived, then the plaintiff has a justiciable claim for malicious prosecution.").

[54]   Relying on DeBlasio v. City of N.Y., 102 F.3d 654 (2d Cir. 1996), the Court previously suggested that Plaintiff may be required to make a stronger showing of his innocence to overcome Heck's bar. In DeBlasio, the Second Circuit held that DeBlasio's malicious prosecution claim was barred by Heck because while his original conviction was vacated pursuant to a writ of habeas corpus, he was retried and convicted on a lesser charge. DeBlasio, 102 F.3d at 655. The Second Circuit further held that the proceeding terminated when he was convicted on the lesser charge and not when the writ of habeas corpus was issued, because the writ could not be considered an "indication of innocence." Id. at 658. To the extent that federal common law requires a plaintiff alleging malicious prosecution to "demonstrate that the outstanding conviction has been conclusively invalidated in

a manner that demonstrates his innocence," the Court finds that, based on its review of the record, Plaintiff has made such a showing. Spak, 857 F.3d at 465.

B. Probable Cause

"Although the existence of probable cause must be determined with reference to the facts of each case," Manganiello, 612 F.3d at 161, generally, there is probable cause when "knowledge of facts, actual or apparent, [is] strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." Riccio v. New York, 859 F. Supp. 2d 480, 486 (E.D.N.Y. 2012) (quoting Genia v. N.Y. State Troopers, No. 03-CV-0870, 2007 WL 869594, at *12 (E.D.N.Y. Mar. 20, 2007)); see also Thomsen, 2016 WL 590235, at *7 ("The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases ... Probable cause, in the context of malicious prosecution, has ... been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.") (internal quotation marks and citation omitted) (alteration in original). In New York, "the existence of probable cause is a complete defense to a claim of malicious prosecution...." Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003). Moreover, "indictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " Savino, 331 F.3d at 72 (quoting Colon, 60 N.Y.2d at 83, 455 N.E.2d at 1251) (emphasis in original). See also Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994). Plaintiff "bears the burden of proof in rebutting the presumption, and he must do so with more than mere conjecture and surmise that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." Reid v. City of N.Y., No. 00-CV-5164, 2004 WL 626228, at *7 (S.D.N.Y. Mar. 29, 2004), R&R adopted by, 2004 WL 1488194 (S.D.N.Y. July 1, 2004) (quoting Savino, 331 F.3d at 73) (internal quotation marks omitted). Further, the failure to take certain investigative steps is "not the equivalent of fraud or the suppression of evidence." Colon, 60 N.Y. 2d at 78, 455 N.E.2d at 1251, 468 N.Y.S.2d at 456.

*21   The Second Circuit has held that " 'even when probable cause is present at the time of the arrest, evidence could later surface which would eliminate that probable cause.' " Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir.

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 50 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

1996) (quoting Cox v. Cty. of Suffolk, 780 F. Supp. 103, 108 (E.D.N.Y. 1991)). However, " '[i]n order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact.' " Fappiano v. City of N.Y., No. 01-CV-2476, 2015 WL 94190, at *13 (E.D.N.Y. Jan. 7, 2015), aff'd 640 Fed.Appx. 115 (2d Cir. 2016) (quoting Lowth, 82 F.3d at 571).

The Court finds that the record is rife with factual disputes related to whether there was probable cause to initiate or continue the prosecution of Plaintiff. In particular, Defendants conceded for the purposes of this motion that there are issues of fact as to whether the confession was fabricated. (Defs.' Mem. at 1 n.1.) If the confession was fabricated, that alone could be sufficient to rebut the presumption of probable cause. Morel v. Reed, Nos. 11-CV-1808, 12-CV-5145, 2015 WL 3755976, at *4 (E.D.N.Y. June 16, 2015) ("When law enforcement officers fabricate evidence ... the presumption of probable cause created by the indictment [is] overcome...."). Further, a reasonable jury could find that probable cause dissipated after Plaintiff was indicted, based on, inter alia, forensic analysis which showed that there was no blood on the purported murder weapons or in the shower, traps, and drains, as well as Steuerman's suspicious behavior. [55]

[55]   Defendants argue that these claims should be dismissed based on the Court's prior determination that there was probable cause to arrest Plaintiff. (Defs.' Mem. at 21-23.) However, this argument fails to consider that probable cause to arrest and probable cause to initiate and continue a prosecution are different standards and analyzing whether each standard is met can involve examining different facts. See Thomsen, 2016 WL 590235, at *7.

Defendants are also not entitled to summary judgment based on qualified immunity. If, as Plaintiff maintains, Plaintiff's statements were coerced and the prosecution was initiated based on a confession fabricated by Defendants, the factfinder could conclude that no reasonable officer would believe that there was probable cause to prosecute. See Smalls, 181 F. Supp. 3d at 189 ("Officers who knowingly lie are not protected by qualified immunity."); Clark, 2015 WL 5719612, at *7 (denying summary judgment on qualified immunity grounds due to factual dispute as to the existence of probable cause). Dismissal on qualified immunity grounds is not appropriate at this time. See Deskovic, 894 F. Supp. 2d at 461-62 (denying motion for summary judgment on qualified

immunity grounds in light of allegations of fabrication and coercion when "a reasonable jury could find that officers of reasonable competence would agree that there was not probable cause to prosecute [plaintiff], given the exculpatory DNA results and general lack of other evidence").

Therefore, Defendants' motion for summary judgment on the Section 1983 and state law malicious prosecution claims is DENIED.

IV. Suppression Claim

Defendants argue that they are entitled to summary judgment on the suppression claim because there is no evidence that Dr. Adams told any detective that he believed the Watermelon Knife was not the murder weapon. (Defs.' Mem. at 28.) Defendants also contend that Plaintiff cannot establish that any detective learned this information, or identify which detective learned it and allegedly withheld it from prosecutors. [56] (Defs.' Mem. at 29.) Further, Defendants argue that even if one of the detectives did become aware of Dr. Adams' conclusion, the failure to disclose did not violate Brady because defense counsel "either knew, or should have known, of the essential facts permitting him to take advantage of that exculpatory evidence." (Defs.' Mem. at 32.) Finally, Defendants maintain that this claim is barred by the statute of limitations. (Defs.' Mem. at 32-33.)

[56]   Defendants have submitted affidavits in which Detective McCready, Detective Carmody, Detective Kosciuk, and Detective Rein deny being present at Arlene's autopsy. Sergeant Doyle does not recall if he was at Arlene's autopsy. (Pl.'s 56.1 Counterstmt. ¶ 102; McCready Aff., Defs.' Ex. FFF, ¶ 9; Doyle Aff., Defs.' Ex. DDD, ¶ 9; Carmody Aff., Defs.' Ex. CCC, at ¶ 9; Kosciuk Aff., Defs.' Ex. EEE, ¶ 10; Rein Aff., Defs.' Ex. GGG, at ¶ 9.)

*22  Plaintiff responds that there is an issue of material fact as to whether Dr. Adams communicated his conclusion to detectives. (Pl.'s Opp. at 32.) He argues that the evidence in the record establishes that it was the department's practice to have a detective present at the autopsy, and handwriting on what appears to be a diagram of the wounds on Arlene's back has been attributed to Detective Rein. (Pl.'s Opp. at 32.) Plaintiff points out that when Dr. Adams was shown that diagram during his deposition, he stated that it appeared to be drawn by an individual who was present at the autopsy. (Pl.'s Opp. at 32.) Moreover, Plaintiff contends that "many Defendants themselves confirmed that they knew that the

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 51 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

[W]atermelon [K]nife was not used in the crime" during the reinvestigation by the Attorney General's Office. (Pl.'s Opp. at 33.) Plaintiff also disputes that his defense counsel could have obtained this information and argues that his defense counsel should not be faulted for relying on the representation of prosecutors that all exculpatory evidence had been disclosed. (Pl.'s Opp. at 34-35.) Further, he argues that the Court should not permit Defendants' "blame the defense rationale to absolve the government of its Brady obligations." (Pl.'s Opp. at 35 (internal quotation marks omitted).) Plaintiff contends that based on the evidence in the record, "a jury could conclude that Defendants knew of, and withheld, Brady evidence." (Pl.'s Opp. at 38.) Finally, Plaintiff argues that this claim is timely under the relation back doctrine and claims that Defendants had adequate notice because the original Complaint included a suppression of evidence claim. (Pl.'s Opp. at 38-39.)

In Brady v. Maryland, the Supreme Court held that "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L.Ed. 2d 215 (1963). Because withholding exculpatory evidence violates the accused's right to a fair trial, a Brady violation may form the basis for a Section 1983 claim. See Fappiano, 640 Fed.Appx. at 118. To prevail on a Section 1983 claim on a Brady theory, (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching," (2) "th[e] evidence must have been suppressed by the State, either willfully or inadvertently," and (3) "prejudice must have ensued." Poventud, 750 F.3d at 133 (quoting United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004)) (internal quotation marks omitted). To evaluate prejudice, the courts should consider materiality, that is, whether there is a "reasonable probability of a different result" based on the allegedly suppressed evidence and "whether in its absence [the plaintiff] received a fair trial." Id. (quoting Leka v. Portuondo, 257 F.3d 89, 104 (2d Cir. 2001)). Officers may be liable on a Brady theory only when they commit such violations intentionally. See Fappiano, 640 Fed.Appx. at 118. Moreover, "[e]vidence is not suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of the exculpatory evidence." United States v. Taylor, 17 F. Supp. 3d 162, 177 (E.D.N.Y. 2014) (quoting United States v. Guerrero, 959 F. Supp. 2d 523, 531 (S.D.N.Y. 2013)) (internal quotation marks omitted).

The Court finds that there are issues of material fact that preclude summary judgment on this claim. At a minimum, whether Dr. Adams ever disclosed his opinion to Defendants is an issue of material fact. Dr. Adams testified during his deposition that he "must have communicated" his conclusion in "some sense" and it was a "reasonable supposition" that he did so during the autopsy. [57] (Adams. Dep. Tr. 192:22-193:21.) Combined with the testimony from several witnesses regarding the department's custom of having a detective present at all autopsies, the diagram allegedly drawn by Detective Rein, Detective Carmody's notes from a meeting with Dr. Adams indicating a "clear knife issue," and the subsequent statements of Detective Rein, Sergeant Doyle, Detective Kosciuk, and Detective Pfalzgraf that they did not believe the Watermelon Knife was the weapon, Plaintiff has presented enough evidence to defeat summary judgment. (Pl.'s 56.1 Counterstmt. ¶¶ 93-95, 122, 123-27.)

[57]     Defendants claim that Dr. Adams testified that "he could have said something about the knife, or he could have said nothing," but this characterization is misleading. (Defs.' Mem. at 29 (internal quotation marks omitted).) In response to a question regarding what he would have said to detectives, he testified: "I could have said that or I could have said nothing, and then they bring in the [W]atermelon [K]nife and I could have said, I don't like that very much for these wounds." (Adams. Dep. Tr. 191:18-21.)

**\*23** Wisely, Defendants do not dispute that Dr. Adams' conclusion is material, but instead argue that Plaintiff's defense counsel could have or should have discovered this information independently. The Court is not persuaded. Defense counsel had no reason to believe that there was exculpatory information regarding the murder weapon beyond what was documented in the autopsy and forensic reports received from the prosecutor. See United States v. Payne, 63 F.3d 1200, 1209 (2d Cir. 1995) (holding that failure to disclose affidavit that was available in a public court records was suppressed within the meaning of Brady because there was "no indication that Payne's counsel was aware of facts that would have required him to discover the affidavit through his own diligent investigation"). In his opening statement, the prosecutor himself said that the Tankleffs' injuries were not inconsistent with having been caused by the Watermelon Knife. (Trial Tr. (Opening), Defs.' Ex. B, 27:20-28:9.) To expect defense counsel to infer that

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 52 of 105

Tankleff v. County of Suffolk, Not Reported in Fed. Supp. (2017)

2017 WL 2729084

there was information contrary to that representation before trial, or to cross-examine Dr. Adams on this issue during trial, would be inconsistent with Brady's mandate. Accordingly, the Court declines to dismiss the claim on these grounds.

Finally, Plaintiff's suppression claim is timely under the relation back doctrine. Federal Rule of Civil Procedure 15 provides that "[a]n amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." See FED. R. CIV. P. 15(c)(1)(B); see also Slayton v. Am. Express Co., 460 F.3d 215, 228 (2d Cir. 2006). Further, "the 'central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading.' " Slayton, 460 F.3d at 228 (quoting Stevelman v. Alias Research Inc., 174 F.3d 79, 86 (2d Cir. 1999)).

In the Complaint, Plaintiff asserted a claim for suppression of evidence, alleging that "Defendants McCready and Rein knowingly and deliberately chose not to document or disclose to the prosecutors information that was favorable and material to Mr. Tankleff's defense, including, without limitation, the truth about how they elicited the so-called confession...." (Compl. ¶ 160 (emphasis supplied).) The Brady claim in the Amended Complaint alleges that Defendants withheld information regarding one piece of evidence—the Watermelon Knife—with greater specificity, but the nature of the conduct is similar to the conduct alleged in Count IV of the original Complaint. See Triano v. Town of Harrison, N.Y., 895 F. Supp. 2d 526, 530 n.3

(S.D.N.Y. 2012) (holding that Monell claim related back to claim against officer in original complaint because both claims arose "from the alleged violations of [plaintiff's] constitutional rights by [officer] during [p]laintiff's arrest"). Thus, Defendants were on notice of alleged Brady violations when the original Complaint was filed. That this claim was dismissed in a subsequent order does not change the result because Defendants were given notice of similar allegations during the statute of limitations period. Slayton, 460 F.3d at 228.

Therefore, Defendants' motion for summary judgment on the suppression claim is DENIED.

<u>CONCLUSION</u>

Defendants' motion for summary judgment (Docket Entry 180) is DENIED, and the case will proceed to trial. Because no claims remain against Lieutenant McElhone, the Clerk of the Court is directed to TERMINATE Lieutenant McElhone as a defendant in this action. See supra note 2. As to Plaintiff's request for a pre-trial conference (Docket Entry 190), the parties are directed to file a joint proposed pre-trial order on or before September 8, 2017. The parties are further directed to appear for a pre-trial conference with Judge Shields on September 11, 2017 at 10:30 a.m.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2729084

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5730605

2015 WL 5730605
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard Holt DUNKELBERGER
and Sarah Allen, Plaintiffs,
v.
Richard Henry DUNKELBERGER, Merilyn Gale
Dunkelberger, William Willard Dunkelberger,
Benjamin Dunkelberger, Scott Reilly, Joseph Izzo,
Ryan Delaney, Come N. Ketchakeu, Anthony Gentile,
Craig, Siegal, John Fitzgerald and John Doe, Defendants.

No. 14–CV–3877 (KMK).
|
Signed Sept. 30, 2015.

**Attorneys and Law Firms**

Anthony M. Giordano, Esq., Giordano Law Office, Ossining, NY, for Plaintiffs.

Jonathan Matthew Victor, Esq., Law Office of Jonathan Victor PLLC, Mahopac, NY, for Defendants Richard Henry Dunkelberger, Merilyn Gale Dunkelberger, William Willard Dunkelberger, and Benjamin Dunkelberger.

Inna Ringh, Esq., Adam Joseph Sansolo, Esq., Attorney General of the State of New York, New York, NY, for Defendants Scott Reilly, Joseph Izzo, Ryan Delaney, Come N. Ketchakeu, and Anthony Gentile.

Eric Daniel Feldman, Esq., Law Firm of Louis Ginsberg, P.C., New York, NY, for Defendants Craig Siegal and John Fitzgerald.

*OPINION & ORDER*

KENNETH M. KARAS, District Judge.

**\*1** Plaintiffs Sarah Allen ("Sarah") and Richard Holt Dunkelberger ("Richard") bring claims against Richard Henry Dunkelberger ("Dunkelberger"), Merilyn Gale Dunkelberger ("Gayle"), William Willard Dunkelberger ("William"), and Benjamin Dunkelberger ("Benjamin") (collectively the "Dunkelberger Defendants"); Scott Reilly ("Reilly"), Joseph Izzo ("Izzo"), Ryan Delaney ("Delaney"),

Come N. Ketchakeu ("Ketchakeu"), and Anthony Gentile ("Gentile") (collectively the "State Trooper Defendants"); and Craig Siegal ("Siegal") and John Fitzgerald ("Fitzgerald") (collectively the "Somers Police Defendants"), alleging that Defendants violated their constitutional rights and committed state torts.[1] The Dunkelberger Defendants, the State Trooper Defendants, and the Somers Police Defendants move to dismiss all claims asserted against them. For the following reasons, each Motion is granted in part and denied in part.

[1] Because many of the Parties share the same last name, the Court follows the naming conventions used in the Complaint.

*I. Background*

*A. Factual Background*

The following facts are taken from Plaintiffs' Second Amended Complaint and are assumed to be true for the purpose of these Motions To Dismiss.[2] Richard is the son of Dunkelberger and Dunkelberger's former wife, Gayle. (Second Am. Compl. ¶¶ 8–9 (Dkt. No. 16).) William and Benjamin are Richard's brothers. (*Id* . ¶¶ 10–11.) Sarah is Richard's girlfriend. (*Id.* ¶ 123.) Reilly, Izzo, Delaney, Ketchakeu, and Gentile were New York State Troopers stationed at the Somers trooper barracks, (*id.* ¶¶ 12–16); John Doe represents unknown members of the New York State police believed to be stationed in Somers, (*id.* ¶ 19); and Siegal and Fitzgerald were Somers Police Department Officers, (*id.* ¶¶ 17–18).

[2] In their Opposition, Plaintiffs include facts in their "preliminary statement" not alleged in the Second Amended Complaint. Furthermore, they attach two documents in their Opposition to the Somers Police Defendants' and the State Trooper Defendants' Motions, namely a State Police 911 report and the New York State Police Field Manual regarding mentally ill persons. For the reasons discussed below, the Court disregards any facts not alleged in the Second Amended Complaint.

On March 15, 2012, and at all relevant times, Dunkelberger resided in a separate apartment in the home of Richard and Sarah at 210 Rte. 100 in Somers. (*Id.* ¶ 20.) Richard and Dunkelberger had been in an ownership dispute over that property. (*Id.* ¶ 21.) Plaintiffs allege that Richard owned

the property, but years earlier had transferred the title to Dunkelberger without a written agreement or consideration so Dunkelberger could obtain a mortgage to pay off debt, with the understanding that Dunkelberger would pay the mortgage, obtain life insurance to pay the debt in the event of his death, and eventually return title to Richard. (*See id.* ¶ 22.) According to Richard, however, once he transferred the title to Dunkelberger, Dunkelberger obtained a mortgage but did not make any payments or obtain life insurance, and refused to return the title to Richard. (*Id.* ¶ 23.) Richard made payments on the mortgage until 2012, at which point he refused to make further payments and demanded that his father either make the future payments or return the title to him. (*Id.* ¶ 24.) This caused the Dunkelberger Defendants to become angry with Richard. (*Id.* ¶ 25.)

According to Plaintiffs, the Dunkelberger Defendants decided that they would try to have Richard arrested and removed from the property, and then rent the apartment and use the rental income to pay Dunkelberger's mortgage. (*Id.* ¶ 26.) Plaintiffs further allege that the Dunkelberger Defendants agreed that Gayle would file a false police report alleging that Richard threatened to harm himself and had weapons in the house, and "in furtherance of their conspiracy" to remove Richard, Gayle called the state police in Somers on March 15, 2012 and "reported this false claim." (*Id.* ¶¶ 27–28.) Plaintiffs allege, upon information and belief, that Gayle was "advised that the troopers would want to enter the home to search and remove the weapons in there but that they could not enter without a warrant unless an emergency existed," and that if Richard "threatened someone at the house, police could use such a threat to search the house for the person threatened and remove both the weapons" and Richard. (*Id.* ¶ 29.) Plaintiffs allege, upon information and belief that "at the direction of the State Police," Gayle had Dunkelberger picked up at his apartment and driven to Gayle's home, then reported to the police that Dunkelberger might be in danger. (*Id.* ¶ 30.) Plaintiffs allege, upon information and belief, that the "police did not ask Gayle for the source of her information regarding Richard's alleged suicide or her belief that Dunkelberger might be in danger." (*Id.* ¶ 31 (internal quotation marks omitted).) On March 15, 2012, before the police arrived, Dunkelberger left his apartment, entered a vehicle operated by one of the Dunkelberger Defendants, and drove to Gayle's home. (*Id.* ¶ 32.) Plaintiffs allege that all Defendants knew that Dunkelberger was not at the residence. (*Id.* ¶ 112.)

**\*2** At approximately 6:20 PM on March 15, 2012, Richard and Sarah were at their home when Richard saw a police vehicle in the driveway, and he exited the home and walked to the edge of the fence to ask why they were there. (*Id.* ¶¶ 33–34.) Delaney, standing behind a police vehicle, yelled into a microphone, asking if anyone else was in the house. (*Id.* ¶ 36.) Plaintiff said yes and, without warning, cause, or justification, a trooper standing next to Delaney pointed a shotgun at Richard's head and ordered him not to move. (*Id.* ¶ 37.) At the same time, another trooper raised a semi-automatic revolver at Richard. (*Id.* ¶ 38.) With two weapons pointed at him, Richard heard a shotgun rack behind him and assumed it was pointed at him. (*Id.* ¶ 39.) At this time, Delaney demanded Richard provide his name and age. (*Id.* ¶ 42.) Richard gave his name and began reaching for his wallet for identification, and a state trooper holding a semiautomatic pistol raised it toward Richard's head and told him not to reach. (*Id.* ¶ 43.) Richard was handcuffed from behind and forced to lie down on a concrete walk. (*Id.* ¶ 44.) Delaney demanded that Richard disclose where he kept his guns, and struck him in the back with a fist or foot, causing him pain and to lose his breath. (*Id.* ¶ 45.)

Two troopers picked Richard up off the ground and began a search of his person. (*Id.* ¶ 46.) No one informed Richard why they were there or why he was detained. (*Id.* ¶ 47.) Although Richard's hands were handcuffed behind his back, a state trooper continuously aimed a weapon at Richard. (*Id.* ¶ 48.) During the search, police found a small pocketknife used by Richard to open his nicotine gum in his wallet. (*Id.* ¶ 49.) A trooper asked Richard why he carried the knife, Richard responded that he used it to open his nicotine gum, and a nearby trooper holding a shotgun raised it toward Richard, racked it, and shouted, "gun." (*Id.* ¶ 50.) Richard was then placed, handcuffed, into the back of a state trooper vehicle. (*Id.* ¶ 51.) At the time, no trooper had asked Richard if he was suicidal or had threatened harm to himself or anyone else. (*Id.*) Richard complained to the troopers that the handcuffs were too tight and were hurting him, but the troopers did not loosen them. (*Id.* ¶ 52.)

Before Richard was placed in the car, two troopers banged on the kitchen door, which was answered by Sarah. (*Id.* ¶¶ 53–55.) The troopers saw Plaintiffs' dog and ordered Sarah to secure it in another room. (*Id.* ¶ 56.) The troopers then entered the house, asking, without providing context, where Dunkelberger was. (*Id.* ¶ 57.) At no time before that did the troopers ask Sarah whether Richard was suicidal or whether Dunkelberger might be in danger. (*Id.* ¶ 58.) Sarah told police

2015 WL 5730605

she did not know where Dunkelberger was, but assumed he was in his apartment, and the two troopers escorted Sarah upstairs and began a room-to-room search of the home, beginning with Dunkelberger's apartment. (*Id.* ¶ 59.) There was no objective indication that an emergency situation existed, and the troopers ignored the fact that the apartment had a separate outside entrance. (*Id.*) As the troopers searched the home, the Somers Police Defendants arrived and joined the search. (*Id.* ¶ 62.) At various points during the search, all of the Somers Police Defendants and the State Trooper Defendants entered the home. (*See id.* ¶ 63.) At no time during the police action did Richard express suicidal ideations, appear mentally ill, or act in a manner likely injurious to himself or others. (*Id.* ¶ 64.)

**\*3** Gayle was present and observed the search of Plaintiffs' home from Plaintiffs' driveway, with the consent of the State Trooper Defendants. (*Id.* ¶ 65.) The troopers then sought access to Richard's gun safe to remove the weapons. (*Id.* ¶ 66.) Delaney demanded that Sarah tell him where the gun safe was, and, after having Sarah remove the dog from the bedroom, Delaney entered the bedroom to access the locked and secured gun safe. (*Id.* ¶¶ 67–69.) Delaney demanded Sarah give him the key to the safe, but she did not have it and told him that she did not know where it was kept, at which time Delaney threatened to arrest her for obstructing justice. (*Id.* ¶¶ 70–71.)

At that point, Richard was finally asked by a trooper if he had threatened to harm himself or kill himself, and Richard told him no. (*Id.* ¶¶ 73–74.) Fitzgerald then approached Richard and told him that prescription drugs were found out of their bottles, and that Richard would likely be charged with a felony. (*Id.* ¶ 75.) Delaney then came to the car and demanded that Richard give him the gun safe key. (*Id.* ¶ 76.) Richard denied having the key, and Delaney accused him of lying and threatened to rip the safe off the wall or have a locksmith come to open it. (*Id.* ¶ 77.) Richard declined to provide the key or otherwise respond to interrogation, exercising his Fifth Amendment rights. (*Id.* ¶ 78.) However, Delaney, without having administered *Miranda* warnings, continued to interrogate Richard, and threatened to arrest him if he continued to refuse to disclose the key's whereabouts. (*Id.* ¶ 79.) When Delaney threatened to arrest Sarah, Richard agreed to disclose the key's location to Sarah. (*Id.*) Sarah was then escorted to the patrol car, where she saw at least six officers in the driveway with weapons out, and Richard gave her the combination to a case, inside of which was the gun safe key. (*Id.* ¶¶ 80–81.) Sarah was escorted back to the house, but, when she was unable to immediately open the case due to

the trauma caused by the circumstances, Delaney roughly grabbed her arm and threatened to arrest her if she did not open the case "now." (*Id.* ¶ 82.) Once they gained access to the safe, the police began removing the weapons. (*Id.* ¶ 83.) In Sarah's presence, one officer asked Delaney what to do with bb guns in the safe, to which Delaney responded that "all weapons were to be removed as it would 'be a shame to have to come back and kill him [Richard] over bb guns.' " (*Id.* ¶ 84.)

After police removed the weapons, Delaney drove Richard to the hospital for admission under New York's Mental Hygiene Law § 9.41, "notwithstanding the fact that [Richard] exhibited no indicia of mental illness or suicidal ideations or threatening conduct." (*Id.* ¶ 85.) Doctors found Richard competent and not a suicide risk and released him. (*Id.* ¶ 90.) Additionally, Richard was charged with weapons possession for an unregistered handgun, but the charge was dropped by prosecutors due to the allegedly illegal search of his home and gun safe. (*Id.* ¶ 91.) Plaintiffs allege that during the criminal prosecution, state troopers provided false information in an attempt to justify their detention, including that Richard was observed "frothing at the mouth." (*Id.* ¶ 92.)

**\*4** In December 2012, John Doe, an unknown state police officer, released Richard's weapons to the Dunkelberger Defendants without Richard's permission. (*Id.* ¶ 93.) The Dunkelberger Defendants have since refused to return the weapons to Richard, despite Richard having demanded their return and despite Richard being the true owner of the guns. (*Id.*)

Plaintiffs further allege that the search and seizure was done without a warrant and at no time was Richard intoxicated, incapacitated, threatening or disorderly, and had committed no criminal offense and engaged in no criminal behavior in the presence of police or known to police." (*Id.* ¶¶ 94, 97–98.) Plaintiffs further allege that they did not consent to police entering their home. (*Id.* ¶ 101.)

### B. Procedural Background

Plaintiffs filed suit in New York State Supreme Court, County of Westchester on April 18, 2014. (*See* Notice of Removal (Dkt. No. 1).) The Somers Police Defendants removed to federal court on May 30, 2014, (*see id.*), which was consented to by the State Trooper Defendants, (*see* Dkt. No. 5), and by the Dunkelberger Defendants, (*see* Dkt. No. 6). On June 16, 2014, Plaintiffs filed the First Amended Complaint. (Dkt. No. 9.) On September 24, 2014, the Court held a pre-

motion conference, and granted Plaintiffs permission to file a Second Amended Complaint and for Defendants to then move to dismiss. (*See* Dkt. (minute entry for Sept. 24, 2014).) Plaintiffs filed the Second Amended Complaint on October 14, 2014. (Dkt. No. 16.)

Pursuant to a schedule set by the Court, (Dkt. (minute entry for Sept. 24, 2014)), and extended on request of the Parties, (Dkt. No. 24), the Parties submitted the following papers: On October 29, 2014, the Dunkelberger Defendants filed their Motion To Dismiss and accompanying papers, (Dkt. No. 17), Plaintiffs filed their opposition on December 29, 2014, (Dkt. No. 26), and the Dunkelberger Defendants replied on January 5, 2015, (Dkt. No. 29). On October 30, 2014, the Somers Police Defendants filed their Motion and accompanying papers, (Dkt.Nos.18–19), Plaintiffs filed their opposition on December 29, 2014, (Dkt. No. 27), and the Somers Police Defendants replied on January 6, 2015, (Dkt. No. 30). Finally, the State Trooper Defendants filed their Motion and accompanying papers on November 3, 2014, (Dkt.Nos.21–22), Plaintiffs filed their opposition on December 29, 2014, (Dkt. No. 28), and the State Trooper Defendants replied on January 23, 2015, (Dkt. No. 32). On July 31, 2015, the Court issued an Order granting Plaintiffs permission to file a surreply memorandum no later than August 7, 2015, responding to arguments raised for the first time in the State Trooper Defendants' Reply Memorandum, (Dkt. No. 33.), which was timely filed (Dkt. No. 34).

## II. Discussion

### A. Standard of Review

Defendants moves to dismiss Plaintiffs' Second Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alterations, citations, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement ." *Id.* (alterations and internal quotation marks

omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level...." *Twombly,* 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id; see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed.R.Civ.P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*5** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also Dixon v. United States,* No. 13–CV–2193, 2014 WL 23427, at \*1 (S.D.N.Y. Jan. 2, 2014) ("For the purpose of this motion to dismiss, we assume that the facts alleged in [the plaintiff's] complaint are true."). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res ., Inc.,* No. 13–CV–4384, 2014 WL 182341, at \*1 n. 1 (S.D.N.Y. Jan.16, 2014) (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir.2012)).

### B. Analysis

#### 1. Materials Considered in Deciding this Motion

As noted above, in opposing Defendants' Motions, Plaintiffs include facts in their "preliminary statement" not alleged in the Second Amended Complaint. Furthermore, they attach two documents in their Opposition to the Somers Police Defendants' and the State Trooper Defendants' Motions, namely a State Police 911 report and the New York State Police Field Manual regarding mentally ill persons. (*See* Pls.' Mem. of Law in Opp'n to Somers Defs. S[ie]gal and Fitzgerald's Mot. To Dismiss ("Pls. Somers Police Opp'n")

2015 WL 5730605

Exs. A, B (Dkt. No. 27); Mem. of Law in Opp'n to Def. State Police's Mot. To Dismiss Pursuant to Rule 12(b) (6) of the FRCP ("Pls. State Trooper Opp'n") Exs. A, B (Dkt. No. 28).) "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted); *see also Hendrix v. City of New York,* No. 12–CV–5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec.20, 2013) (same). "To be incorporated by reference, the complaint must make a clear, definite[,] and substantial reference to the documents[,] and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Bill Diodato Photography LLC v. Avon Prods, Inc.,* No. 12–CV–847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (brackets and internal quotation marks omitted). When considering whether a plaintiff relies on the document in framing the complaint, it is sufficient if "the complaint relies heavily, albeit implicitly, upon [the document's] terms and effect." *Capela v. J.G. Wentworth, LLC,* No. 09–CV–882, 2009 WL 3128003, at *1 n. 2 (E.D.N.Y. Sept. 24, 2009); *see also Baraliu v. Vinya Capital, L.P.,* No. 07–CV–4626, 2009 WL 959578, at *4 (S.D.N.Y. Mar. 31, 2009) (noting that a court may review "any documents that are integral to [the] plaintiff's allegations even if not explicitly incorporated by reference").

**\*6** The Court disregards all factual assertions contained in the summaries of facts in Plaintiffs' opposition papers but not in the Second Amended Complaint. *See Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading[s] for purposes of Rule 12(b.)."); *Green v. City of Mount Vernon,* —— F.Supp.3d ——, 2015 WL 1455701, at *10 (S.D.N.Y. Mar.31, 2015) (declining to consider new factual allegations made by plaintiffs in their opposition papers); *Tolliver v. Skinner,* No. 12–CV–971, 2013 WL 658079, *11 (S.D.N.Y. Feb.11, 2013) (same); *McCray v. City of New York,* No. 03–CV–9685, 2007 WL 4352748, at *30 n. 34 (S.D.N.Y. Dec.11, 2007) (same); *GCG Int'l, Inc. v. Eberhardt,* No. 05–CV–2422, 2005 WL 2647942, at *4 (S.D.N.Y. Oct.17, 2005) (same); *Arnold v. Goetz,* 245 F.Supp.2d 527, 539 (S.D.N.Y.2003) (same). [3] As to the documents attached to Plaintiffs' Opposition to the Somers Police Defendants and the State Trooper Defendants, Plaintiffs offer no basis for the Court to consider them. The Second Amended Complaint refers to the Manual in two paragraphs, (*see* Second Am. Compl. ¶¶ 87, 89), but this is insufficient to incorporate the document by reference. Indeed, "[l]imited quotation does not constitute incorporation by reference," *Looney v. Black,* 702 F.3d 701, 716 n. 2 (2d Cir.2012) (internal quotation marks omitted), and Plaintiffs did not even do that. Furthermore, because there is no reference to the 911 report in the Second Amended Complaint, it is not integral to the Complaint, and this is not the type of document of which the Court may take judicial notice. *See Alvarez v. Cty. of Orange,* —— F.Supp.3d ——, 2015 WL 1332347, at *10–11 (S.D.N.Y. Mar.25, 2015) (declining to take judicial notice of a police incident report).

[3]    It bears noting that Plaintiffs are not proceeding pro se.

*2. Qualified Immunity*

"A police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (citation and internal quotation marks omitted); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (same). Because qualified immunity is "an affirmative defense [that] ... reflects an immunity from suit rather than a mere defense to liability[,] .... it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss." *Betts v. Shearman,* No. 12–CV–3195, 2013 WL 311124, at *4 (S.D .N .Y. Jan. 24, 2013), *aff'd,* 751 F.3d 78 (2d Cir.2014) (emphasis and internal quotation marks omitted). "In the case of allegations to which probable cause is a complete defense, such as false arrest or imprisonment, the Second Circuit has defined the standard of qualified immunity as one of 'arguable probable cause.' " *Id.* (footnote omitted) (quoting *Cerrone,* 246 F.3d at 202). "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Cerrone,* 246 F.3d at 202–03 (internal quotation marks omitted). In other words, an officer is entitled to qualified immunity if (1) "it was objectively reasonable for the officer to believe that probable cause existed," or (2) "officers of reasonable competence could disagree on whether

Dunkelberger v. Dunkelberger, Not Reported in F.Supp.3d (2015)

2015 WL 5730605

the probable cause test was met." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991); *see also Betts,* 2013 WL 311124, at *4 (same).

### 3. Plaintiffs' Claims against Police Officer Defendants

#### a. State Claims

**\*7** The State Trooper Defendants and the Somers Police Defendants moved to dismiss the state claims asserted against them. (Mem. of Law in Supp. of Defs. Siegal and Fitzgerald's Mot. to Dismiss the Compl. ("Somers Police Defs.' Mem.") 14–15 (Dkt. No. 19); Mem. of Law in Supp. of the State Defs.' Mot. to Dismiss Pls.' Second Am. Compl. ("State Trooper Defs.' Mem.") 15–16 (Dkt. No. 22).) In their Opposition, Plaintiffs conceded that the state law claims should be dismissed. (Pls. Somers Police Opp'n 19; Pls. State Trooper Opp'n 19.) These claims are therefore dismissed. *See Alvarez,* 2015 WL 1332347, at *12 (dismissing claims where the plaintiff conceded he had failed to plausibly plead them and stated that he did not oppose the relief requested by the defendants); *Willner ex rel. Willner v. Doar,* No. 12–CV–1955, 2013 WL 4010205, at *1 (E.D.N.Y. Aug. 5, 2013) (dismissing a claim after the plaintiff made concessions in his opposition brief and consented to the dismissal of his due process claim); *Murphy v. Keller Indus., Inc.,* No. 95–CV–7643, 2002 WL 91622, at *1 (S.D.N.Y. Jan.23, 2002) (granting the defendant's motion to dismiss after the plaintiff, in her opposition papers, "expressly conced[ed] that her claim against the [defendant] [was] barred by the Federal Tort Claims Act").

#### b. Fourth Amendment Unreasonable Search Claim

Plaintiffs bring a Fourth Amendment claim against the State Trooper Defendants and the Somers Police Defendants based on the warrantless search of Plaintiffs' home. The Somers Police Defendants and the State Trooper Defendants move to dismiss. (*See* Somers Police Defs.' Mem. 6–11; State Trooper Defs.' Mem. 6–9.) "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *United States v. Bershchansky,* 788 F.3d 102, 110 (2d Cir.2015) (quoting U.S. Const. amend. IV). "Police officers must first obtain a warrant before they search a person's home, unless exigent or other circumstances justify a warrantless search." *Id.; see also Fernandez v. California,* ––– U.S. ––––, ––––, 134 S.Ct. 1126, 1132, 188 L.Ed.2d 25 (2014) ( "Our cases establish that a warrant is generally required for a search of a home, but the ultimate touchstone of the Fourth Amendment

is reasonableness. And certain categories of permissible warrantless searches have long been recognized." (citations and internal quotation marks omitted)); *Kentucky v. King,* 563 U.S. 452, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable. But we have also recognized that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness. Accordingly, the warrant requirement is subject to certain reasonable exceptions." (alteration, citations, and internal quotation marks omitted)). Because warrantless searches of the home are presumptively unreasonable, in the absence of a warrant, police officers need " 'probable cause plus exigent circumstances in order to make a lawful entry into a home.' " *Harris v. O'Hare,* 770 F.3d 224, 231–32 (2d Cir.2014) (quoting *Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002)); *see also Soller v. Boudreux,* No. 12–CV–167, 2015 WL 500492, at *11 (E.D.N.Y. Feb.3, 2015) (" '[W]hether the officers had probable cause ..., is the first requirement for a warrantless search on the basis of exigent circumstances.' " (alterations in original) (quoting *Harris,* 770 F.3d at 232)). The Supreme Court has "identified several exigencies that may justify a warrantless search of a home." *King,* 131 S.Ct. at 1856 (discussing the exigencies that may justify a warrantless search). For example, as relevant here, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (internal quotation marks omitted).

**\*8** Here, the State Trooper Defendants argue that the exigent circumstances and emergency aid exceptions apply. (State Trooper Defs.' Mem. 6–9.)[4] In such cases, the relevant question is whether " 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.' " *Jackson v. City of New York,* 29 F.Supp.3d 161, 174 (E.D.N.Y.2014) (alteration in original) (quoting *Mincey v. Arizona,* 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)); *see also Harris,* 770 F.3d at 233 ("The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." (internal quotation marks omitted)). Defendants also invoke the emergency aid exception. " 'This ... exception does not depend on the officers' subjective intent or the seriousness of any crime

Dunkelberger v. Dunkelberger, Not Reported in F.Supp.3d (2015)

2015 WL 5730605

they are investigating when the emergency arises.' " *Soller,* 2015 WL 500492, at *12 (some internal quotation marks omitted) (quoting *Michigan v. Fisher,* 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009)). " 'It requires only an objectively reasonable basis for believing ... that a person within the house is in need of immediate aid[,]' i.e., "that medical assistance was needed, or persons were in danger[.]' " *Id.* (citation omitted) (quoting *Fisher,* 558 U.S. at 47). In determining the reasonableness of the officer's belief that exigent circumstances existed, "[c]ourts must apply an objective standard," but nonetheless must apply the "probable cause requirement ... by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Tierney v. Davidson,* 133 F.3d 189, 196–97 (2d Cir.1998) (alteration and internal quotation marks omitted).

4        The Somers Police Defendants merely argue that they had probable cause to search the home, (*see* Somers Police Defs.' Mem. 5–6), but the existence of probable cause, on its own, is insufficient to justify a warrantless home search.

The Somers Police Defendants further claim that Sarah permitted them to enter, thus implying that consent could be another basis for the constitutionality of this search. (*See id.* at 2.) Although Defendants may be able to make this argument at summary judgment, here, Plaintiffs plainly allege that "[a]t no time did [P]laintiffs consent to police entering their home to conduct a search of it or consent to a search of [Richard's] gun safe." (Second Am. Compl. ¶ 101.)

According to the facts alleged in the Second Amended Complaint, Gayle called the New York State Police and made a false report that Richard threatened to harm himself and had weapons in the house. (Second Am. Compl. ¶¶ 27–28.) Allegedly, on the direction of the state police, Gayle had Dunkelberger picked up at his apartment and taken to Gayle's house. (*Id.* ¶¶ 30, 32.) Further, Gayle reported to the State Police that Dunkelberger "might be in danger." (*Id.* ¶ 30 (internal quotation marks omitted).) When the State Trooper Defendants arrived and asked Richard if anyone else was in the house, he responded, "yes." (*Id.* ¶¶ 36–37.) Sarah further told the State Trooper Defendants that she did not know Dunkelberger's whereabouts, but assumed he was in his apartment. (*Id.* ¶ 59.) However, Plaintiffs also allege that the State Trooper Defendants and the Somers Police Defendants *knew* Dunkelberger was not at the residence. (*Id.*

¶ 112.) Plaintiffs further emphasize that, other than the phone call from Gayle, there was no indication that Richard was mentally unstable or that there was any emergency situation. (*See, e.g., id.* ¶¶ 59, 64, 66, 90.)

**\*9** Information "provided by a single complainant can establish probable cause when that information is sufficiently reliable and corroborated." *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994). "Significantly, when information furnished by a single complainant suffices to establish probable cause, such information often comes from the victim, who has provided specific details of the crime." *Id.; see also Morrison v. Brooks,* No. 13–CV–4216, 2015 WL 1276768, at *5 (E.D.N.Y. Mar.13, 2015) ("Information indicating guilt of any crime furnished to police by the victim of a crime generally suffices to establish probable cause, where it seems reasonable to believe that the victim is telling the truth." (alteration, citations, and internal quotation marks omitted). Courts have also held that identification by an eyewitness alone can suffice to establish probable cause, in the absence of any reason to believe that person is not telling the truth. *See, e.g., Bailey v. City of New York,* 79 F.Supp.3d 424, 444 (E.D.N.Y .2015) ("Law enforcement officials have probable cause to arrest if they receive credible information from putative victims or eyewitnesses. A court will consider the reliability of the identification, including the corroborating circumstances and whether there was reason to question the veracity of the witness." (citations omitted)); *Vanderwoude v. City of New York,* No. 12–CV–9046, 2014 WL 2592457, at *15 (S.D.N.Y. June 10, 2014) ("[I]dentification of an individual as a perpetrator of a crime by a putative victim of, or eyewitness to, the crime is in itself sufficient to establish probable cause, as long as it is reasonable to believe that the putative victim or eyewitness is telling the truth." (internal quotation marks omitted)), *reconsideration denied,* 2014 WL 5139341 (S.D.N.Y. Sept.30, 2014); *United States v. McManus,* No. 12–CR–356, 2012 WL 3526669, at *2 (S.D.N.Y. Aug. 10, 2012) (holding that an identification from "a disinterested eyewitness to one of the robberies ... alone justified [the] arrest").

Here, under the facts alleged in the Complaint, the tip from Gayle was not anonymous, which points toward the existence of probable cause. *Compare Kerman v. City of New York,* 261 F.3d 229, 235 (2d Cir.2001) (holding that an anonymous 911 call "could not, by itself, justify the warrantless entry" into a home), *with Sha v. N.Y.C. Police Dep't Twentieth Precinct, Detectives, Officers Doe,* No. 03–CV–5273, 2005

WL 877852, at *5 (S.D.N.Y. Apr.18, 2005) (noting, in holding that there was probable cause for a warrantless entry, that "[t]he fact that [the complainant] was not an anonymous caller is a crucial point"). Additionally, the Second Circuit has recognized that even "an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality." *United States v. Simmons,* 560 F.3d 98, 105 (2d Cir.2009). "This approach recognizes the need for police to act on reports of an emergency situation without delay, but still requires police officers to corroborate allegations of criminal activity in some meaningful way." *Id.* (citation omitted).

 **\*10** However, even assuming that Defendants would have been justified in conducting a warrantless search of Plaintiffs' home based on Gayle's tip on its own, or that they would have been entitled to qualified immunity for the same, Plaintiffs have alleged enough facts to plausibly claim that the search was still unreasonable. According to Plaintiffs' allegations, at the time the warrantless search began, Richard, who had come out of the house, was identified and handcuffed by the State Trooper Defendants. (*See* Second Am. Compl. ¶¶ 34, 43–44.) Furthermore, according to Plaintiffs, before entering the home, Sarah had also come to the front door. (*Id.* ¶ 54.) These allegations are most similar to the facts in *United States v. Simmons,* 661 F.3d 151 (2d Cir.2011). In that case, officers entered the suspect's home, "removed him from his bedroom, placed him against the wall in the common hallway, and made sure that he had nothing in his possession that could harm them ." *Id.* at 157. He was cooperative and non-combative. *Id.* In deciding that the subsequent warrantless search was unreasonable, the Second Circuit emphasized that "before conducting the search, the officers had effectively allayed the safety concerns that justified their initial questioning of [the suspect] and had, by exercising control over a compliant occupant and the surrounding premises, neutralized any threat that [the suspect] or the gun may have initially posed." *Id.* at 158. "Under these circumstances," the Second Circuit held, "there was simply no 'urgent need' to further search the home for the gun without a warrant." *Id.* Furthermore, based on the facts alleged in the Second Amended Complaint, the officers knew that Dunkelberger was not present in the home, and therefore there was no reason to believe "that a person within the house [was] in need of immediate aid," *Soller,* 2015 WL 500492, at *12, and, given that Richard was restrained outside of the house, there was no need whatsoever to enter the home to recover the weapons at that time without a warrant, *see Simmons,* 661 F.3d at 158–59 (rejecting the

argument that another person could have been in the home that either was in danger or posed a threat because there was no reason to believe anyone other than the suspect was in the home); *cf. Schoolcraft v. City of New York,* ——— F.Supp.3d ———, 2015 WL 2070187, at *32 (S.D.N.Y. May 5, 2015) (holding that because "the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance," even if the initial warrantless entry is justified, the decision to remain is also evaluated on a reasonableness standard), *reconsideration granted on other grounds,* 2015 WL 5542770 (S.D.N.Y. Sept.18, 2015). Thus, even if Defendants would have been entitled to do a warrantless entry and search of Plaintiffs' home based on Gayle's phone call, or even if they were entitled to qualified immunity on that ground, the search still would not have been justified because any threat Richard posed was neutralized before the search started since he was outside the home, handcuffed, and searched, and, under the facts alleged in the Second Amended Complaint, there was no reason to think that Dunkelberger or any other person was in danger inside the home. Based on the facts alleged, no reasonable officer could think otherwise. Therefore, Defendants' Motion To Dismiss this claim is denied. [5]

5      Of course, this issue could be re-visited at summary judgment, particularly the claim that Gayle worked with the State Trooper Defendants and Somers Police Defendants to remove Dunkelberger before the search was conducted.

### c. False Arrest Claim

 **\*11** Defendants also move to dismiss Plaintiffs' false arrest claim, arguing that they had probable cause to arrest Richard based on the New York Mental Hygiene Law ("MHL"). (*See* State Trooper Defs.' Mem. 9–11.) [6] A " § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006); *see also Widget v. Town of Poughkeepsie,* No. 12–CV–3459, 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013) (same). "In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred." *Jaegly,* 439 F.3d at 151 (internal quotation marks omitted); *see also Ackerson v. City of White Plains,* 702 F.3d 15, 19 (2d Cir.2012) ("A § 1983 claim for false arrest ... is substantially the same as a claim for

2015 WL 5730605

false arrest under New York law." (internal quotation marks omitted)). [7] Under New York Law, which is applicable here, "an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.' " *Ackerson,* 702 F.3d at 19 (quoting *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 314 (N.Y.1975)).

[6]  The Somers Police Defendants argue generally there was probable cause to arrest. (*See* Somers Police Defs.' Mem. 5–6.)

[7]  "In New York, the tort of false arrest is synonymous with that of false imprisonment." *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991); *see also Williams v. City of Mount Vernon,* 428 F.Supp.2d 146, 157 (S.D.N.Y.2006) (same). The only difference between § 1983 claims for false arrest and New York claims for false arrest or false imprisonment is that, under § 1983 the "tortfeasor [must] act under color of state law." *Williams,* 428 F.Supp.2d at 157 (internal quotation marks omitted).

The State Trooper Defendants and the Somers Police Defendants do not contest that the first three elements are met, but rather argue that the arrest was privileged because there was probable cause to arrest. (*See* State Trooper Defs.' Mem. 9–11; Somers Police Defs .' Mem. 5–6.) "Probable cause 'is a complete defense to an action for false arrest' brought under New York law or § 1983." *Ackerson,* 702 F.3d at 19 (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996)); *see also Conte v. Cty. of Nassau,* No. 06–CV–4746, 2010 WL 3924677, at *12 (E.D.N.Y. Sept. 30, 2010) (same). Requirements for arrests pursuant to the New York Mental Hygiene Law are interpreted "consistently with the requirements of the Fourth Amendment." *Kerman,* 261 F.3d at 240 n. 8. The State Trooper Defendants argue that there was probable cause to arrest based on the New York Mental Hygiene Law. Specifically, New York Mental Hygiene Law § 9.41 provides that

[a]ny peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's

department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39....

"[L]ikely to result in serious harm" is defined as:

**\*12**  (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. Mental Hyg. Law § 9.01. Thus, Defendants' arrest of Richard was privileged if "they had probable cause to conclude that [he] was acting in a manner that invoked Section 9.41." *Amato v. Hartnett,* 936 F.Supp.2d 416, 435 (S.D.N.Y.2013); *see also Tsesarskaya v. City of New York,* 843 F.Supp.2d 446, 456 (S.D.N.Y.2012) ("[The][d]efendants' conduct is privileged where there was probable cause to believe that the individual was a danger to herself or others."); *Glowczenski v. Taser Int'l Inc.,* No. 04–CV–4052, 2010 WL 1936200, at *6 (E.D.N.Y. May 13, 2010) ("[B]efore a person can be seized and detained for psychiatric evaluation, an official must have probable cause to believe that the person is dangerous to himself or others.").

"An objective reasonableness standard is applied to police behavior under Section 9.41, as well as to claims under the Fourth Amendment," and the question thus becomes " 'whether the facts and circumstances known to the officers at the time they seized Plaintiff were sufficient to warrant a person of reasonable caution to believe that [he] might be mentally ill and conducting [himself] in a manner likely to result in serious harm to [himself].' " *Amato,* 936 F.Supp.2d

at 435 (alterations in original) (quoting *Nicholas v. City of Binghamton,* No. 10–CV–1565, 2012 WL 3261409, at \*5 (N.D.N.Y. Aug.8, 2012)); *see also Burdick v. Johnson,* No. 06–CV–1465, 2009 WL 1707475, at \*6 (N.D.N.Y. June 17, 2009) (same). "Whether a person seized pursuant to the MHL is later found to be mentally competent and released is irrelevant to the probable cause analysis." *Burdick,* 2009 WL 1707475, at \*6; *see also Bayne v. Provost,* No. 04–CV–44, 2005 WL 1871182, at \*7 (N.D.N.Y. Aug. 4, 2005) ("Like in the criminal context, a police officer is justified in relying upon a citizen's warning that another person has threatened suicide even if it is later determined by mental health professionals that the person presents no such risk ."); *Sanchez v. Town of Greece,* No. 98–CV–6433, 2004 WL 1964505, at \*4 (W.D.N.Y. Sept.1, 2004) ("A mental hygiene arrest can be based on probable cause even though it is later determined that the arrested person does not suffer from a dangerous mental condition."); *Vallen v. Connelly,* No. 99–CV–9947, 2004 WL 555698, at \*8 (S.D.N.Y. Mar.19, 2004) ("Just as actual innocence will not render an arrest invalid if it is based on then-existing probable cause that criminal activity is occurring, a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition." (citation omitted)), *aff'd,* 185 F. App'x 22 (2d Cir.2006).

**\*13** Defendants rely on the phone call from Gayle, in which she stated that Richard threatened to harm himself, that he had guns in the house, and that Dunkelberger might be in danger. (Second Am. Compl. ¶¶ 27–28, 30.) Again, there is no indication that Gayle was a witness or that she told Defendants the basis for her knowledge, and Plaintiffs allege, upon information and belief, that the "police did not ask Gayle for the source of her information regarding Richard's alleged suicide or her belief that Dunkelberger might be in danger." (*Id.* ¶ 31 (internal quotation marks omitted).) Once Defendants arrived, Richard exhibited no behavior indicating that he might be a risk to himself or others. (*See, e.g., id.* ¶¶ 59, 64, 66, 90.) Additionally, as discussed above, Plaintiffs allege that Defendants knew that Dunkelberger was not in the home. (*Id.* ¶ 112.)

It is a close call whether Defendants would generally be entitled to rely exclusively on the phone call from Gayle to establish probable cause. Defendants had more information than cases where courts have held there was insufficient probable cause. For example, in *Kerman,* the officers made a warrantless entry into the plaintiff's home and detained him based solely on an anonymous and uncorroborated 911

call. 261 F.3d at 237–38. There, the Second Circuit held that there was insufficient probable cause but nonetheless upheld the district court's grant of summary judgment on the false arrest claim on the basis of qualified immunity. *Id.* Here, by contrast, the phone call was not anonymous. But Defendants also had less information than cases where courts have held there was sufficient probable cause to arrest. For example, in *Bayne v. Provost,* No. 04–CV–44, 2005 WL 1871182 (N.D.N.Y. Aug. 4, 2005), a licensed nurse who was employed by the plaintiff to aid him in his daily activities "called the 911 emergency number after having a telephone conversation with [the][p]laintiff," "informed the 911 operator that she was a nurse, that [the][p]laintiff was her patient, and that [the][p]laintiff had told her during a telephone call that he planned to commit suicide," and indicated that one possible method of suicide might be an overdose of pills, and, upon arriving, the troopers "observed multiple bottles of pills about the residence." *Id.* at \*1–2. There, unlike in this case, the tipper provided the basis for her knowledge, and at least one aspect of her story was corroborated before the arrest. In other cases, such as *Mittelman v. County of Rockland,* No. 07–CV–6382, 2013 WL 1248623 (S.D.N.Y. Mar. 26, 2013), the tipper was an eyewitness and the victim of the alleged threats. *See id.* at \*12 ("[The officer] was informed by [the complainant] directly that [the plaintiff] threatened to shoot him. That alone provided probable cause to arrest him .... " (citation omitted)). Finally, in *Glowczenski v. Taser International Inc.,* No. 04–CV–4052, 2010 WL 1936200 (E.D.N.Y. May 13, 2010), a mother called the police reporting that her son was "having a psychotic episode, and was hearing voices." *Id.* at \*2 (internal quotation marks omitted). The court held that the mother's 911 calls, combined with the fact that the officers had knowledge of the son's history of mental illness and the fact that the family expressed fear that he might be a danger to himself was sufficient for a finding that probable cause existed. *Id.* at \*6.

**\*14** Although Defendants may have been entitled to rely on the call from Gayle, or at least may have been entitled to qualified immunity on this ground, in the absence of other allegations, here Defendants had reasons to doubt the veracity of Gayle's statements. In particular, as discussed below, Plaintiffs allege that the police Defendants and the Dunkelberger Defendants, including Gayle, entered into a conspiracy to deprive Ricard of his constitutional rights. Specifically, although Gayle told the police that Dunkelberger might be in danger, Plaintiffs allege that the police Defendants knew that Dunkelberger was not at home. (Am.Compl.¶ 112.) Thus, there were reasons for Defendants to doubt the veracity of Gayle's statement, and, taking Plaintiffs' allegations as true,

2015 WL 5730605

it was unreasonable for them to rely on that statement alone, especially in the absence of any corroborating information, to think they had probable cause to arrest. *See Williams v. City of New York,* No. 14–CV–5123, 2015 WL 4461716, at *4 (S.D.N.Y. July 21, 2015) ("A police officer may have probable cause to arrest and charge a suspect based on information provided by a single victim or witness, 'unless circumstances raise doubts as to the person's veracity.' " (quoting *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir.2001))). [8] Therefore, the Court denies the State Trooper Defendants' and the Somers Police Defendants' Motions To Dismiss the False Arrest claim. [9]

[8]    The Court notes that Plaintiffs' allegations that the Dunkelberger Defendants and the police Defendants conspired to have Dunkelberger removed from Plaintiffs' residence, that Gayle then made the false report, and that the police Defendants then swarmed to Plaintiffs' residence are the only reasons Plaintiffs' claims are surviving the Motions. These claims likely will, at some point, have to be substantiated in order for the case to survive summary judgment.

[9]    To be clear, the Court rejects both Defendants' argument that Plaintiffs fail to state a false arrest claim, and their argument that they are entitled to qualified immunity. As discussed, taking Plaintiffs' allegations as true, the police Defendants did not have even arguable probable cause to arrest Richard under the MHL.

### d. Excessive Force Claim

Defendants next move to dismiss Plaintiffs' Fourth Amendment excessive force claim. (*See* Somers Police Defs.' Mem. 12–14; State Trooper Defs.' Mem. 18–19.) "Application of physical force is excessive when it is more than is necessary under the circumstances." *Brown v. City of New York,* No. 11–CV–1068, 2013 WL 491926, at *10 (S.D.N.Y. Feb. 8, 2013). Qualified immunity may also be a defense to an excessive force claim. In this context, "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Usavage v. Port Auth. of N.Y. & N.J.,* 932 F.Supp.2d 575, 594 (S.D.N.Y.2013) (internal quotation marks omitted). Plaintiffs allege four categories of conduct by Defendants that could arguably constitute excessive force: (1) excessively tight handcuffing of Richard; (2) threatening

Richard and Sarah with arrest and destruction of property; (3) pointing their guns at Richard; and (4) physical force in grabbing Sarah's arm and kicking or punching Richard while he was lying, handcuffed on the ground. The Court will address each type of conduct in turn.

#### i. Handcuffing

The Court will first address whether Plaintiffs have stated an excessive force claim based on the handcuffing of Richard. "Courts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell,* No. 10–CV–1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). This particularized standard reflects the need to balance the "right to use some degree of coercion," including the use of tight handcuffs "to prevent the arrestee's hands from slipping out," *Esmont v. City of New York,* 371 F.Supp.2d 202, 214 (E.D.N.Y.2005) (internal citation omitted), with the use of "overly tight handcuffing" that could constitute excessive force, *Lynch ex rel. Lynch v. City of Mount Vernon,* 567 F.Supp.2d 459, 468 (S.D.N.Y.2008). When considering whether handcuffing constitutes excessive force, a court "is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Usavage,* 932 F.Supp.2d at 592 (internal quotation marks omitted); *see also Pelayo v. Port Auth.,* 893 F.Supp.2d 632, 642 (S.D.N.Y.2012) (same). Additionally, "there is a consensus among courts in [the Second Circuit] that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Usavage,* 932 F.Supp.2d at 592 (brackets and internal quotation marks omitted). "These injuries need not be severe or permanent, but must be more than merely de minimis." *Id.* (citation and internal quotation marks omitted). Here, although Plaintiffs plead that Richard complained to the troopers that the handcuffs were too tight and were hurting him, and that the troopers did not loosen them, (Second Am. Compl. ¶ 52), there is no allegation that Richard suffered any injury as a result. Therefore, Plaintiffs fail to state a claim for excessive force based on the handcuffing of Richard. *See, e.g., Selvaggio v. Patterson,* ––– F.Supp.3d ––––, 2015 WL 1293007, at *13 (E.D.N.Y. Mar.20, 2015) (granting summary judgment on excessive force claim where the evidence showed only minimal injuries such as scabbing and abrasions); *Green,* 2015 WL 1455701, at *20 (dismissing excessive force handcuffing claim, in part because the plaintiff failed to allege that she suffered an injury as a result of the handcuffing); *Lozada v. City of New York,* No. 12–CV–38, 2013 WL 3934998, at *5 (E.D.N.Y. July 29, 2013)

2015 WL 5730605

(granting motion to dismiss excessive force claim because the plaintiff's "vague reference to injuries" and a "complaint of a swelled wrist [were] insufficient" (internal quotation marks omitted)).

### ii. Threats of Arrest and Destruction of Property

**\*15** Plaintiffs allege that Delaney threatened Sarah with arrest, (Second Am. Compl. ¶¶ 71, 79), and threatened that he would rip the gun safe off the wall or get a locksmith to open the safe if Plaintiffs did not cooperate, (*id.* ¶ 77). "A threat of force does not constitute excessive force." *Mittelman,* 2013 WL 1248623, at *13; *see also Smith v. City of New York,* No. 14–CV–5934, 2015 WL 3929621, at *3 n. 3 (S.D.N.Y. June 17, 2015) ("To the extent that [the plaintiff] intends to assert an excessive force claim based on threats of violence in his affidavit, the claim would fail because, in [the Second] Circuit, neither mere verbal abuse nor mere threats of force support an excessive force claim."); *Pelt v. City of New York,* No. 11–CV–5633, 2013 WL 4647500, at *13 (E.D.N.Y. Aug. 28, 2013) ("Because [the] [p]laintiff alleges nothing beyond mere threats of force, [his] excessive force claim fails."). Moreover, even if there are circumstances under which threats could be sufficient for excessive force, a threat of arrest is not such a situation, *see Robertson v. Town of Washington,* No. 13–CV–3020, 2015 WL 1564888, at *11 (W.D.La. Apr.6, 2015) (holding that the plaintiff did not state a claim for excessive force based on, inter alia, a threat to arrest); *Wilson v. Fla. Dep't of Revenue,* No. 14–CV–4726, 2015 WL 136557, at *7 (N.D.Cal. Jan.8, 2015) ("A claim for *threatened* arrest, seizure or search is not cognizable under the Fourth Amendment."); *Periera v. Lizzio,* No. 09–CV–1024, 2012 WL 1205750, at *2 (M.D.Pa. Apr. 11, 2012) ("[T]hreats of arrest alone are insufficient to make out an 'excessive force' claim under the Fourth Amendment."); *Szalabawka v. Russo,* No. 09–CV–88, 2011 WL 7776786, at *15 (W.D.Pa. Sept. 28, 2011) (holding that the plaintiff did not allege an excessive force claim based on allegations that he was told to "shut up" and was threatened with arrest); *Shuey v. Schwab,* No. 08–CV–1190, 2010 WL 479938, at *4 (M.D.Pa. Feb. 4, 2010) ("[T]he alleged threats to arrest [the plaintiff] standing alone cannot support a claim of excessive force."); *Sherman v. City of Davis,* No. 04–CV–2320, 2008 WL 553632, at *9 (E.D.Cal. Feb. 26, 2008) (granting summary judgment on claims related to threats of arrest), *adopted by* 2008 WL 822180 (E.D.Cal. Mar.26, 2008), *aff'd,* 362 F. App'x 726 (9th Cir.2010), nor is a threat to destroy property, *see United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (treating "[e]xcessive or unnecessary destruction of property in the course of a search" as an unreasonable search

violation, rather than an excessive force violation). Therefore, any excessive force claim based on these alleged threats is dismissed.

### iii. Brandishing Weapons

Next, Richard alleges that several officers had guns pointed at him. (Second Am. Compl. ¶¶ 37–39, 41–43.) He was then made to lay face down and was handcuffed from behind. (*Id.* ¶ 44.) The Troopers then searched Richard, finding a small pocketknife. (*Id.* ¶¶ 46, 49.) He was then placed in the police vehicle, still handcuffed. (*Id.* ¶ 51.) After this point, Plaintiffs do not allege that any weapons were pointed at Richard, although at least six officers had their weapons out. (*Id.* ¶ 80.) The State Trooper Defendants and the Somers Police Defendants are, at the very least, entitled to qualified immunity with respect to their use of guns, as the vast majority of cases within the Second Circuit hold that merely drawing weapons when effectuating an arrest does not constitute excessive force as a matter of law, and Plaintiffs do not allege other facts that could change the calculus. *See Cabral v. City of New York,* No. 12–CV–4659, 2014 WL 4636433, at *11 (S.D.N.Y. Sept. 17, 2014) ("[The defendant's] approach with his gun drawn does not constitute excessive force as a matter of law."); *Mittelman,* 2013 WL 1248623, at *13 ("Likewise insufficient is [the][p]laintiff's assertion that the officers pointed guns at him. A threat of force does not constitute excessive force."); *Askins v. City of New York,* No. 09–CV–10315, 2011 WL 1334838, at *3 (S.D.N.Y. Mar.25, 2011) ("While the Second Circuit has noted that circuit law could very well support a claim that a gunpoint death threat issued to a restrained and unresisting arrestee represents excessive force, [the] plaintiff's assertion that a gun was pointed at his head cannot be the basis of a claim for excessive force." (alterations and internal quotation marks omitted)); *Aderonmu v. Heavey,* No. 00–CV–9232, 2001 WL 77099, at *3 (S.D.N.Y. Jan.26, 2001) (dismissing excessive force claim based on an interrogation at gunpoint because the plaintiff "fail[ed] to allege that any physical force was used against him during his interrogation, or that any injuries resulted from [the] defendants' allegedly unconstitutional conduct"). Therefore, Plaintiffs' excessive force claim based on the drawing of the guns is dismissed.

### iv. Physical Force

**\*16** Plaintiffs allege that after Richard was lying face down, with his hands cuffed behind his back, Delaney struck Richard in his back with a fist or foot, causing him pain and to lose his breath. (Second Am. Compl. ¶ 45.) Under the allegations

2015 WL 5730605

in the Second Amended Complaint, there is no indication that Richard was resisting arrest in any way. Additionally, Plaintiffs allege that later Delaney "roughly grabbed" Sarah's arm when she was unable to open the case containing the key to Richard's gun case. (*Id.* ¶ 82.) Defendants argue that this force used was de minimis and therefore cannot state a constitutional violation.

Defendants are correct that "[a]n arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim." *Greenaway v. County of Nassau,* —— F.Supp.3d ——, 2015 WL 1509486, at *9 (E.D.N.Y. Mar.31, 2015) (internal quotation marks omitted) (quoting *Landy v. Irizarry,* 884 F.Supp. 788, 798 n. 14 (S.D.N.Y.1995)). "Such injury need not be severe, however." *Acosta v. City of New York,* No. 11–CV–856, 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012); *see also Kastle v. Town of Kent,* No. 13–CV–2256, 2014 WL 1508703, at *8 (S.D.N.Y. Mar. 21, 2014) (noting that "courts have allowed plaintiffs to recover, even though the injury caused was not permanent or severe, where the force used was excessive" (internal quotation marks omitted) (quoting *Lemmo v. McKoy,* No. 08–CV–4264, 2011 WL 843974, at *6 (E.D.N.Y. Mar.8, 2011))). Indeed, in *Robison v. Via,* 821 F.2d 913 (2d Cir.1987), the Second Circuit held that while the fact that the plaintiff sustained only minor injuries "may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure [to seek medical care for her alleged injuries] is not fatal to her claim." *Id.* at 924.

Here, Plaintiffs have alleged that Richard suffered an injury from the kick or punch. (*See* Second Am. Compl. ¶ 45 ("Upon information and belief, while he was face down, [D]efendant [Delaney] demanded [Richard] disclose where he kept his guns, striking [Richard] in his back with a fist or foot, causing him pain and to lose his breath."). Moreover, under the circumstances alleged, Plaintiffs have plausibly alleged that the use of force was objectively unreasonable. When evaluating whether the use of force was reasonable, courts are to consider the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010) ("Because the Fourth Amendment test of reasonableness is one of objective reasonableness, the inquiry is necessarily case and fact specific and requires balancing the nature and

quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake. In conducting that balancing, we are guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." (alteration, citations, and internal quotation marks omitted)); *Burks v. Perrotta,* No. 13–CV–5879, 2015 WL 2340641, at *4 (S.D.N.Y. May 15, 2015) (same). In making this assessment, the Court must examine the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, ... [and must] make allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Tracy,* 623 F.3d at 96 (internal quotation marks omitted). Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham,* 490 U.S. at 396 (citation and internal quotation marks omitted).

**\*17** Here, the nature of the conduct at issue points to it being permissible to use some level of force. However, at the time of the punch/kick, Richard was on the ground, and handcuffed with his hands behind his back. Under the facts alleged, Richard posed no immediate threat to the safety of others. Further, Richard was not actively resisting in any way. Therefore, as alleged, Plaintiffs state a claim for excessive force based on the kick or punch to Richard's back. *See Smith v. Fields,* No. 95–CV–8374, 2002 WL 342620, at *5–6 (S.D.N.Y. Mar.4, 2002) (denying summary judgment on excessive force claim, and defense, where there was an issue of fact as to whether the plaintiff was slapped and kicked in the head after he was handcuffed). Further, under the facts alleged, no reasonable officer could have thought this use of force was necessary, and thus Delaney is not shielded by qualified immunity. *See id.* (rejecting qualified immunity defense where the plaintiff claimed he was kicked and slapped after being handcuffed).

The Court next turns to the alleged use of force against Sarah. As noted above, an "arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim." *Greenaway,* 2015 WL 1509486, at *9 (internal quotation marks omitted). Sarah does not allege any injury whatsoever. However, Sarah was not an arrestee, and, under the facts as alleged, there was no reason for the Defendant officers

2015 WL 5730605

to suspect she was a threat to herself or anyone else. Courts have allowed excessive force claims to go forward even in the absence of injury when the allegedly excessive force was applied to a bystander not suspected of any wrongdoing. *See Piper v. City of Elmira,* 12 F.Supp.3d 577, 595 (W.D.N.Y.2014) (denying summary judgment where "no dispute exist[ed] that [the plaintiff] suffered no physical injury," because "a jury could conceivably find that no force was appropriate in these circumstances and that [the defendant's] two-handed attempt to throw her to the floor was, at the very least, gratuitous and unrelated to any legitimate law enforcement purpose"). Therefore, while the absence of injury may ultimately point to the force not being constitutionally excessive, the Court will not dismiss on this ground.

Turning next to the reasonableness of the conduct, the Court concludes that, as alleged, the conduct at issue, roughly grabbing Sarah's arm, was objectively unreasonable. Sarah was not suspected of any wrongdoing; she did not pose an immediate threat to the safety of the officers or others; and she was not actively resisting arrest. Furthermore, at that point, Richard was handcuffed with his hands behind his back, placed in the patrol car, and searched, (*see* Second Am. Compl. ¶¶ 48–49, 69, 80, 82), and the house had already been searched, (*See id.* ¶¶ 59, 69, 82). As alleged, it is plausible that any force whatsoever used against Sarah was unreasonable, and that no reasonable officer would have thought it necessary. *See Clash v. Beatty,* 77 F.3d 1045, 1048 (7th Cir.1996) ("It is clear ... that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."); *Bedenfield v. Shultz,* No. 01–CV–7013, 2002 WL 1827631, at *9 (N.D.Ill. Aug. 7, 2002) ("Using force of any kind on a citizen the officer knows to be innocent is unreasonable."). Therefore, the Motions To Dismiss Plaintiffs' excessive force claims against Delaney based on the punch/kick to Richard's back and his grabbing of Sarah's arm are denied.

### *e. Fifth Amendment Claim*

**\*18** The State Trooper Defendants move to dismiss any claims Plaintiffs seek to assert based on the continued interrogation of Richard after Richard exercised his right to remain silent and without *Miranda* warnings being given. (*See* Reply Mem. of Law in Further Supp. of the State Defs.' Mot. to Dismiss Pls.' Second Am. Compl. ("State Trooper Defs.' Reply" 8 (Dkt. No. 32).)[10] Plaintiffs allege that Richard declined to respond to interrogation, exercising

his Fifth Amendment rights, and that Delaney did not administer *Miranda* warnings, but continued to interrogate him. (Second Am. Compl. ¶¶ 78–79.) Plaintiffs also allege that, in continuing to interrogate him, Delaney threated to arrest him and Sarah if he declined to cooperate. (*Id.* ¶ 79.) As a result of this interrogation, Richard agreed to disclose the key's location to Sarah. (*Id.*)

10    In reply, the State Trooper Defendants argued for the first time that Plaintiff's Fifth Amendment, Eighth Amendment, and Second Amendment claims should be dismissed. (*See* State Trooper Defs.' Reply 8–9.) Although courts normally do not consider arguments raised for the first time in reply, *see, e.g., Mason Tenders Dist. Council of Greater N.Y. v. Fortune Interiors Dismantling Corp.,* No. 12–CV–4253, 2015 WL 4503630, at *5 n. 5 (S.D.N.Y. July 23, 2015); *Okor v. Borough of Manhattan Cmty. Coll.,* No. 14–CV–1593, 2015 WL 3750630, at *4 n. 6 (S.D.N.Y. June 16, 2015), the Court has discretion to do so, *see, e.g., Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 252 (2d Cir.2005); *Marks v. Energy Materials Corp.,* No. 14–CV–8965, 2015 WL 3616973, at *5 n. 11 (S.D.N.Y. June 9, 2015); *Bricklayers Ins. & Welfare Fund Bricklayers Pension Fund v. P.P.L. Constr. Servs. Corp.,* No. 12–CV–3940, 2015 WL 1443038, at *7 (E.D.N.Y. Mar. 27, 2015); *see also Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela,* 341 F. App'x 722, 724 (2d Cir.2009), and here the Court granted Plaintiffs permission to file a surreply brief addressing these arguments that were raised for the first time in reply, (*see* Dkt. No. 33). Therefore, the Court will consider these arguments.

Even assuming that Delaney's conduct was unconstitutional, Plaintiffs still have not stated a § 1983 claim. As the Second Circuit has explained, "a § 1983 action may exist under the Fifth Amendment self-incrimination clause if coercion was applied to obtain a waiver of the plaintiffs' rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiffs in a criminal proceeding." *Deshawn E. ex rel. Charlotte E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998). Even if Plaintiffs have plausibly alleged that Richard was coerced to answer Defendants' questions, Plaintiffs have not alleged that any inculpatory statements were used against Richard in a criminal proceeding, and therefore this claim must be dismissed. *See Chavez v. Martinez,* 538

U.S. 760, 767, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (rejecting § 1983 claim because the petitioner was "never made to be a witness against himself in violation of the Fifth Amendment's Self–Incrimination Clause because his statements were never admitted as testimony against him in a criminal case"); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 357, 370 (S.D.N.Y.2010) ("In order to bring a § 1983 claim based on such violations, a plaintiff must show that his privilege against self-incrimination was violated, and such a violation cannot be shown where that plaintiff denies making any inculpatory statements that were used against him in a criminal proceeding."); *Rodriguez v. Kelly,* No. 05–CV–10682, 2009 WL 911085, at *3 (S.D.N.Y. Apr. 6, 2009) (holding that coerced incriminatory statements do not violate the Fifth Amendment if not used against the speaker, but that "[a] successful section 1983 claim may arise when a plaintiff is coerced into waiving Fifth Amendment rights, and utters self-incriminating or inculpatory statements later used against him in a criminal proceeding."), *aff'd sub nom. Rodriguez v. City of New York,* 364 F. App'x 702 (2d Cir.2010); *see also Deshawn E.,* 156 F.3d at 346 ("The remedy for a violation of the right against self-incrimination is the exclusion from evidence of any ensuing self-incriminating statements and not a § 1983 action." (internal quotation marks omitted)); *Selvaggio,* 2015 WL 1293007, at *3 n. 9 (same); *LaFrance v. Bemben,* No. 10–CV–4583, 2013 WL 132702, at *7 (E.D.N.Y. Jan. 10, 2013) (same). Therefore, Plaintiffs' Fifth Amendment claim based on the interrogation of Richard is dismissed.

**\*19**  In their Surreply, Plaintiffs claim that their allegations about Richard's interrogation should be considered a substantive due process violation under the Fourteenth Amendment. (Mem. of Law in Sur–Reply to Def. State Police's Mot. To Dismiss Pursuant to Rule 12(b)(6) of the FRCP ("Pls.' Surreply") 4–5 (Dkt. No. 34).) In support of this contention, Plaintiffs cite *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003). In *Chavez,* the Supreme Court rejected the claim of the petitioner, who claimed that the un-Mirandized interrogation of him violated his rights under the Fifth Amendment's Self–Incrimination Clause. *See id.* at 766–67. However, the Supreme Court also remanded the case to allow the petitioner to pursue a claim of liability based on a substantive due process violation under the Fourteenth Amendment. *See id.* 779–80. Thus, while conceding their Fifth Amendment claim is not viable (leaving open the question of why it was included in the first place), Plaintiffs now wish to pursue a substantive due process claim. (*See* Pls.' Surreply 5.)

The Court is troubled by this shift in Plaintiffs' theory. Nowhere in Plaintiffs' Second Amended Complaint do Plaintiffs maintain a violation of their substantive due process rights. Instead, Plaintiffs only referenced their procedural due process rights (along with their Second, Fourth, Fifth, and Eighth Amendment rights). (Second Am. Compl. ¶¶ 103–05.) Therefore, the Court dismisses Plaintiffs' Fifth Amendment claim, but gives Plaintiffs leave to amend the complaint to include (if there is a good faith basis under the law to do so) a substantive due process claim.

*f. Eighth Amendment Claim*

The State Trooper Defendants also move to dismiss Plaintiffs' Eighth Amendment claim, arguing that the Eighth Amendment applies only post-conviction. (State Trooper Defs.' Reply 8.) They are correct, and, indeed, Plaintiffs concede this point in their Surreply. (*See* Pls.' Surreply 5.) Because the relevant conduct occurred without either Plaintiff being convicted of a crime-or even charged with a crime-Plaintiffs' claims relating to their treatment are cognizable only as Fourth and Fourteenth Amendment claims, and their Eighth Amendment claim is dismissed. *See Whitley v. Albers,* 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ("The Cruel and Unusual Punishments Clause was designed to protect those convicted of crimes, and consequently the Clause applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." (citation and internal quotation marks omitted)); *Lindsey v. Butler,* 43 F.Supp.3d 317, 325–26 (S.D.N.Y.2014) ( "[The][p]laintiff claims that the officers subjected him to excessive force in violation of the Eighth Amendment. The Court must dismiss this claim because the Eighth Amendment attaches only after conviction. Because the excessive force claim arises in the context of a custodial interrogation during the arrest process, the constitutional right at issue derives from the Fourth Amendment." (citations omitted)), *on reconsideration in part,* No. 11–CV–9102, 2014 WL 5757448 (S.D.N.Y. Nov.5, 2014), *reconsideration denied,* 2015 WL 1501625 (S.D.N.Y. Apr.1, 2015); *Bowman v. City of Middletown,* 91 F.Supp.2d 644, 657 (S.D.N.Y.2000) ("[T]he Eighth Amendment right to be free from cruel or unusual punishment applies only to the post-conviction stage."). Plaintiffs acknowledge that their Eight Amendment claim is not viable, but ask to convert it to a Fourteenth Amendment claim. (Pls.' Surreply 5.) Plaintiffs may do so in a Third Amended Complaint to be filed within 30 days of this Opinion and Order.

**Dunkelberger v. Dunkelberger, Not Reported in F.Supp.3d (2015)**

2015 WL 5730605

### g. Second Amendment Claims

**\*20** The State Trooper Defendants also move to dismiss Plaintiffs' Second Amendment claim. (*See* State Trooper Defs.' Reply 9.) The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The right of an individual to keep and bear arms has been affirmed by the Supreme Court in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and *McDonald v. City of Chicago,* 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). This right, however, is not absolute, *Heller,* 554 U.S. at 602, and within the Second Circuit, "the contours of [the right to bear arms] are as of yet underdeveloped and ill-defined," *Doutel v. City of Norwalk,* No. 11–CV–1164, 2013 WL 3353977, at *23 (D.Conn. July 3, 2013). Prior to *Heller* and *McDonald,* in *Garcha v. City of Beacon,* 351 F.Supp.2d 213 (S.D.N.Y.2005), *aff'd,* 232 F. App'x 74 (2d Cir.2007), a court in this District held that "the right to bear arms is not a right to hold some particular gun." *Id.* at 217 (internal quotation marks omitted). Since *Heller* and *McDonald,* lower courts in the Second Circuit have continued to follow *Garcha,* noting specifically that when an individual's right to acquire firearms generally has not been infringed, the confiscation of a specific weapon does not constitute a Second Amendment violation. *See, e.g., Vaher v. Town of Orangetown,* 916 F.Supp.2d 404, 430 (S.D.N.Y.2013) (relying on *Garcha* in dismissing a Second Amendment claim because "there [was] no allegation that [the][d]efendants' actions ... affected [the][p]laintiff's ability to retain or acquire other firearms or ammunition, and no law [was] cited that infringe[d] on [the][p]laintiff's right to obtain other firearms"); *McGuire v. Village of Tarrytown,* No. 08–CV–2049, 2011 WL 2623466, at *7 (S.D.N.Y. June 22, 2011) (holding that a police department's seizure of a plaintiff's handgun pursuant to an order of protection did not violate the plaintiff's Second Amendment right to bear arms); *see also Doutel,* 2013 WL 3353977, at *25 ("Several cases in this circuit have followed *Garcha'* s reasoning post-*Heller* and *McDonald* and have held that where a plaintiff's ability to acquire *other* firearms has not been abridged, a Second Amendment violation has not occurred even despite a seizure of a plaintiff's *particular* firearm.") (emphasis in original); *accord Sutterfield v. City of Milwaukee,* 751 F.3d 542, 571 (7th Cir.2014) ("Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention."), *cert. denied,* ——

U.S. ——, 135 S.Ct. 478, 190 L.Ed.2d 362 (2014); *Walters v. Wolf,* 660 F.3d 307, 318 (8th Cir.2011) (holding there was no Second Amendment violation where the "defendants' policy and action affected *one* of [the plaintiff's] firearms," but did not prevent him "from retaining or acquiring other firearms," but "not foreclos[ing] the possibility that some plaintiff could show that a state actor violated the Second Amendment by depriving an individual of a specific firearm that he or she otherwise lawfully possessed for self-defense"). Thus, there is a very real question whether Plaintiffs have adequately pled a violation of the Second Amendment from the mere claim that the police Defendants seized Richard's guns. Indeed, in their Surreply Memorandum, Plaintiffs offered not a single case that addressed the issue or that suggested that the cases cited above should be disregarded.

**\*21** In any event, even if Plaintiffs had pled a plausible Second Amendment claim, the police Defendants would be entitled to qualified immunity. As previously noted, an officer is entitled to qualified immunity if he or she has not violated a clearly established statutory or constitutional right. *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Second Circuit has set forth three criteria of a clearly established right: "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.' " *Schubert v. City of Rye,* 775 F.Supp.2d 689, 702 (S.D.N.Y.2011) (quoting *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004)). The State Trooper Defendants and Somers Police Defendants are entitled to qualified immunity for the Second Amendment allegation because, at the very least, it was reasonable for them to assume that they were not violating the Second Amendment by taking action that resulted in the seizure of specific firearms from Richard, where there are no allegations that they prevented him from retaining or acquiring other firearms. Second Amendment law post-*Heller* and *McDonald* is "ill defined" in this context, *Doutel,* 2013 WL 3353977 at *23, and, the Second Circuit case law that does exist arguably suggests that seizure of a specific firearm does not violate the Second Amendment. Therefore, because the State Trooper and Somers Police Defendants were entitled to rely on these lower court rulings, it was reasonable for them to conclude they was not violating Richard's constitutional right to bear arms by confiscating his firearms. *Doutel,* 2013 WL 3353977 at *25 (holding that "[d]efendants ... are entitled to rely on the holdings of [Circuit and lower court] cases" "[a]bsent authority ... reversing the holdings in [those

cases]".). Therefore, the Court therefore dismisses Plaintiffs'
Second Amendment Claim. [11]

> [11]    In their Surreply Memorandum, Plaintiffs did not
> address the qualified immunity defense as it relates
> to the Second Amendment claim.

### 4. § 1985 Conspiracy Claim against all Defendants

The Dunkelberger Defendants and the State Trooper
Defendants argue that Plaintiffs have insufficiently alleged
a § 1985 conspiracy that would allow Plaintiffs to hold
them liable for constitutional violations. (*See* State Trooper
Defs.' Mem. 19; Mem. of Law Supporting Mot. To Dismiss
("Dunkelberger Defs.' Mem.") 6–8 (Dkt No. 17).) Plaintiffs
allege that the Dunkelberger Defendants agreed to try to
have Richard arrested and remove him and his weapons from
his home. (Second Am. Compl. ¶ 26.) In particular, they
agreed that Gayle would file a false police report alleging
that Richard threatened to harm himself and had weapons in
the house in the hopes that police would arrest Richard for
the weapons and remove him and Sarah from the premises.
(*Id.* ¶ 27 .) Gayle reported this false claim, (*id.* ¶ 28), after
she "was advised that the troopers would want to enter the
home to search and remove the weapons in there but that
they could not enter without a warrant unless an emergency
existed" and that if Richard "threatened someone at the
house, police could use such a threat to search the house
for the person threatened and remove both the weapons
and [Richard]," (*id.* ¶ 29). [12] Plaintiffs further allege that
Gayle had Dunkelberger removed from the home "at the
direction of the State Police," and then reported to police
that Dunkelberger "might be in danger," (*id.* ¶ 30), and that
the State Trooper and Somers Police Defendants conspired
with the Dunkelberger Defendants to "use concern over the
absence of [Dunkelberger] from the home in order for police
to enter [P]laintiffs' home on the preten[s]e of searching for
[Dunkelberger], when all the conspirators knew he was not at
the residence," (*See id.* ¶¶ 112–13.)

> [12]    The Complaint does not allege who advised Gayle
> of this.

**\*22** "To prove a § 1983 conspiracy, a plaintiff must
show: (1) an agreement between two or more state actors
or between a state actor and a private entity; (2) to act
in concert to inflict an unconstitutional injury; and (3) an
overt act done in furtherance of that goal causing damages."
*Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). "In
addition, complaints containing only conclusory, vague, or

general allegations that the defendants have engaged in a
conspiracy to deprive the plaintiff of his constitutional rights
are properly dismissed; diffuse and expansive allegations
are insufficient, unless amplified by specific instances of
misconduct." *Ciambriello v. Cty. of Nassau,* 292 F.3d 307, 325
(2d Cir.2002) (internal quotation marks omitted). The Court
holds that Plaintiffs have plausibly pleaded facts, namely
that the police Defendants searched the home purporting
to look for and protect Dunkelberger when they knew he
was not home, tending to show that the police Defendants
and the Dunkelberger Defendants had agreed to act in
concert to inflict an unconstitutional injury-the unreasonable,
warrantless search of Plaintiffs' home. The Court recognizes
that Plaintiffs have offered little by way of explanation as to
how they believe the police Defendants conspired with the
Dunkelberger Defendants, but it is not the Court's job to judge
how believable these allegations are, or the likelihood they
will be borne out at later stages of this case, but rather to assess
whether Plaintiffs have plausibly pleaded the elements of the
claim. Although this claim may one day be ripe for summary
judgment, the Court denies Defendants' Motions To Dismiss
this claim.

### 5. Claims against Dunkelberger Defendants

#### a. Mental Hygiene Law

The Dunkelberger Defendants argue that there is no private
right of action under the New York Mental Hygiene Law.
(Dunkelberger Defs.' Mem. 8–9.) Plaintiff disputes this, citing
exclusively to a Sixth Circuit case interpreting Michigan
state law. (*See* Mem. of Law in Opp'n to Defs. Richard
Henry Dunkelberger, Merilyn [Gale] Dunkelberger, William
Willard Dunkelberger, Benjamin Dunkelberger['s] Mot. To
Dismiss 10 (Dkt. No. 26) (citing *Monday v. Oullette,* 118
F.3d 1099, 1102 (6th Cir.1997))). *See also Monday,* 118 F.3d
at 1102–03. Of course, the question of whether there is a
private cause of action under a Michigan Mental Health
Code has no bearing on whether there is a private cause of
action under the New York analog. The Court's own research
shows that every court to have addressed the issue has held
that there is no private right of action under the Mental
Hygiene Law, except with respect to one provision not at issue
here. [13] *See McWilliams v. Catholic Diocese of Rochester,*
145 A.D.2d 904, 536 N.Y.S.2d 285, 286 (App.Div.1988)
( "The Mental Hygiene Law is a regulatory statute.... No
private cause of action is authorized for violations of the
Mental Hygiene Law. Although [the plaintiff] is an intended
beneficiary of the legislation, a private cause of action should
not be implied because it would not be consistent with

2015 WL 5730605

the legislative scheme."); *see also Byng v. Delta Recovery Servs., LLC,* No. 13–CV–733, 2013 WL 3897485, at *15 n. 3 (N.D.N.Y. July 29, 2013), *aff'd,* 568 F. App'x 65 (2d Cir.2014); *Sulehria v. New York,* No. 12–CV–21, 2012 WL 1288760, at *10 (N.D.N.Y. Feb. 8, 2012), *adopted by* 2012 WL 1284380 (N.D.N.Y. Apr.16, 2012); *June v. Blair,* No. 09–CV–323, 2010 WL 8522831, at *17 (N.D.N.Y. Sept. 30, 2010), *adopted in relevant part, rejected in part by* 2012 WL 1048463 (N.D.N.Y. Mar.28, 2012); *Byng v. Campbell,* No. 07–CV–471, 2010 WL 681374, at *18–19 (N.D.N.Y. Feb. 24, 2010); *Lombardo v. Holanchock,* No. 07–CV–8674, 2008 WL 2543573, at *10 (S.D.N.Y. June 25, 2008); *Lombardo v. Stone,* No. 99–CV–4603, 2001 WL 940559, at *5 (S.D.N.Y. Aug. 20, 2001). In any event, it does not appear that Plaintiffs even seek to assert a claim under the New York Mental Hygiene Law against the Dunkelberger Defendants. Indeed, the only claim related to the Mental Hygiene Law in the Second Amended Complaint is asserted against the New York State Troopers for allegedly misusing the law and for falsifying evidence against Richard. (*See* Second Am. Compl. ¶¶ 131–35 (alleging that the State Trooper Defendants manufactured evidence against Richard and detained him under the law without basis).) For the foregoing reasons, any claim Plaintiffs seek to assert against the Dunkelberger Defendants under the New York Mental Hygiene Law is dismissed.

[13]     New York state courts have held that there is a private right of action under N.Y. Mental Hygiene Law § 33.13, which addresses the confidentiality of medical records. *See Godinez v. Siena Coll.,* 288 A.D.2d 659, 733 N.Y.S.2d 262, 266 (App.Div.2001); *Ace v. State,* 146 Misc.2d 954, 553 N.Y.S.2d 605, 607 (Ct.Cl.1990), *aff'd,* 207 A.D.2d 813, 616 N.Y.S.2d 640 (App.Div.1994), *aff'd,* 87 N.Y.2d 993, 642 N.Y.S.2d 855, 665 N.E.2d 656 (N.Y.1996).

*b. Conversion*

**\*23** "Under New York law, 'conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.' " *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC,* 842 F.Supp.2d 502, 514 (S.D.N.Y.2012) (quoting *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 403–04 (2d Cir.2006)). To state a conversion claim, "the plaintiff must allege that (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another[,] (3) the

rightful owner makes a demand for the property, and (4) the demand for the return is refused." *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.,* 888 F.Supp.2d 385, 396 (S.D.N.Y.2012) (internal quotation marks omitted). Plaintiffs have sufficiently alleged such a claim. Specifically, Plaintiffs allege that in or about December 2012, "without knowledge, permission or right, ... an unknown member of the N.Y. State Police, wrongfully, illegally and without the permission or consent of [Richard], released [Richard's] weapons to the [Dunkelberger Defendants], who have since refused to return them to [Richard] despite a demand to do so...." (Second Am. Compl. ¶ 93.) Plaintiffs have thus plausibly alleged that the Dunkelberger Defendants, acting without authorization, exercised a right to ownership over Richard's property, that Richard made a demand for the property, and that that demand was refused. The Dunkelberger Defendants' Motion to Dismiss this claim is therefore denied.

*c. Cross–Claims*

The Dunkelberger Defendants also move to dismiss any cross claims remaining brought against them by the Somers Police Defendants. Their argument, in its entirety, to this is: "For the reasons stated previously, to the extent any claims against Defendants Siegal or Fitzgerald remain after their Motion to Dismiss, the Court should dismiss any cross-claims they raised against the Dunkelberger Defendants." (Dunkelberger Defs.' Mem. 9.) The Somers Police Defendants do not mention this Motion at all, either in their initial Memorandum of Law or in their reply. (*See generally* Somers Police Defs.' Mem; Reply Mem. of Law in Further Supp. of Defs .[ ] Siegal and Fitzgerald's Mot. To Dismiss the Compl. (Dkt. No. 30) .) In reply, the Dunkelberger Defendants assert that "to the extent that [the Somers Police Defendants] still assert cross-claims against all other Defendants, those against the Dunkelberger Defendants should be dismissed." (Reply Mem. of Law Supporting Dunkelberger Defs.' Mot. To Dismiss 7–8 (Dkt. No. 29).) Strangely, though, the Somers Police Defendants *never brought* cross-claims; therefore, there is nothing for the Court to dismiss (or not dismiss).[14]

[14]     Based on the fact that the Dunkelberger Defendants first raised the issue of dismissing cross-claims asserted against them around the time of removal, (Dkt.Nos.1, 5–8), the Court surmises that the claims may have been brought in state court prior to removal.

2015 WL 5730605

### III. Conclusion

For the foregoing reasons, the Dunkelberger Defendants', the Somers Police Defendants', and the State Trooper Defendants' Motions To Dismiss are granted in part and denied in part. As to the claims alleged against the State Trooper and Somers Police Defendants, the Court grants Defendants' Motions To Dismiss Plaintiffs' state law claims, Plaintiffs' Fifth Amendment self-incrimination claim, Plaintiffs' Eighth Amendment Claim, Plaintiffs' Second Amendment Claim, and Plaintiffs' excessive force claim, except as to Delaney's alleged use of force against Richard and Sarah as described herein. As to the claims alleged against the Dunkelberger Defendants, the Court grants the Motion To Dismiss Plaintiffs' claim based on the New York Mental Hygiene Law. The Court denies Defendants' Motion as to the unreasonable search claim, the false arrest claim, the excessive force claim against Delaney related to his use of force against Sarah and Richard, the § 1985 conspiracy claim, and the conversion claim. The claims that are dismissed are dismissed with prejudice, as Plaintiffs have already twice amended, including once in response to Defendants' pre-motion letters raising the arguments addressed in the instant Opinion. *Justice v.*

*McGovern,* No. 11–CV–5076, 2013 WL 1809634, at *3 (E.D.N.Y. Apr. 29, 2013) ("Although when a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint, when the plaintiff is put on notice of the deficiencies in his complaint and fails to correct them in the amended complaint[,] dismissal with prejudice is proper" (brackets, citation, ellipses, and internal quotation marks omitted)); *Tyler v. Liz Claiborne, Inc.,* 814 F.Supp.2d 323, 344 (S.D.N.Y.2011) ("[A]s plaintiff has already amended his complaint twice, dismissal with prejudice is appropriate at this stage in the litigation.") Nonetheless, Plaintiff may file a Third Amended Complaint to the extent permitted herein to add new claims within 30 days of the date of this Opinion and Order.

**\*24** The Clerk of the Court is respectfully directed to terminate the pending Motions. (*See* Dkt. Nos. 17, 18, 21.)

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5730605

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Adams v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 4608216

2018 WL 4608216
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jerry ADAMS, Plaintiff,

v.

Anthony ANNUCCI, Acting
Commissioner DOCCS, Defendant.

No. 17-CV-3794 (KMK)
|
Signed 09/25/2018

**Attorneys and Law Firms**

Jerry Adams, Sonyea, NY, Pro Se Plaintiff.

Kara F. Sweet, Esq., Office of the New York State Attorney General, New York, NY, Counsel for Defendant.

OPINION AND ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** Pro se Plaintiff Jerry Adams ("Plaintiff") filed the instant Complaint ("Complaint"), pursuant to 42 U.S.C. § 1983, against Acting Commissioner of the New York Department of Corrections and Community Supervision ("DOCCS") Anthony Annucci ("Defendant"). (Compl. (Dkt. No. 1).) [1] Plaintiff alleges that Defendant violated his rights under the Fifth, Eighth, and Fourteenth Amendments by creating or implementing a policy which requires Plaintiff either to join a treatment program and admit guilt for a crime for which he maintains his innocence, or to lose his "Good Time Credits," thereby lengthening his sentence. (Id.) [2]

[1]     The Complaint does not specify whether Defendant is sued in his official or individual capacity. To the extent Plaintiff seeks damages against Defendant in his official capacity, his suit is barred by the Eleventh Amendment. See Kentucky v. Graham, 473 U.S. 159, 169–70 (1985) (explaining that the Eleventh Amendment bars a damages action against State officials sued in their official capacity).

[2]     Plaintiff also lists the Fourth Amendment and the Fourteenth Amendment Equal Protection Clause, (Compl. 2), but because the Complaint alleges no unreasonable search or seizure, see Carpenter v. United States, 138 S. Ct. 2206, 2213 (2018), or differential treatment or invidious discrimination, Panzella v. City of Newburgh, 231 F. Supp. 3d 1, 6–8 (S.D.N.Y. 2017), aff'd, 705 F. App'x 50 (2d Cir. 2017), these claims are dismissed.

Before the Court is Defendant's Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (See Notice of Mot. To Dismiss (Dkt. No. 23).) For the following reasons, Defendants' Motion is granted.

I. Background

A. Factual Background
The following facts are drawn from Plaintiff's Complaint, (Compl.), Plaintiff's opposition to the Motion To Dismiss, (Pl.'s Decl. ("Pl.'s Mem.") (Dkt. No. 25) ), and Plaintiff's supplemental opposition, (Further Opp'n Against Dismissal ("Pl.'s Supp. Mem.") (Dkt. No. 28) ), and are taken as true for the purpose of resolving the instant Motion. [3] During the time of the alleged events, Plaintiff was a convicted prisoner at Livingston Correctional Facility. (Compl. 1.) Plaintiff was incarcerated in 1989 and is serving an indeterminate sentence with an aggregate minimum sentence of 20 years and aggregate maximum sentence of 40 years for crimes including first degree sodomy, first and second degree robbery, and third degree criminal possession of stolen property. See NYDOCCS, Inmate Information, http://nysdoccslookup.doccs.ny.gov (last visited Aug. 30, 2018) (DIN # 89A7005) (hereinafter "DOCCS Profile"); see also (Pl.'s Mem. 4–5, 8.) At least with respect to the sodomy offense, Plaintiff did not plead guilty. (Compl. 4.)

[3]     For ease of reference, the Court will cite to the ECF-generated page number located in the top right-hand corner of the page when citing to all of Plaintiff's submissions.

Under New York Correction Law § 622, DOCCS must "make available a sex offender treatment program for those inmates who are serving sentences for felony sex offenses ... and are identified as having a need for such program in accordance with [§§ [803] and [805] of [Chapter 43]." N.Y. Corr. Law § 622(1). The first cited provision—§ 803—

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 73 of 105

Adams v. Annucci, Not Reported in Fed. Supp. (2018)
2018 WL 4608216

provides that every inmate serving an indeterminate sentence of imprisonment at a DOCCS facility "may receive time allowance against the maximum term of his ... sentence not to exceed one-third of the maximum term imposed by the court." N.Y. Corr. Law § 803(1)(b). These allowances are also called "[g]ood behavior time" or "good time." N.Y. Penal Law § 70.30(4)(a). "Such allowances may be granted for good behavior ... or progress and achievement in an assigned treatment program, and may be withheld, forfeited, or canceled in whole or in part for bad behavior ... or failure to perform properly in the ... program assigned." N.Y. Corr. Law § 803(1)(a). [4] Subject to certain conditions, an inmate, upon his request, must be "conditionally released" from incarceration when his total "good time" equals the unserved portion of the maximum of his indeterminate sentence—in other words, one-third. N.Y. Penal Law § 70.40(b). The second provision cited in § 622—Section 805—provides that inmates serving indeterminate sentences "shall be assigned a work and treatment program as soon as practicable," and that the DOCCS commissioner must "review the inmate's institutional record to determine whether he has complied with the assigned program" no more than two months prior to the inmate's eligibility for parole to determine if the inmate merits a certificate of earned eligibility. N.Y. Corr. Law § 805. Finally, § 622 itself also states that any inmate committed to DOCCS custody "on or after the effective date of [§ 622] [, April 13, 2017,] for a felony sex offense" must, "as soon as practicable, be initially assessed by staff of the office of mental health regarding their "risk of violent sexual recidivism and ... need for sex offender treatment while in prison." Id. § 622(5) (emphasis added).

[4] As DOCCS Commissioner, Defendant is responsible for promulgating rules and regulations "for the granting, withholding, forfeiture, cancellation and restoration of allowances authorized by this section." Id. § 803(3). His decision regarding such allowances is final and not reviewable, and "[n]o person shall have the right to demand or require the allowances." Id. § 803(4).

**\*2** Plaintiff alleges that, beginning in 2013, DOCCS threatened him and implemented sanctions against him for refusing to participate in a Sex Offender Treatment Program ("SOTP") in which he must admit guilt for his crime. (Compl. 3.) [5] Plaintiff refused to participate because of his right to appeal his conviction and the fact that he has maintained his innocence during and after his trial. (Id.) In other words, Plaintiff alleges, Defendants were attempting to force Plaintiff

to change his plea from Not Guilty to Guilty. (Id. at 4.) Furthermore, Plaintiff alleges that he was never "screened for having a need for treatment," as required by § 622. (Id. at 3; see also id. at 4; Pl.'s Mem. 3–4; Pl.'s Supp. Mem. 2.)

[5] To the extent Plaintiff brings claims regarding events occurring prior to March 27, 2014, they are barred by the three-year statute of limitations. See Owens v. Okure, 488 U.S. 235, 236, 249–50 (holding that the court should apply the statute of limitations from the state's general personal injury statute of limitations to § 1983 claims); N.Y. C.P.L.R. § 214(5) (setting three year statute of limitations for personal injury actions).

However, on June 22, 2016, the Chairman of the Time Allowance Committee told Plaintiff that "[i]f [he] did not take the program, [he] would lose [his] Good Time [credits]." (Compl. 3.) Plaintiff therefore "consented to take the [SOTP] [but] on the way to the program, [he] was given a new time computation showing [he] had lost all of [his] Good Time Credits for the prior refusals." (Id.) He was told that he "must complete the program to be reconsidered for Good Time." (Id.) However, "[a]fter participating in the program for four months," Plaintiff was removed "for poor progress and participation," because he would not admit guilt for his crime of conviction, which he claims he "did not do." (Id.; see also Pl.'s Mem. 5 (same).) "Plaintiff has lost fourteen (14) years of [G]ood [T]ime credits," although it is unclear over what time period. (Pl.'s Mem. 4.) Plaintiff alleges that this policy therefore impermissibly changed his sentence and conditional release date, as he did not receive any other infractions for rule violations or refusing assigned programs. (Id. at 5–6; Compl. 4; Pl.'s Supp. Mem. 1, 3.) Defendant, as Commissioner of DOCCS, is the "final" word on this matter and is "responsible for" DOCCS' enforcement of its SOTP policy, (Pl.'s Mem. 6), which directs Defendant's subordinates "to threaten and punish those inmates" like Plaintiff who are eligible for a § 622 SOTP but have not been screened as needing it, (Pl.'s Supp. Mem. 2).

As a result of this policy, Plaintiff cannot sleep or eat and suffers from stomach pain and back aches, as well as exacerbation of his other "ongoing ailments." (Compl. 3.) He therefore requests two million dollars in compensatory damages and additional punitive damages, as well as an injunction to release Plaintiff from his allegedly "illegal detention." (Id. at 4.)

Adams v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 4608216

B. Procedural Background

Plaintiff filed the Complaint on March 27, 2017 in the Western District of New York. (Compl.) The case was then transferred to this Court on May 19, 2017. (Dkt. No. 4.) Plaintiff was granted in forma pauperis status on June 6, 2017. (Dkt. No. 7.) On June 28, 2017, the Court issued an Order of Service directing service on Defendant, (Order of Service (Dkt. No. 9) ), who was served on August 22, 2017, (Dkt. No. 22). Plaintiff filed an application for appointment of pro bono counsel, (Dkt. Nos. 13, 16), which the Court denied without prejudice on October 11, 2017, (Dkt. No. 19).

On September 26, 2017, Defendant filed a pre-motion letter indicating the grounds on which he would move to dismiss. (Letter from Kara Sweet, Esq. to Court (Sept. 26, 2017) (Dkt. No. 15).) Plaintiff filed a response on October 6, 2017. (Letter from Plaintiff to Court (Oct. 6, 2017) (Dkt. No. 17).) The Court set a briefing schedule in a memo endorsement. (Dkt. No. 18.) On November 10, 2017, Defendant filed the instant Motion and accompanying documents. (Not. of Mot; *id.* Ex. 1 ("Def.'s Mem.").) Plaintiff filed a motion to dismiss the New York Attorney General's office from the case because of a conflict of interest, along with an accompanying declaration. (Dkt. No. 24; Pl.'s Mem.) The Court denied the motion to recuse the Attorney General, but stated that it "will consider the [Declaration] in opposition to the Motion to Dismiss." (Dkt. No. 26.) Defendant filed a reply memorandum on January 10, 2018. (Reply Mem. of Law in Supp. of Mot. to Dismiss ("Def.'s Reply") (Dkt. No. 27).) Plaintiff filed a supplemental opposition on January 22, 2018. (Pl.'s Supp. Mem.)

II. Discussion

A. Standard of Review

**\*3** The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid

of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2) ) ); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[ ] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.,* 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012) ). Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.,* 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell,* 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr.*

Adams v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 4608216

*Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents either in [the] plaintiff[']s possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

B. Analysis

Defendant argues that the Complaint should be dismissed for several reasons: Plaintiff failed to plausibly allege Defendant's personal involvement; his claims are barred by *Heck v. Humphrey*, 523 U.S. 477 (1994); he fails to allege a constitutional violation; and Defendant is entitled to qualified immunity. (*See* Def.'s Mem.) The Court will address each argument separately.

1. Personal Involvement

Defendant argues that the Complaint should be dismissed against him because he was not personally involved in the alleged constitutional violations. (Def.'s Mem. 8–9.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> **\*4** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created

a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted). In other words, "because vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Defendant's actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal* ).

Defendant is not mentioned in the Complaint aside from in the caption. (*See* Compl.) However, Plaintiff makes allegations about Defendant's involvement in his other submissions, which the Court will consider. *See Vlad-Berindan v. MTA New York City Transit*, No. 14-CV-675, 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) (collecting cases and holding that a court may rely on factual allegations raised for the first time in a pro se plaintiff's opposition papers if consistent with the allegations in the complaint). Construing his submissions liberally, Plaintiff alleges that Defendant, as DOCCS Commissioner, either drafted or enforced the DOCCS policy of forcing inmates to choose between participating in the SOTP or forgoing their Good Time Credits. (*See* Pl.'s Mem. 6 ("Defendant is Commissioner of DOCCS, the 'final' word on this matter and responsible for the constitutionally impermissible policy ..."); Pl.'s Supp. Mem. 2 ("The Defendant's policies and directives direct[ ] his employees under his supervision to threaten and punish those inmates, such as Plaintiff ... to participate in medical treatment without any screening or need for such treatment."); *id.* at 3 (Defendant's practices and policies directed by him in his official capacity have violated Plaintiff's constitutional rights. Defendant ... initiated a cruel and unusual burden upon ...

Case 9:21-cv-00791-AMN-TWD Document 32 Filed 06/01/22 Page 76 of 105

Adams v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 4608216

Plaintiff to earn his [G]ood [T]ime credits by completing the treatment program.").) Therefore, Defendant allegedly "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Grullon*, 720 F.3d at 139 (internal quotation marks omitted); *see also Jones v. Annucci*, No. 16-CV-3516, 2018 WL 910594, at *9 (S.D.N.Y. Feb. 14, 2018) (finding that the plaintiff plausibly alleged personal involvement by alleging that the defendant "instituted the policy requiring Shia inmates to change their religion from 'Islam' to 'Siha' "); *Pressley v. City of New York*, No. 11-CV-3234, 2013 WL 145747, at *10 (E.D.N.Y. Jan. 14, 2013) (concluding that the "[p]laintiff has sufficiently alleged that [the defendants] created an unconstitutional policy regarding her mail," by alleging that the defendants "collaborate on the policies for the mail room" and "have established, implemented, sanctioned, accepted or caused the deliberate practice at the City of retaining, opening and reviewing mail sent to [the] [p]laintiff and [the] [p]laintiff's business" (internal quotation marks omitted) ); *Bissinger v. City of New York*, No. 06-CV-2325, 2007 WL 2826756, at *4 (S.D.N.Y. Sept. 24, 2007) (finding allegations that the defendants "created the City's policy of prohibiting protected First Amendment activity or allowed its continuance" to be "sufficient to allege individual liability"). Although the Complaint could provide more details, "it is a reasonable inference that a policy" implementing a treatment program across DOCCS facilities "was either created or implemented by the DOC[CS] Commissioner," as "[t]hese are the kinds of policy decisions that one expects might fall within his ... purview." *Russell v. Pallito*, No. 15-CV-126, 2017 WL 1093187, at *2 (D. Vt. Mar. 23, 2017). This is particularly true with respect to programs affecting the provision of Good Time Credits. *See* N.Y. Corr. Law § 803(3), (4) (stating that the DOCCS Commissioner is responsible for promulgating the rules and regulations governing Good Time Credits and his decisions are final and not reviewable). The Court therefore denies Defendant's Motion To Dismiss for lack of personal involvement.

### 2. *Heck v. Humphrey*

**\*5** The gravamen of Plaintiff's Complaint is that Defendant's policy caused him to lose his accrued Good Time Credits and prevented him from earning more, which ultimately changed his sentence and conditional release date, because he would not plead guilty to his crime of conviction. (Compl.) Defendant argues that Plaintiff's claims are barred by *Heck*.

(Def.'s Mem. 4–5.) In *Heck*, the Supreme Court held that "a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated." *Edwards v. Balisok,* 520 U.S. 641, 643 (1997) (quoting *Heck,* 512 U.S. at 487). Moreover, while *Heck* held that the favorable-termination rule is triggered when a prisoner's success must "necessarily demonstrate the invalidity of the *conviction,*" 512 U.S. at 481–82 (emphasis added), the Supreme Court has since clarified that *Heck* applies to any challenge to the duration of "confinement" that necessarily implies the invalidity of that confinement, even if that challenge would not implicate the underlying conviction or sentence. *See Wilkinson v. Dotson,* 544 U.S. 74, 81–82 (2005) ("[A] state prisoner's § 1983 action is barred ... *if* success in that action would necessarily demonstrate the invalidity of confinement or its duration.); *Edwards,* 520 U.S. at 648 (finding that a prisoner's claim for money damages alleging that he was deprived of good-time credits without due process necessarily implies the invalidity of the "punishment imposed," meaning the deprivation of the credits). Absent such a showing, a prisoner may only seek relief in the federal courts through a petition for habeas corpus. *See Wilkinson,* 544 U.S. at 81 (holding that habeas corpus is the only remedy available to prisoners seeking to "invalidate the duration of their confinement—either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody"); *see also Jenkins v. Haubert,* 179 F.3d 19, 23 (2d Cir. 1999) ("[W]here the fact or duration of a prisoner's confinement is at issue, § 1983 is unavailable, and only § 2254(b) with its exhaustion requirement may be employed.").

Defendant argues that the Complaint fulfills both conditions of the *Heck* rule. First, Plaintiff specifically alleges that neither his conviction, sentence, nor revocation of Good Time Credits has been invalidated. (Compl. 5 ("They have taken all of my [G]ood [T]ime Credits and I cannot be release[d] upon my Conditional Release date ... I cannot use habeas corpus due to 28 U.S.C. [§] 22[5]4 and I do not have counsel and my Article 78 application has been pending since July 2016.").) *See Edwards,* 520 U.S. at 643– 44 ("[T]he sole remedy in federal court for a prisoner seeking restoration of good-time credits is a writ of habeas corpus."). Second, Defendant argues that Plaintiff's claims, if true, necessarily imply the invalidity of his confinement, because he alleges that the SOTP policy delayed his conditional

2018 WL 4608216

release and left him in DOCCS custody for longer than he would have been absent that policy. (Def.'s Mem. 4–5.) The Court agrees. The crux of Plaintiff's allegations is that he is "being detain[ed] illegal[l]y by the State" by being kept past his conditional release date—October 3, 2016. (Compl. 5.) In other words, Plaintiff contends that Defendant "chang[ed] [his] sentence and Conditional Release date." (*Id.* at 4; *see also* Pl.'s Mem. 5; Pl.'s Supp. Mem. 1.) Indeed, Plaintiff even requests that the Court order his "release ... from this illegal detention." (Compl. 4.) Because a decision in favor of Plaintiff on these claims would result in his "immediate release from confinement or a shorter stay in prison," they are barred by *Heck*. *See Wilkinson*, 544 U.S. at 82. Put differently, were the Court to find that Defendant's SOTP policy, which required Plaintiff to forgo his earned and future Good Time Credits, was arbitrary, discriminatory, or unconstitutional punishment, it would necessarily imply that the invalidity of his continued confinement beyond the date of his conditional release. *See D'Angelo v. Annucci*, No. 16-CV-6459, 2017 WL 6514692, at *6–7 (S.D.N.Y. Dec. 19, 2017) (finding due process and Eighth Amendment claims barred by *Heck* where the plaintiff argued that the defendants "unconstitutionally delayed his conditional release" by failing to provide transitional services and housing); *Ahlers v. Boruch*, No. 04-CV-1747, 2007 WL 2042794, at *4 (E.D.N.Y. July 16, 2007) (same); *see also Jackson v. Gokey*, No. 15-CV-0922, 2017 WL 1317122, at *2 (W.D.N.Y. Apr. 10, 2017) (explaining that when a prisoner challenges the loss of good time credits, "[t]his impacts the overall length of his confinement" and thus is barred by *Heck*).

To be sure, a prisoner may bring a procedural due process claim for the arbitrary revocation of Good Time Credits. *See Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *see also Edwards v. Goord*, 362 F. App'x 195, 197 (2d Cir. 2010). However, if such a claim is to survive *Heck*, it must be based only on use of "the wrong procedures," and cannot "call into question the lawfulness of the plaintiff's continuing confinement," as Plaintiff does here. *Heck*, 512 U.S. at 483 (distinguishing *Wolff* ). Similarly, a prisoner may bring a § 1983 claim alleging that the *conditions* of his or her confinement violate the Eighth Amendment without violating *Heck. See, e.g., Channer v. Mitchell*, 43 F.3d 786, 788 (2d Cir. 1994) (per curiam) (holding that a § 1983 claim "stemming from conditions of confinement that allegedly violate the Eighth Amendment" are not per se barred by *Heck* ). However, Plaintiff's claim is that he is being punished by the denial of Good Time Credits necessary for his conditional release, not by the conditions of his confinement. (Pl.'s Supp. Mem. 3; Pl.'s Mem. 5.) Thus, the Court grants Defendant's Motion To Dismiss Plaintiff's Eighth and Fourteenth Amendment claims as barred by *Heck*.

### 3. Constitutional Claims

**\*6** Even assuming Plaintiff's claims were not barred by *Heck*, the Complaint fails to plausibly allege a constitutional violation. The Court will address each purported violation separately.

### a. Fourteenth Amendment

Construing his submissions generally, Plaintiff alleges two ways in which his due process rights were violated: (1) he was deprived of Good Time Credits, and (2) he was forced to participate in the SOTP even though he was not screened for, and did not demonstrate, a need for such treatment. [6] "[T]o present a [procedural] due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (internal quotation marks omitted). By contrast, "[t]o state a claim for substantive due process a plaintiff must allege that: (1) he had a valid [liberty] interest and (2) 'defendants infringed on that ... right in an arbitrary or irrational manner.' " *Cherry v. New York City Hous. Auth.*, No. 15-CV-6949, 2017 WL 4357344, at *28 (E.D.N.Y. Sept. 29, 2017) (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 545 (2d Cir. 2014) ).

[6]    Plaintiff also contends that Defendant "converted his judicially-imposed indeterminate sentence into a maximum sentence without judicial consent." (Pl.'s Mem. 5 (citing *Hill v. U.S. ex rel. Wampler*, 298 U.S. 460, 465 (1936) ) ). Even assuming this claim were not barred by *Heck*, it fails. *Wampler* stands for the proposition that a prisoner may be detained only on account of the judgment and sentence entered by the court. *See* 298 U.S. at 464–65. However, "DOCCS calculates a defendant's ultimate release date," which includes "the sentences imposed by the court," but is based on "factors other than the length of his sentence ...

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 78 of 105

Adams v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 4608216

such as ... the availability of so-called 'good time' credits." *Smith v. Wenderlich*, 826 F.3d 641, 653 (2d Cir. 2016). Thus, Defendant did not illegally expand Plaintiff's sentence even to the extent he caused Plaintiff's Conditional Release date to change. Indeed, Plaintiff's DOCCS record indicates that Plaintiff was previously released on parole and re-incarcerated for a parole violation, with an upcoming parole hearing scheduled for February 2020. (DOCCS Profile.)

With respect to the deprivation of Good Time Credits, Plaintiff has not plausibly alleged either a procedural or substantive due process violation. There is no constitutional right to Good Time Credits; however, a prisoner has a protected liberty interest in such credits if they have already properly vested under state law. *See Wolff*, 418 U.S. at 557 (holding that prisoners who earned good time credits under state law could not be deprived of those credits without compliance with procedures satisfying the Due Process Clause); *Abed v. Armstrong*, 209 F.3d 63, 66–67 (2d Cir. 2000) ("Although inmates have a liberty interest in good time credit they have *already earned*, no such interest has been recognized in the opportunity to earn good time credit where, as here, prison officials have discretion to determine whether an inmate or class of inmates is eligible to earn good time credit." (citation omitted) (emphasis added) ); *see also Edwards*, 362 F. App'x at 196–97 (noting that a prisoner has a protected liberty interest in accrued good time credits but not in the discretionary grant of them in the first place). Thus, to the extent Plaintiff is alleging that the SOTP policy prevented him from earning *new or additional* Good Time Credits that would count towards his Conditional Release, he fails to identify a cognizable liberty interest under the Fourteenth Amendment. (*See* Compl. 3 ("I must complete the program to be reconsidered for Good Time. After participating in the program for four months, the program removed me ..."); Pl.'s Mem. 5 (alleging that Defendant "continually den[ied] him the [G]ood [T]ime [C]redits available to every other inmate within DOCCS"); Pl.'s Supp. Mem. 2 ("Plaintiff is now required to complete the [SOTP] which he has consistently pleaded is impossible to accomplish in order to earn Good Time Credits ...").)

**\*7** Plaintiff also alleges that Defendant deprived him of his accrued Good Time Credits when he refused to join the SOTP. (Compl. 3.) However, Plaintiff does not allege that this was done without due process. Indeed, Plaintiff alleges that he received a hearing, before the "Time Allowance Committee." (*Id.*) *See* N.Y. Comp. Codes R. & Regs.

["N.Y.C.R.R."] Tit. 7 § 261.3 (describing the procedure of time allowance committees); *id.* § 261.4 (describing the hearing before the committee). Plaintiff does not allege how this hearing, or any other aspect of the decision to revoke his credits, was procedurally deficient under *Wolff* or its progeny. *See Wolff*, 418 U.S. at 557–58; *Edwards*, 520 U.S. at 648 (listing due process requirements for revocation of good time credits); *see also Edwards*, 362 F. App'x at 197 (finding no procedural due process violation where "the discretionary award of good time credits to [the plaintiff] was reconsidered in accordance with the procedures generally set forth in [7 N.Y.C.R.R. §§ 261.3–26.14]," in that the plaintiff "received a ... hearing before the Commissioner," who found that the plaintiff's "refusal to participate in sex offender counseling made him an inappropriate candidate for such an award"). For example, Plaintiff does not allege that he was not given "a reasonable opportunity to call witnesses and present documentary evidence," "a fair and impartial hearing officer," or "a written statement of the disposition." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (describing process due to an inmate under *Wolff* ). Nor does Plaintiff allege how the revocation of his Good Time Credits for failure to participate in the SOTP was so "arbitrary or irrational" that it violated his substantive due process rights. *Royal Crown Day Care LLC*, 746 F.3d at 545; *see also Cunney v. Bd. of Trs. of Vill. Of Grand View, N.Y.*, 660 F.3d 612, 626 (2d Cir. 2011) ("Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." (citation and internal quotation marks omitted) ). Indeed, New York law explicitly provides that refusal to participate in an SOTP is a relevant consideration in the decision to revoke accrued Good Time Credits. *See* N.Y. Corr. Law § 803(1)(a) (stating that good time credits "may be withheld, forfeited or canceled in whole or in part for ... failure to perform properly in the ... program assigned").

Plaintiff also alleges that he was forced to participate in the SOTP even though he was not screened for and did not "need" such treatment. (*E.g.*, Compl. 3.) This allegation appears to be based on Plaintiff's reading of New York Correction Law § 622 to require DOCCS to screen inmates for a need for treatment before subjecting them to an SOTP. (Pl.'s Mem. 3–4.) This reading is incorrect. As explained earlier, § 622 requires DOCCS to make an SOTP available to inmates serving sentences for felony sex offenses "and are identified as having a need for such program *in accordance with* [§§ 803 and 805 of Chapter 43 of the Correction Law]." N.Y.

Adams v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 4608216

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 79 of 105

Corr. Law § 622 (emphasis added). Under § 805, an inmate serving an indeterminate sentence must be "assigned a work and treatment program as soon as practicable." *Id.* § 805. And, § 803 provides that Good Time Credits may be awarded for "progress and achievement in an assigned treatment program, and may be withheld, forfeited, or canceled ... for ... failure to perform properly in the ... program assigned." *Id.* § 803(1)(a). Together, §§ 803 and 805 stand for the proposition that an inmate must be assigned to a treatment program upon entry into DOCCS custody, and that the provision of Good Time Credits to that inmate can be based on their participation in that program. *Id.* §§ 803, 805. These provisions state nothing about requiring "screening" or demonstrating "medical need" for an SOTP. (Compl. 3–4.) [7] Therefore, to the extent Plaintiff claims that Defendant violated his due process rights merely by failing to comply with § 622, this claim fails. In any event, the failure to follow a state law or a prison regulation does not violate due process. *See Golian v. New York City Admin. for Children Servs.*, 282 F. Supp. 3d 718, 727 (S.D.N.Y. 2017) ("The mere failure to follow state law does not violate substantive due process." (citing *Kuck v. Danaher*, 600 F.3d 159, 167 (2d Cir. 2010) ) ); *Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("An alleged violation of a prison policy, directive, or regulation, in and of itself, does not give rise to a federal claim, because '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' " (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990) ) ). The Court therefore grants Defendant's Motion to Dismiss the Fourteenth Amendment claims.

[7]   Section 622 states that any inmate convicted of a felony sex offense committed to DOCCS custody "*on or after* the effective date of [the statute]"— that is, April 13, 2017—must be screened "as soon as practicable" for the "need for sex offender treatment while in prison." *Id.* § 622(5). Plaintiff was admitted to DOCCS custody in 1989, so this provision does not apply here. *See* DOCCS Profile.

### b. Fifth Amendment

**\*8** Plaintiff also alleges that Defendant violated his Fifth Amendment rights by forcing Plaintiff to admit responsibility for his crime—as a condition of release. (Pl.'s Mem. 5.) [8] The Fifth Amendment provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In 2010, the Supreme Court considered whether this privilege against compelled self-incrimination was violated by a prison SOTP requiring participants to admit responsibility for their crimes of conviction. *See McKune v. Lile*, 536 U.S. 24, 30 (2002). Specifically, the Court considered a Kansas state prison program in which participants were required to fill out a form "accept[ing] responsibility for the crime for which they have been sentenced" and "to complete a sexual history form ... detail[ing] all prior sexual activities, regardless of whether such activities constitute uncharged criminal offenses." *Id.* This "information [wa]s not privileged," and "Kansas le[f]t] open the possibility that new evidence might be used against sex offenders in future criminal proceedings." *Id.* Prisoners who refused to participate in the program suffered a reduction in various prison privileges, including transfer to another facility. *Id.* at 30–31. A plurality of the Court concluded that the program did not violate the Fifth Amendment, explaining that "[a] prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not violate the privilege against compelled self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life." *Id.* at 37–38 (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995) ). The plurality therefore held that an SOTP like the one at issue here "does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating" fall short of constituting "atypical and significant hardships" under *Sandin*'s definition. *Id.* However, Justice O'Connor, concurring only in the judgment, rejected the plurality's reliance on the *Sandin* due process standard, but agreed that the program did not constitute compulsion under the Fifth Amendment. *Id.* at 53–54. Therefore, *McKune* did not set forth a definitive answer regarding "what standard to apply when evaluating compulsion for purposes of the Fifth Amendment privilege against self-incrimination in a prison setting," and the Second Circuit has declined to take a position on this question. *United States v. Jones*, 299 F.3d 103, 111 n.2 (2d Cir. 2002); *see also Edwards*, 362 F. App'x at 198–99 (explaining that "there was no majority opinion setting forth the appropriate analysis or rule" in *McKune* and thus "[a]ll that can be said ... is that a majority of the justices agreed that the Fifth Amendment privilege against compelled self-incrimination was not violated when prisoner faced less restrictive sanctions than" the loss of good time credits).

Case 9:21-cv-00791-AMN-TWD   Document 32   Filed 06/01/22   Page 80 of 105

Adams v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 4608216

8    Plaintiff suggests that this also constituted "cruel and unusual punishment" under the Eighth Amendment, but cites *Wolff*, a due process case. (Pl.'s Mem. 5.) The Eighth Amendment does not, without more, cover compelled speech. *See LaBounty v. Adler*, 933 F.2d 121, 123–24 (2d Cir. 1991) ("To constitute a violation of the cruel and unusual punishment clause of the [E]ighth [A]mendment, a prisoner must allege something akin to unnecessary and wanton infliction of pain, or punishment incompatible with the evolving standards of decency that mark the progress of a maturing society." (citations and internal quotation marks omitted) ).

However, "[s]ince *McKune*, several courts have held that the rationale in *McKune* extends to the loss of good time credits or jeopardizing the chance for parole, and that such a consequence for the failure to participate in a sex offender program does not constitute a violation of the Fifth Amendment." *Sayles v. Fischer*, No. 08-CV-0747, 2011 WL 1199834, at *5 (W.D.N.Y. Mar. 29, 2011) (collecting cases); *see also McChesney v. Hogan*, No. 08-CV-1290, 2010 WL 1027443, at *7 (N.D.N.Y. Feb. 26, 2010) ("It is by now fairly well settled that risking the loss of good time credits or jeopardizing the chance for parole, alone, does not qualify as sufficiently compulsive to meet the test."), *adopted by* 2010 WL 1037957 (N.D.N.Y. Mar. 18, 2010).[9] Generally, these cases rely on two arguments to reach this conclusion: first, that there is no liberty interest in receiving good time credits, and second, that participation is voluntary and failure to participate does not guarantee a denial of parole. *See Sayles*, 2011 WL 1199834, at *5–6. Here, Plaintiff had the opportunity to refuse participation in the SOTP and to refuse to admit responsibility, which he exercised. (Compl. 3.) Although he risked the loss of his accrued Good Time Credits, he was not "made to be a 'witness' against himself in violation of the Fifth Amendment's Self–Incrimination Clause[,] because his statements were never admitted as testimony against him in a criminal case. Nor was he ever placed under oath and exposed to the cruel trilemma of self-accusation, perjury or contempt." *Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (internal quotation marks omitted). Indeed, unlike the program in *McKune*, Plaintiff does not allege that the SOTP at issue here required him to admit responsibility for uncharged crimes or crimes of which he was not convicted. *See* 538 U.S. at 30; *see also Hernandez v. Tribley*, No. 14-CV-21, 2016 WL 1749765, at *2 (W.D. Mich. May 3, 2016) ("Petitioner was not asked to admit to conduct

that could support a conviction for criminal sexual conduct, but to admit to the factual circumstances that surrounded the crimes for which he was actually convicted."). Rather, as the Tenth Circuit explained in analyzing a similar claim:

*9    "Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." *McKune*, 536 U.S. at 53 (O'Connor, J., concurring) (quoting *McGautha v. California*, 402 U.S. 183, 213 (1971) ). [The plaintiff] having been convicted through a fair criminal process of a sex offense, was made aware of the consequences of any failure on his part to complete the S[O]TP upon intake into the prison. The fact that the KDOC will not let [the plaintiff] complete the S[O]TP unfettered by its more unpleasant aspects does not render his original choice to enter the program any less voluntary. *See [Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 286 (1998) ] ("It is difficult to see how a voluntary interview could 'compel' respondent to speak.").

*Searcy v. Simmons*, 299 F.3d 1220, 1226 (10th Cir. 2002); *see also Simmons v. Nish,* No. 10-CV-4934, 2011 WL 2175851, at *4 (E.D. Pa. May 9, 2011) ("Because the parole proceeding that petitioner challenges is voluntary in nature and an inmate's decision to remain silent risked no additional penalty as that concept has been understood by the Third Circuit, the Board did not violate petitioner's Fifth Amendment rights when part of its reason for denying petitioner parole related to the refusal, to accept responsibility for [the] offenses of conviction." (alterations and internal quotation marks omitted) ), *adopted by* 2011 WL 2175894 (E.D. Pa. June 3, 2011). Therefore, because, as alleged, Plaintiff was faced only with the choice between forgoing the *potential* for an earlier Conditional Release date through accumulation of Good Time Credits—something to which he is not constitutionally entitled—or admitting responsibility only for his crime of conviction, his Fifth Amendment rights were not violated. *See Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."); *see also Edwards*, 362 F. App'x at 199 (affirming denial of habeas corpus relief to petitioner who argued that the state court erroneously found that the revocation of his good time credits for refusing to participate in a SOTP violated *McKune* ). The Court therefore grants the Motion to Dismiss Plaintiff's Fifth Amendment claim.[10]

9    The *McKune* plurality did note, in dicta, that "respondent's decision not to participate in the Kansas [SOTP] did not ... affect his eligibility for good-time credits or parole." 536 U.S. at 38.

10    To the extent that Plaintiff argues that Defendant attempted to or did force Plaintiff to change his *plea* from "Guilty" to "Not Guilty," this claim is not plausible. (Compl. 4.) Plaintiff was convicted and sentenced, (Pl.'s Mem. 8), and does not allege any facts plausibly suggesting that the SOTP required him to somehow change his plea. Indeed, he alleges that the SOTP required him to "admit to a crime [he] did not do" and "to admit to committing the crime," which is different from actually pleading guilty before a court. (Compl. 3.) *See* Fed. R. Crim. P. 11 (rules governing guilty pleas).

### c. Eighth Amendment

Finally, Plaintiff alleges that Defendant violated the Eighth Amendment by forcing him to undergo a medical treatment which he did not need. (Pl.'s Mem. 3, 6.) The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. It is axiomatic that "[t]he conditions of a prisoner's confinement can give rise to an Eighth Amendment violation." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam). "Although the Constitution does not require 'comfortable' prison conditions, the conditions of confinement may not 'involve the wanton and unnecessary infliction of pain.' " *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ). "In such cases, a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.' " *Phelps*, 308 F.3d at 185 (italics omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ). Plaintiff alleges no facts satisfying these standards here.

**\*10** To be sure, forcing a prisoner to undergo an unwanted and unnecessary medical treatment could violate the Eighth Amendment, if it posed a risk to his or her health or safety or was done for the purpose of inflicting pain. However, as explained earlier, Plaintiff was not forced to participate in the SOTP; rather, he was given the ability to refuse, which he did initially, and then he "consented" to participate

when he was told he would otherwise lose his Good Time Credits. (Compl. 3.) *See Jones v. Goord*, 435 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (finding that inmates' "voluntary accumulation of personal property" in small cells did not violate the Eighth Amendment as the clutter was caused by "the inmates' own desire for personal property and their refusal to use out-of-cell storage, not any 'punishment' imposed by defendants"); *see also Haas v. Weiner*, 765 F.2d 123, 124 (8th Cir. 1985) (per curiam) (finding "no substantial evidence that [the plaintiff's] will was overborne, or that he was offered inducements that he did not have the power to resist if he chose," and that "conduct in which one voluntarily engages can hardly be said to violate the Eighth Amendment"); *cf. Pabon v. Wright*, 459 F.3d 241, 246 (2d Cir. 2006) (holding that a prisoner's liberty interest in refusing medical treatment includes "a concomitant right to such information as a reasonable patient would deem necessary to make an informed decision regarding medical treatment"). Moreover, although Plaintiff describes the SOTP as "a form of medical treatment," he alleges no facts describing what sort of treatment he was forced to undergo, let alone that he was somehow harmed by it. (Pl.'s Mem. 6.) *See Kingsley v. Bureau of Prisons*, 937 F.2d 26, 32 (2d Cir. 1991) (finding that there was "no medical justification" for the defendant's action and it "may have hindered, rather than helped," the plaintiff, but it did not "amount[ ] to cruel and unusual punishment" because "[n]o harm was inflicted"). Nor does Plaintiff allege any facts about Defendant's, or his subordinates', states of mind. Put differently, even assuming Plaintiff did not "need" the SOTP, he alleges no facts plausibly suggesting that Defendant knew that and imposed it anyway. *See Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Therefore, the Court grants Defendant's Motion to Dismiss the Eighth Amendment claim. 11

11    Because the Court dismisses Plaintiff's claims on the merits, it need not address Defendant's alternative argument that he is entitled to qualified immunity. (Def.'s Mem. 10–11.)

### III. Conclusion

For the foregoing reasons, Defendant's Motion To Dismiss is granted. Because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *See Terry v. Inc. Vill. Of Patchogue*, 826 F.3d 631, 633

(2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile"). Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The new amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by the 30-day deadline, this action could be dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4608216

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00791-AMN-TWD    Document 32    Filed 06/01/22    Page 83 of 105
McChesney v. Hogan, Not Reported in F.Supp.2d (2010)
2010 WL 1027443

2010 WL 1027443
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David McCHESNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, New York
State Office of Mental Health, et al., Defendants.
David McChesney, Plaintiff,
v.
Michael F. Hogan, Commissioner, New York
State Office of Mental Health, et al., Defendants.

Civil Action Nos. 9:08–CV–1186 (NAM/
DEP), 6:08–CV–1290 (NAM/DEP).
|
Feb. 26, 2010.

**Attorneys and Law Firms**

David McChesney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State
of New York, Adele Taylor–Scott Esq., Assistant Attorney
General, Dean J. Higgins, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

 **\*1** Plaintiff David McChesney, a convicted sex offender
who has been civilly committed to the Central New
York Psychiatric Center ("CNYPC"), for participation in
sex offender treatment, has commenced these two actions
pursuant to 42 U.S.C. § 1983, claiming deprivation of his
civil rights. In his complaints, plaintiff alleges that the Sex
Offender Treatment Program ("SOTP") administered at the
CNYPC is predicated in part upon religious tenets, and he
is being forced, contrary to his beliefs as an atheist, to
practice religion in violation of his First Amendment rights.
In addition, plaintiff alleges that various other aspects of the
SOTP, including use of polygraph and penile plethysmograph
("PPG") testing and the requirement that he compose and
share an autobiography detailing his sexual history, violate
his Fifth Amendment right against self-incrimination.[1] As
relief, plaintiff seeks both damages and an injunction against

the continued use of the problematic religious and self-
incriminating elements of the treatment program.

[1]    A plethysmograph is "[a]n instrument that
measures variations in the size of an organ or
body part on the basis of the amount of blood
passing through or present in the [body] part."
American Heritage Dictionary 1338 (4th ed.2000).
According to materials regarding the programming
at the CNYPC, use of the PPG is intended to
"assess sexual interests and measure treatment
effectiveness. In this treatment, while wearing
a sterilized gauge around the penis, a machine
records any erection response resulting from
listening to and/or viewing depiction of sexual
and non-sexual materials. This assessment occurs
within a laboratory setting for complete privacy."
*See Decker v. Hogan,* No. 9:09–CV–0239 (TJM/
GJD), 2009 WL 3165830 at \*1 n. 1 (N.D.N.Y.
Sept.28, 2009).

Defendants have moved for dismissal of the complaints on a
variety of grounds, both procedural and substantive, arguing
that 1) plaintiff's complaints are legally insufficient because
he has failed to separately number paragraphs and include all
exhibits referenced in one of the two complaints; 2) plaintiff's
damage claims against the defendants in their official
capacities are precluded under the Eleventh Amendment; 3)
plaintiff's forced self-incrimination claims lack merit; and
4) they are entitled to qualified immunity with respect to
plaintiff's First Amendment cause of action in light of the
unsettled state of the law governing such a claim. For the
reasons set forth below, I recommend that plaintiff's Fifth
Amendment self-incrimination claim be dismissed because
he has failed to plead that information set forth in his
autobiography or derived through polygraph or PPG testing
has been used against him in a criminal proceeding, that
his damage claims against the defendants as individuals
alleging violation of the First Amendment be dismissed based
on qualified immunity, and that any damage claims against
defendants as state officials be dismissed pursuant to the
Eleventh Amendment. To the extent that plaintiff's First
Amendment claim seeks injunctive relief against defendants
in their official capacities only, however, I further recommend
that this claim survive defendants' motion, and additionally
that defendants' motion to dismiss the complaint for failure to
meet the governing pleading requirements be denied.

I. *BACKGROUND* [2]

2010 WL 1027443

[2]
In light of the procedural posture of this case, my recitation of the relevant facts is drawn principally from plaintiff's complaints, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). Portions of the background description which follows have been derived from the exhibits attached to plaintiff's complaints, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *see also Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

On or about December 6, 2007 the plaintiff, a convicted sex offender, was involuntarily committed to the care and custody of the New York State Office of Mental Health and designated to the CNYPC pursuant to the mandates of New York Mental Hygiene Law Article 10.[3] *See generally,* Civil Action No. 9:08–CV–1186 (NAM/DEP) Complaint (Dkt. No. 1) § 4. While there, McChesney is required to participate in the SOTP, an established sex offender treatment regimen that is broken down into four distinct segments. *Id.,* Exh. D; Civil Action No. 9:08–CV–1290 (NAM/DEP) Complaint (Dkt. No. 1) Exhs. B and C. Phase I of the program, entitled "Orientation and Treatment Readiness", is described as the "readiness phase" and "provides basic information related to the commitment process, goals of the sex offender treatment program, and the treatment plan which documents an individual's progress towards meeting the program goals." *Id.* Phases II through IV of the SOTP are more intensive and are based upon what is described as a "structured treatment protocol." *Id.*

[3]
Enacted in 2007, Article 10 of the Mental Hygiene Law provides for civil commitment and treatment of certain individuals convicted of committing sex crimes, recognizing the danger that recidivistic offenders present when released into the community. *See* N.Y. Mental Hyg. Law § 10.01.

**\*2** In order to participate in the latter three phases of the SOTP, which are conducted in group therapy settings, a patient is required to sign a consent form, described by

the plaintiff as a contract. Civil Action No. 9:08–CV–1186 (NAM/DEP) Complaint (Dkt. No. 1) § 4 and Exhs. D and E. Significantly, the consent form discloses the potential use of polygraph and PPG testing during the course of the final three phases and notes that a separate written consent is required for use of each of those types of testing. *Id.* While advised of his or her right to refuse such testing, the patient is also pointedly informed that a refusal "may slow or prevent advancement in SOTP Phases of treatment." *Id.*

Attached to plaintiff's first complaint are two versions of the SOTP Phase II–IV Consent to Participate in Treatment form. Civil Action No. 9:08–CV–1186 (NAM/DEP) Complaint (Dkt. No. 1) Exhs. D and E. According to the plaintiff, the second of those forms "was recently issued by defendant [OMH Commissioner] Hogan." *Id.* § 4. The more recent consent form differs from the earlier version in several critical respects. First, while the original form provided that polygraph examinations "are not designed to be incriminating or to be used in court", the amended version instead states that "[t]he courts may choose to use any information gathered from [polygraph] examinations." *Id.* The more recent iteration also specifically advises that the polygraph examination may be used to explore the patient's sexual history. *Id.*

In addition to use of polygraph and PPG testing as treatment tools, the SOTP employs course materials which, plaintiff asserts, incorporate or are predicated upon Buddhist and Christian beliefs and practices, including "The Good Lives Model and Boundaries Programs," which discusses spirituality; "Dialectic Behavior Therapy", "Self Care Skills I and II", and "Relaxation Programs", all teaching the rituals and practices of Buddhism; and "Growing up Male, Problem Solving, Anger Management Programs", described as "Hazleton Products which incorporate Christian beliefs and practices into their programs." Civil Action No. 9:08–CV–1186 (NAM/DEP) Complaint (Dkt. No. 1) § 4. McChesney, who is an atheist, asserts that by requiring him to submit to teaching using those materials defendants have violated his First Amendment rights. *Id* .

In or about August of 2008, as part of the SOTP program, plaintiff was directed by Donald Sawyer, Executive Director of the CNYPC, to author and be prepared to present an autobiography. Civil Action No. 9:08–CV–1290) (NAM/DEP) Complaint (Dkt. No. 1) § 4. Preparation of such an autobiography is a requirement of the Phase II treatment protocol and is described in a handout entitled

2010 WL 1027443

"Introduction to Autobiographies." Civil Action No. 9:08–CV–1290 (NAM/DEP) Complaint (Dkt. No. 1) Exh. A. Segment four of the questionnaire given to patients for use in complying with this requirement requests information about criminal history and asks specific questions regarding the patient's participation in sex crimes and other unlawful sexual conduct. *Id.,* Exhs. A and C. On or about October 9, 2008, defendant Valerie Colasante, a psychologist at the facility, advised plaintiff that each participant in the program would be questioned regarding his or her autobiography, which was to recount a history of sexual offenses including charged and uncharged crimes. Civil Action No. 9:08–CV–1290 (NAM/ DEP) Complaint (Dkt. No. 1) § 4. According to McChesney, Terry Maxymillan, the SOTP Director, issued an order that plaintiff's autobiography be collected, placed in his file, and made available for inspection by the Attorney General. *Id.* On October 30, 2008, plaintiff was directed by defendant Colasante to turn in his autobiography. *Id.* Plaintiff was later removed from the treatment group based upon a refusal to permit his autobiography to be copied. *Id.*

## II. *PROCEDURAL HISTORY*

 **\*3** The first of these two actions, Civil Action No. 9:08–CV–1196 (NAM/DEP), was commenced by the plaintiff on November 6, 2008. The second, Civil Action No. 9:08–CV–1290 (NAM/DEP), was filed some three weeks later on November 28, 2008. The two actions were subsequently consolidated by the court, on its own initiative, based upon a report issued by me on December 23, 2008 recommending that measure and approval of that recommendation by Chief District Judge Norman A. Mordue on March 9, 2009.[4] [5] Civil Action No. 9:08–CV–1186 (NAM/DEP) Dkt. Nos. 4, 13.

[4]     Plaintiff currently has two other actions pending in this court, including *McChesney v. Hogan, et al.,* No. 9:08–CV–0163 (FJS) (filed Feb. 11, 2008), in which plaintiff complains of the inadequacy of the law library at the CNYPC, and *McChesney v. Hogan, et al.,* No. 9:08–CV–0563 (NAM) (filed June 10, 2008), in which McChesney has lodged claims against the named defendants for failure to protect him from assaults the hands of fellow patients at the center. A fifth action commenced by the plaintiff, *McChesney v. Miller, et al.,* No. 9:08–CV–0195 (TJM) (filed Feb. 21, 2008), was closed in March of 2008 based upon plaintiff's voluntary

withdrawal of the claims set forth in his complaint without prejudice. *See id.,* Dkt. Nos. 4–6.

[5]     The court's consolidation order designated Civil Action No. 9:08–CV–1186 (NAM/DEP) as the lead action. All references to docket entries in this report, unless indicated otherwise, will refer to the docket sheet in that case.

Plaintiff's complaint in Civil Action No. 9:08–CV–1186 (NAM/DEP) names OMH Commissioner Michael Hogan and CNYPC Executive Director Donald Sawyer as defendants and asserts claims under the First and Fifth Amendments to the United States Constitution. McChesney's complaint in 9:08–CV–1290 (NAM/DEP) names Commissioner Hogan and Executive Director Sawyer as well as three new defendants, including SOTP Director Terri Maxymillian; Psychologist Valerie Colasante; and Registered Nurse Regina Anderson, identified as a Treatment Team Leader at the Center. The complaint in that action focuses on the compelled self-incrimination aspect of the SOTP program, particularly the requirement to complete an autobiography, seemingly asserting a claim under the Fifth Amendment to the United States Constitution. *Id.*

On April 21, 2009 defendants moved pursuant to Rules 10(b) and 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of plaintiff's complaints in these two consolidated actions. Dkt. No. 17. In their motion defendants allege that 1) plaintiff has failed to meet the pleading requirements of Rule 10(b) by not separately numbering the paragraphs and because of his failure to include some of the exhibits that are specifically incorporated by reference into one of the complaints; 2) the Eleventh Amendment bars plaintiff's damage claims against the defendants in their official capacities; 3) plaintiff's Fifth Amendment claim lacks merit; and 4) defendants are entitled to qualified immunity in connection with plaintiff's First Amendment claim.[6] Although plaintiff did not respond to defendants' motion within the allotted time, which expired on May 26, 2009, he has since submitted what is denominated as a declaration in further support of his action. Dkt. No. 22. Without providing great detail, plaintiff's submission states that a New York State Supreme Court Justice has made a finding that McChesney suffers from "a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that he is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility"; it appears that plaintiff is suggesting that this determination was based upon the sexual autobiography

that he was compelled to prepare as part of his participation in the SOTP.

6    Defendants' motion also requests a protective order precluding plaintiff from engaging in discovery pending determination of their motion. That relief is no longer necessary, however, since by order entered on April 23, 2009, I stayed discovery in the action pending resolution of defendants' motion to dismiss. *See* Dkt. No. 19.

III. *DISCUSSION*

A. *Failure To Comply With Governing Pleading Requirements*

**\*4** As a threshold matter, in their motion defendants argue that plaintiff's complaints do not conform to applicable pleading requirements in that they do not consist of separately numbered paragraphs and that he has also failed to attach Exhibits A through C despite their incorporation by reference into his complaint in Civil Action No. 9:08–CV–1186 (NAM/DEP). Defendants urge the court to exercise its discretion to dismiss the complaints due to these omissions.

Federal Rule of Civil Procedure 10 imposes a requirement whose intent is largely pragmatic, requiring, among other things, that a pleading consist of separately numbered paragraphs "each of which shall be limited as far as practicable to a statement of a single set of circumstances[.]" Fed.R.Civ.P. 10(b). Rule 10(b) is designed to assist litigants and the court by allowing the interposition of a responsive pleading and the corresponding framing of issues with sufficient clarity to allow an orderly and meaningful presentation of a plaintiff's claims and any corresponding defenses, either on motion or at trial. *See Flores v. Graphtex,* 189 F.R.D. 54, 55 (N.D.N.Y.1999) (Munson, S.J.).

Analysis of plaintiff's amended complaint, in the face of defendants' motion, is informed not only by the salutary purposes to be served by these pleading requirements but additionally by two equally important principles. First, it is a well settled that a complaint prepared by a *pro se* litigant should be liberally construed in his or her favor. *Salahuddin v. Cuomo,* 861 F.2d 30, 42–43 (2d Cir.1988). Second, courts generally favor adjudication of cases on their merits rather than on the basis of a technicality or procedural nicety. *Id.* at 42; *see also Zdziebloski v. Town of East Greenbush,* 101 F.Supp.2d 70, 72 (N.D.N.Y.2000) (Kahn, J.) (citing *Salahuddin* ); *Upper Hudson Planned Parenthood, Inc. v.*

*Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.).

Unlike the situation presented in many instances involving *pro se* litigants, including the case cited by the defendants, *Jochnowitz v. Russell Sage College,* No. 90–CV–1101, 1992 WL 106813 (N.D.N.Y. May 13, 1992), plaintiff's complaints in these two actions are neither rambling nor prolix and instead concisely state the facts upon which relief is sought. [7] In this instance the factual allegations recited in both complaints are broken down into separate paragraphs. In the case of plaintiff's complaint in Civil Action No. 9:08–CV–1186 (NAM/DEP) plaintiff has attempted to separately letter some of the paragraphs; in Civil Action No. 9:08–CV–1290 (NAM/DEP), however, the factual recitation includes paragraphs that are wholly unnumbered.

7    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

The salutatory objective to be served by Rule 10 is to permit the formulation of a proper pleading and response. That end can be served in this instance by assuming that the paragraphs outlined in section four of plaintiff's two complaints are separately numbered, beginning with paragraph number one, with defendants responding accordingly in their answers.

**\*5** Slightly more problematic is the fact that plaintiff's complaint in Civil Action No. 08–CV–1186 (NAM/DEP) fails to attached three exhibits referenced in the complaint. This is a curable defect and presumably the result of an oversight on the plaintiff's part. I therefore recommend against dismissal of plaintiff's complaint on this basis. Instead, I respectfully suggest that plaintiff be directed to submit to the court and defendants' counsel copies of the exhibits referenced in his complaint in Civil Action No. 9:08–CV–1186 (NAM/DEP) before defendants must file an answer so that they may know the full extent of the allegations to which they are responding.

B. *Dismissal Standard*

The second prong of defendants' motion is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss a complaint brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting

2010 WL 1027443

in its requirements, "demands more than an unadorned, the defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ——U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570 127 S.Ct. at 1974).

### C. *Eleventh Amendment*

Plaintiff's complaints in these consolidated actions seek both monetary and injunctive relief. They do not, however, clearly specify whether monetary damages are sought against the defendants in their official capacities, or instead just as individuals. To the extent that plaintiff's complaints may be construed as seeking damages against the defendants as state officials, they argue that such relief is precluded under the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[8] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his or her

official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[9] *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

[8]   In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

[9]   By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30–31, 112 S.Ct. at 364–65.

**\*6** Since plaintiff's damage claim against the named defendants in their official capacities is in reality a claim against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, it is subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted and that plaintiff's damage claim against the defendants in their capacity as state officials be dismissed.[10]

[10]   Dismissal of plaintiff's damage claim against the defendants in their official capacities does not preclude plaintiff from maintaining an action for injunctive relief against those individuals as state officials. *Frew ex. rel. Frew v. Hawkins,* 540 U.S. 431, 437, 124 S.Ct. 899, 903, 157 L.Ed.2d 855 (2007) ("[T]he Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.") (citations omitted).

### D. *Plaintiff's Fifth Amendment Self Incrimination Claim*

Defendants next seek dismissal of plaintiff's Fifth Amendment claim. In support of this portion of their motion defendants argue that using polygraph and PPG testing

and an autobiography potentially containing incriminating information, including that related to past uncharged crimes, in a civil setting to treat the plaintiff as a sex offender does not run afoul of the Fifth Amendment's privilege against self-incrimination.

The Fifth Amendment, which applies to the states through the Fourteenth Amendment, *see Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), insures that no person "shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V. That provision protects persons against being compelled in a criminal case to give self-incriminating testimony. *McKune v. Lile,* 536 U.S. 24, 35–36, 122, 122 S.Ct. 2017, 153 L.Ed.2d 47, S.Ct. 2017, 2026 (2002); *Higazy v. Templeton,* 505 F.3d 161, 171 (2d Cir.2007). As the Supreme Court has noted, "[t]he privilege reflects a complex of our fundamental values and aspirations, and marks an important advance of the development of our liberty." *Kastrigar v. United States,* 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). While speaking in terms of criminal cases, the Fifth Amendment offers a privilege that "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory...." *Id.* at 444–45, 92 S.Ct. at 1656 (footnote omitted).

The first question presented in connection with plaintiff's Fifth Amendment claim is whether by virtue of the SOTP's autobiography requirement he has been compelled by the government to give incriminating information. "The test for whether a statement was improperly obtained by coercion is 'determined by the totality of the circumstances' ". *Higazy,* 505 F.3d at 170 (citing and quoting *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998)).

The element of compulsion, in the context of the Fifth Amendment, was addressed by the Supreme Court in *McKune.* 536 U.S. at 48–49, 122 S.Ct. at 2032–33 (O'Connor, J., concurring). *McKune* involved a Kansas prison inmate who, as a participant in a sex abuse treatment program, was required not only to discuss and accept responsibility for the crime of conviction but also to complete a sexual history form detailing all prior sexual activities. *McKune,* 536 U.S. at 29–32, 122 S.Ct. at 2022–24. The consequences for refusing to participate in the treatment program included curtailment of various privileges and a transfer into a more secure facility with more limited opportunities for movement. *Id.* at 30–31, 122 S.Ct. at 2022–23. A plurality of the Court concluded that the plaintiff in that case had failed to demonstrate a

sufficient degree of constitutionally significant compulsion, although no one opinion garnered a majority. Focusing on the compulsion element of the self-incrimination clause Justice Kennedy, who delivered an opinion in which three others joined, concluded that the limitations faced for failing to cooperate were similar to that which other prison inmates could also be exposed and did not rise to a level sufficient to constitute undue compulsion and thus run afoul of the Fifth Amendment. [11] *McKune,* 536 U.S. at 41–47, 122 S.Ct. 2017, 153 L.Ed.2d 47.

[11]    In its decision *McKune,* the Supreme Court took notice of the serious threat presented by sex offenders released into the community and the high rate of their recidivism, noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault[,]" adding that "[s]tates thus have a vital interest in rehabilitating convicted sex offenders." *McKune,* 536 U.S. at 33, 122 S.Ct. at 2024 (citations omitted). The Court also observed in *McKune* that "[a]cceptance of responsibility is the beginning of rehabilitation," noting that the acceptance of responsibility for past offenses "gives inmates a basis to understand why they are being punished and to identify the traits that cause such a frightening and high risk of recidivism." *Id.,* 536 U.S. at 33–34, 47, 122 S.Ct. 2025, 2032.

**\*7** In *Edwards v. Ladlair* this court went one step further, concluding the requirement that the petitioner in that habeas case disclose prior uncharged sex offenses during the course of a prison sex offender treatment program did not violate his Fifth Amendment right against self-incrimination since the sanction for refusing to participate in the program was the denial of good time credit allowances, a discretionary privilege, and under *McKune* the denial of prison privileges does not suffice to establish the requisite degree of compulsion for purposes of the Fifth Amendment. No. 9:07–CV–0059–JKS, 2008 WL 3156214 at \*6 (N.D.N.Y. Aug.4, 2008), *aff'd,* 2010 WL 292749 (2d Cir. Jan.26, 2010). As acknowledged by Judge Singleton in *Edwards,* the *McKune* Court noted that the decision not to participate in the Kansas sex offender treatment did not affect the respondent's eligibility for good time credits or parole. *Edwards,* 2008 WL 3156214, at \*5 (citing *McKune,* 536 U.S. at 38, 122. S.Ct.2017). *Edwards* therefore extended the reasoning in *McKune,* applying it as well to circumstances in which the

sanction for failure to comply included loss of good time credits.

When addressing the compulsion element of a Fifth Amendment claim such as that now presented,

> [t]he test, as articulated in *McKune,* depends upon the severity of the consequences of the choice made by the prisoner not to participate and discuss his crimes. 536 U.S. at 44–45 (plurality), 48–50 (O'Connor, J. concurring). Unfortunately, the Supreme Court has not provided a bright-line of demarcation above which the severity of the consequences constitutes compulsion.

*Edwards,* 2008 WL 3156214, at *5. It is by now fairly well settled that risking the loss of good time credits or jeopardizing the chance for parole, alone, does not qualify as sufficiently compulsive to meet the test. *See Wolfe v. Pennsylvania Dep't of Corrections,* 334 F.Supp.2d 762, 771 (E.D.Pa.2004); *see also Ainsworth v. Stankley,* 317 F.3d 1, 5 (1st Cir.2002), *cert. denied,* 538 U.S. 999, 123 S.Ct. 1908, 155 L.Ed.2d 825 (2003); *Searcy v. Simmons,* 299 F.3d 1220, 1226 (10th Cir.2002). Beyond these forms of recrimination, however, the issue becomes less clear.

In this instance, the plaintiff is a civil detainee whose liberty is being withheld beyond the expiration of his prison sentence. McChesney is therefore in a very different circumstance than the inmates involved in *Edwards* and *McKune.* Although this is somewhat unclear from the scant record now before the court, it appears that in all likelihood *McChesney* has served all of the time imposed based upon his criminal sex conviction and is now involuntarily committed for rehabilitation pursuant to the relatively recently enacted provisions of New York Mental Hygiene Law Article 10. The record now before the court does not disclose what sanctions could result from plaintiff's failure to provide the requested information in connection with his SOTP. Plausibly, however, one could imagine that it could well result in an extension of his confinement at the CNYPC. This, then, is a very different situation than presented in *McKune,* 536 U.S. at 38, 122 S.Ct. at 2027 ("in the present case, respondent's decision not to participate in Kansas SOTP did not extend

his term of incarceration"), and the potential sanction for plaintiff's refusal to incriminate himself suffices, at least at this early procedural juncture, to establish the requisite degree of compulsion necessary to support a Fifth Amendment claim. *Decker v. Hogan,* No. 9:09–CV–0239 (TJM/GJD), 2009 WL 3165830, at *6 (N.D.N.Y. Sept.28, 2009) (McAvoy, S.J.).

**\*8** The more difficult question presented is whether, in being compelled by officials at the CNYPC to submit to polygraph and PPG testing and complete an autobiography, plaintiff has been unlawfully forced to incriminate himself in violation of his right under the Fifth Amendment. As unsettled as the controlling legal principles were after the Court's decision in *McKune,* the landscape was further muddied by the Supreme Court's later decision in *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), another case heavily relied upon by the defendants in their motion. That action involved a claim brought by an individual pursuant to 42 U.S.C. § 1983, arguing that his Fifth Amendment right against self-incrimination was violated when he was interrogated by the petitioner, a police patrol supervisor, even though the statements obtained through the course of that interrogation were never used against him in any criminal prosecution. Under the circumstances presented the Court found no constitutional violation, since the respondent was never forced to be a witness against himself in a criminal proceeding. *Chavez,* 538 U.S. at 767, 123 S.Ct. at 2001.

Admittedly, it is somewhat difficult to reconcile *Chavez* with some of the Court's prior decisions regarding the Fifth Amendment. In *Kastigar,* for example, the Court noted that the privilege

> can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory, and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.

406 U.S. at 444–45, 92 S.Ct. at 1656 (footnote omitted). *Chavez,* however, appears to stand for the proposition that while this may be true, and *Kastigar* and other cases permit invocation of the Fifth Amendment privilege in non-criminal settings, a violation of the right of against self-incrimination

is inchoate until a person has been actually compelled to be a witness against himself or herself in a criminal proceeding, meaning that his or her testimony or statements have been used in a criminal arena. *Chavez,* 538 U.S. at 770, 123 S.Ct. at 2002–03. Accordingly, since McChesney has not alleged that he completed an autobiography disclosing uncharged sex crimes, permitted it to be copied, and the autobiography was used against him in a criminal in prosecution, or that he consented to and underwent polygraph or PPG testing the results of which were offered against him in a criminal setting, his complaint fails to allege a Fifth Amendment violation [12] [13] *Fifield v. Eaton,* No. 07–CV–6521L, 2009 WL 3429791, at *3 (W.D.N.Y. Oct.20, 2009) (claim by a convicted sex offender that defendants required him to complete forms admitting guilt of a sex offense, leading to expulsion from sex offender treatment upon his denial, held not to give rise to a Fifth Amendment violation since plaintiff failed to allege that the defendant used, sought to use, or could have used any incriminating statement against him at a criminal proceeding"); *see also Krug v. County of Rennselaer,* 559 F.Supp.2d 223, 246 (N.D.N.Y.2008) (statements made to law enforcement officers but never used in a criminal proceeding do not give rise to a Fifth Amendment claim) (citing, *inter alia, Chavez,* 538 U.S. at 766, 123 S.Ct. at 2000).

[12]     Any contention on plaintiff's part that his autobiography may be used in the future in a criminal proceeding against him is not presently ripe for adjudication. *Longway v. Jefferson County Bd. of Supervisors,* 24 F.3d 397, 400 (2d Cir.1994) ("An issue is ripe for judicial resolution only if it presents a real and substantial controversy, not a mere hypothetical question.") (internal quotations and citation omitted). This decision therefore does not foreclose plaintiff from challenging the use of his autobiography in a subsequent criminal proceeding, nor does it preclude him from bringing a separate action under for damages 42 U.S.C. § 1983 for violating his Fifth Amendment rights in the event that government officials attempt to use his compulsory autobiography against him in a subsequent criminal proceeding.

[13]     Even if plaintiff could establish a Fifth Amendment violation with regard to the autobiography requirement, fearing that its contents could give rise to and be used in a subsequent criminal proceeding, he could not make a plausible self-incrimination claim with regard to the polygraph

and PPG testing. Addressing the use of a polygraph examination under analogous circumstances with regard to a convicted sex offender as a condition of his supervised released, the Second Circuit has concluded that the requirement that a party submit to a polygraph exam does not violate the privilege against self-incrimination since such evidence is generally inadmissible, and the individual would be free to challenge the evidence should it be used against him in a future proceeding. *United States v. Johnson,* 446 F.3d 272, 278–80 (2d Cir.2006); *see also United States v. Zinn,* 321 F.3d 1084, 1090–92 (11th Cir.2003) (holding that requiring polygraph testing as a condition of supervised release generally does not violate the Fifth Amendment), *U.S. v. Santiago,* No. 03 Cr. 66 4, 2008 WL 1959548 at *1 (S.D.N.Y. May 5, 2008) (citing *Johnson,* 446 F.3d at 278–80); and, *Decker,* 2009 WL 3165830 at *6. Similarly, the use of a penile plethysmograph does not implicate plaintiff's Fifth Amendment right against self-incrimination since the test result is not testimonial but a physical test of plaintiff's sexual reactions to various stimuli. *See Walrath v. United States,* 830 F.Supp. 444, 446 (N.D.N.Y.Ill.1993). Moreover, there is little likelihood that testimony involving PPG testing would pass muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1990) and its progeny as being sufficiently reliable to be admitted in evidence at a criminal trial. *Decker,* 2009 WL 3165830, at *7.

 **\*9**  I therefore recommend dismissal of plaintiff's Fifth Amendment claim in its entirety.

### E. *First Amendment*

Another material aspect of plaintiff's claims in these consolidated actions centers upon the program materials utilized for the SOTP which, he contends, are premised upon religious principles contrary to his beliefs as an atheist. Plaintiff argues that by exposing him to those materials and requiring his participation in the SOTP the defendants have violated his First Amendment rights. Defendants seek dismissal of this claim on the basis of qualified immunity, citing the state of flux of the governing legal principles applicable to plaintiff's free exercise claim.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[14] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[15] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision-makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[16] *Pearson,* 555 U.S. at ——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 555 U.S. at ——, 129 S.Ct. at 821) (emphasis in original).

[14]    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

[15]    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

[16]    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at ——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

**\*10** For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

Turning first to whether plaintiff has established a plausible First Amendment violation, I note at the outset that the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." U.S. Const. amend 1. That amendment, which applies to the states through the Fourteenth Amendment, *Decker,* 2009 WL 3165830, at *2, prohibits a governmental entity from favoring one religious

2010 WL 1027443

denomination over another and additionally protects against "government compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a leave forbidden or required by one's religion. *Id.* (citing and quoting *Mozert v. Hawkins County Bd. of Educ.,* 827 F.2d 1058, 1066 (2d Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988)). As an atheist, plaintiff is subject to the protections of the First Amendment. *Decker,* 2009 WL 3165830, at *3 (citing, *inter alia, Wallace v. Jaffree,* 472 U.S. 38, 52–53, 105 S.Ct. 2479, 2487–88, 86 L.Ed.2d 29 (1985)). Because plaintiff contends that the SOTP subjects him to religious tenets that violate his generally held religious beliefs, he has successfully stated a plausible First Amendment claim sufficient to withstand dismissal at this early stage. *Decker,* 2009 WL 3165830, at *3.

Turning to the second prong of the qualified immunity inquiry, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [government employee in the defendant's position] that his [or her] conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government employees of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no [government worker] of reasonable competence would conclude that the conduct

in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

**\*11** As defendants have argued, the law is anything but clear on the question of whether compelled use by officials at the CNYPC of treatment materials peripherally based upon religious principles violates the rights of patients involuntarily committed and subjected to the program. *Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (Hurd, J). That inquiry turns, in part, upon whether secular alternatives are offered for those who voice a *bona fide* religious objection, *see, e.g. Miner v. Goord,* No. 09–0674–cv, 2009 WL 4072085, at *2 (2d Cir. Nov.25, 2009) (citing, *inter alia, DeStefano v. Emergency Hous. Group, Inc.,* 247 F.3d 397, 408 (2d Cir.2001) (cited in accordance with Fed. R.App. Proc. 32.1). In this case, there is no question that persons of reasonable competence in defendants' circumstances could disagree on whether the compelled use of religious based SOTP program materials would violate the First Amendment.

Based upon the lack of clearly established guidance on the specific legal issue presented, I recommend a finding that defendants are entitled to qualified immunity with respect to plaintiff's First Amendment religious claim. *Pratt,* 631 F.Supp.2d at 198; *see also Bush v. Goord,* No. 03–CV–759S, 2009 WL 790358, at *8–9 (W.D.N.Y. Mar.25, 2009).

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaints in these two consolidated actions, though sparse in their allegations, are sufficient to place defendants on notice of his claims and permit them to both frame an answer and engage in discovery to flesh out any remaining causes of action, provided that the missing exhibits in Civil Action No. 9:08–CV–1186 (NAM/DEP) are filed with the court.

Turning to the merits of plaintiff's claims, I conclude that plaintiff has not pleaded a plausible claim that his required participation in the SOTP while involuntarily committed at the CNYPC potentially violates his Fifth Amendment right against self-incrimination. I further find that defendants are entitled to qualified immunity from suit with respect to plaintiff's claim for damages in connection with plaintiff's First Amendment's religious exercise claim, in light of the fact that the legal principles regarding how the First Amendment's right of a free exercise affects the required use of SOTP teaching materials of a religious tenor are distinctly unsettled, but that plaintiff should be permitted to pursue his First

2010 WL 1027443

Amendment claim against them as officials for purposes of injunctive relief. I further find that all claims against the defendants for damages in their official capacities are subject to dismissal on the basis of their Eleventh Amendment. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 17) be GRANTED, in principal part, and that all of plaintiff's claims, with the exception of his First Amendment cause of action against the defendants in their official capacities seeking injunctive relief, be DISMISSED.

**\*12** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.

Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1027443

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1037957
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David McCHESNEY, Plaintiff,

v.

Michael F. HOGAN, Commissioner, New
York State Office of Mental Health, and
Donald Sawyer, Executive Director, Central
New York Psychiatric Center, Defendants.
David McChesney, Plaintiff,

v.

Michael F. Hogan, Commissioner, New York
State Office of Mental Health, Terri Maxymillian,
Director—Sex Offender Treatment Program,
Central New York Psychiatric Center; Valerie
Colasante, Psychologist Central New York Psychiatric
Center, Regina Anderson, R.N., Treatment Team
Leader, and Donald Sawyer, Executive Director,
Central New York Psychiatric Center, Defendants.

Nos. 9:08–CV–1186 (NAM/
DEP), 9:08–CV–1290 (NAM/DEP).
|
March 18, 2010.

**Attorneys and Law Firms**

David McChesney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Adele Taylor Scott, Assistant Attorney General,
Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1** In these consolidated *pro se* actions, plaintiff, an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), seeks monetary and
injunctive relief under 42 U .S.C. § 1983 stemming from his
civil commitment to the Central New York Psychiatric Center
for participation in the Sex Offender Treatment Program
("SOTP"). Upon referral of defendants' motion to dismiss
(Dkt. No. 17), United States Magistrate Judge David E.

Peebles issued a Report and Recommendation (Dkt. No. 23)
recommending dismissal of all of plaintiff's claims with the
exception of his First Amendment claim for injunctive relief
against defendants in their official capacities. Defendants do
not object. Plaintiff has submitted an objection (Dkt. No. 24).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de
novo* those parts of a report and recommendation to which a
party specifically objects. Plaintiff objects to most aspects of
the Report and Recommendation, and, accordingly, the Court
conducts a *de novo* review. Upon review, the Court accepts
and adopts the Report and Recommendation in all respects.

In particular, as to plaintiff's Fifth Amendment claim, the
Court notes that "mere coercion does not violate the text of
the Self–Incrimination Clause absent use of the compelled
statements in a criminal case against the witness [.]" *Chavez
v. Martinez,* 538 U.S. 760, 769–70, 123 S.Ct. 1994, 155
L.Ed.2d 984 (2003) (Thomas, J., plurality op.); *accord Higazy
v. Templeton,* 505 F.3d 161, 171 (2d Cir.2007). Thus, in the
instant case, even if the potential consequences of failure to
comply with SOTP requirements can be said to constitute
coercion, plaintiff states no Fifth Amendment claim because
he does not allege "use or derivative use of a compelled
statement at any criminal proceeding against [him]." *Higazy,*
505 F.3d at 717 (quoting *Weaver v. Brenner,* 40 F.3d 527,
535 (2d Cir.1994)). The Court agrees with Magistrate Judge
Peebles that the individual defendants are entitled to qualified
immunity on the First Amendment damages claim. The Court
has reviewed the materials attached to plaintiff's objection and
finds they do not warrant a different result. Finally, the Court
agrees that plaintiff states a claim for prospective injunctive
relief on his First Amendment claim against defendants in
their official capacities.

It is therefore

ORDERED that the Report and Recommendation of United
States Magistrate Judge David E. Peebles (Dkt. No. 23) is
accepted and adopted; and it is further

ORDERED that defendants' motion to dismiss (Dkt. No. 17)
is granted in part and denied in part; and it is further

ORDERED that all claims are dismissed except the First
Amendment claim for injunctive relief against defendants in
their official capacities.

IT IS SO ORDERED.

2010 WL 1037957

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1037957

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

805 Fed.Appx. 73 (Mem)
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Vladimir KRULL, Plaintiff-Appellant,
v.
Rebecca OEY, S.O.R.C. NYS DOCCS,
Anthony J. Annucci, Commissioner, NYS
DOCCS, Banker Defendants-Appellees,
Megan Mactavish, Director of Guidance and Counseling,
NYS DOCCS, Jeffrey McKoy, Deputy Commissioner
for Program Services, NYS DOCCS, Defendants.

19-2138-pr
|
May 20, 2020

Appeal from a judgment of the United States District Court
for the Northern District of New York (Thomas J. McAvoy,
Judge).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the June
25, 2019 judgment of the District Court be and hereby
is **VACATED** insofar as it dismisses the claim under the
Self-Incrimination Clause of the Fifth Amendment with
respect to the increased risk-level assessment, the cause
**REMANDED** to the District Court for further proceedings
consistent with this order, and the appeal of the remaining
claims **DISMISSED** as moot.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Vladimir Krull, pro se,
Dannemora, NY.

FOR DEFENDANTS-APPELLEES: No appearance

PRESENT: Amalya L. Kearse, Dennis Jacobs, José A.
Cabranes, Circuit Judges.

**SUMMARY ORDER**

Plaintiff-Appellant Vladimir Krull ("Krull"), proceeding pro
se, appeals from a judgment of the District Court dismissing
*sua sponte* his action under 42 U.S.C. § 1983.[1] While
incarcerated, Krull sued the New York Department of
Corrections and Community Supervision ("DOCCS") and
several DOCCS officials, claiming that the Sex Offender
Counseling and Treatment Program ("SOCTP"), as applied
to him, violated his Fifth Amendment right against self-
incrimination. Specifically, Krull alleged that the SOCTP
required him to either admit guilt for his crimes of conviction
or face a series of consequences, including expulsion
from the program, a loss of good time credits, and an
increased risk level under the New York Sex Offender
Registration Act ("SORA"). Krull also argued that the
SOCTP Guidelines were unconstitutionally vague under the
Fourteenth Amendment's Due Process Clause. The District
Court dismissed Krull's amended complaint under **\*74** 28
U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1). The
instant appeal followed. We assume the parties' familiarity
with the underlying facts, the procedural history of the case,
and the issues on appeal.

[1]    In 2017, Krull was convicted of second-degree
    rape and second-degree criminal sexual act and
    sentenced to three years in prison. *See* Inmate
    Lookup, Dep't of Corr. & Cmty. Supervision,
    http://nysdoccslookup.doccs.ny.gov/ (last visited
    Apr. 26, 2020). Krull was released from Clinton
    Correctional Facility in January 2020. *See id.*; *see
    also* Fed. R. Evid. 201(b)(2) (courts may take
    judicial notice of facts which "can be accurately
    and readily determined from sources whose
    accuracy cannot reasonably be questioned"). Krull
    has not updated his address.

**I. Mootness**
Because Krull was released from prison in January 2020,
we must now address whether Krull's appeal has become
moot and must be dismissed for lack of jurisdiction. "A
case becomes moot when it no longer satisfies the 'case-

or-controversy' requirement of Article III, Section 2 of the Constitution. In order to satisfy the case-or-controversy requirement, a party must, at all stages of the litigation, have an actual injury which is likely to be redressed by a favorable judicial decision." *United States v. Williams*, 475 F.3d 468, 478–79 (2d Cir. 2007) (internal quotation marks omitted); *see also Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed.").

SORA "requires sex offenders, after serving their sentences, to register with law enforcement officials, and provides for various degrees of public notification of the identity and address of these offenders." *Doe v. Pataki*, 120 F.3d 1263, 1265 (2d Cir. 1997), *as amended on denial of reh'g* (Sept. 25, 1997). As a result of his failure to complete the SOCTP, Krull has been assigned a Risk Level Two under SORA, which requires offenders to register annually for life. *See* N.Y. Corr. L. § 168-h(1), (2). [2] Because Krull must continue to register annually for life, his self-incrimination challenge to the SOCTP on the basis of an increased risk level presents a live case or controversy.

[2]     We note that Krull had not been assigned a SORA risk level at the time when the District Court dismissed the complaint, or even by the time he filed his appellate brief. A recent search of New York's SORA database, however, shows that Krull has been listed now as a Level Two sex offender. *See* New York State Div. of Criminal Justice Servs., Offender Details, *available at* https://www.criminaljustice.ny.gov/nsor/ (last visited April 26, 2020).

By contrast, Krull's claim for restoration of good time credits is now moot, since we can no longer provide that form of injunctive relief now that Krull has been released from prison. *See Martin-Trigona*, 702 F.2d at 386; *cf. Spencer v. Kemna*, 523 U.S. 1, 12–13, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (holding that the potential collateral consequences of parole violations are too remote and speculative for a continuing controversy post-release); *United States v. Key*, 602 F.3d 492, 494–95 (2d Cir. 2010) (holding that a challenge to 18 U.S.C. § 3582(c)(2) proceedings was rendered moot by an appellant's release from prison). Similarly, Krull's vagueness challenge to the SOCTP Guidelines is also moot, since the only penalty for violating the Guidelines is removal from the SOCTP during incarceration. Now that Krull has been released, he is no longer eligible to participate in the SOCTP.

## II. Self-Incrimination Challenge Based on an Increased Risk Level

We review *de novo* a district court's dismissal of a complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A. *See Zaleski v. Burns*, 606 F.3d 51, 52 (2d Cir. 2010); *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004). To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Pro se submissions are reviewed with "special solicitude," and "must be construed liberally and interpreted to raise the strongest arguments that they **\*75** suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and emphasis omitted).

A sex-offender treatment program that requires disclosure of criminal conduct without guaranteeing immunity does not violate the Fifth Amendment's Self-Incrimination Clause unless the consequences for non-disclosure compel the prisoner to make self-incriminating statements. *See McKune v. Lile*, 536 U.S. 24, 36, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002). In *McKune*, the Supreme Court upheld a sex-offender rehabilitation program that required a prisoner to admit responsibility for his crime of conviction (exposing him to a perjury charge because he had testified to his innocence), as well as to disclose past offenses for which he had not been convicted. *See id.* at 30–31, 122 S.Ct. 2017. The Kansas program at issue did not provide immunity for the information disclosed, although the State argued that the program participants' disclosures had never actually been used in a prosecution. *See id.* The Supreme Court concluded that the program did not violate the Fifth Amendment because the consequences for non-participation (transfer from a medium- to a maximum-security facility, as well as loss of visitation and commissary privileges) were not so severe that the prisoner was compelled to incriminate himself. *See id.* at 37–48, 122 S.Ct. 2017 (Plurality Op.); *see also id.* at 50–54, 122 S.Ct. 2017 (O'Connor, J., concurring in the judgment).

We have not yet applied *McKune* to a self-incrimination claim involving an increased SORA risk level (*i.e.*, Level Two) and the resulting heightened registration and monitoring requirements. The District Court also has yet to address the merits of this issue, as it dismissed the claim on ripeness grounds because Krull had not then been assigned a SORA risk-level score. Now that Krull has been assigned a Level Two score, the District Court must address the merits question in the first instance on remand.

**CONCLUSION**

For the foregoing reasons, we **VACATE** the portion of the judgment dismissing Krull's self-incrimination challenge to his increased risk level under SORA, **REMAND** the cause to the District Court for further proceedings consistent with this order, and **DISMISS** Krull's appeal of the dismissal of his remaining claims as moot.

**All Citations**

805 Fed.Appx. 73 (Mem)

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Carney v. Hogan, Not Reported in F.Supp.2d (2010)

2010 WL 2519121

2010 WL 2519121
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donald CARNEY, Plaintiff,

v.

Michael F. HOGAN, Commissioner, NYS
Office of Mental Health; Donald Sawyer,
Executive Director, CNYPC, Defendants.
Donald Carney, Plaintiff,

v.

Michael F. Hogan, Commissioner, NYS Office
of Mental Health; Donald Sawyer, Executive
Director, CNYPC; Terri Maxymillian, Director,
Sex Offender Treatment Program; Valerie
Colasante, Psychologist Assistant, Defendants.

Nos. 9:08–CV–1251 (DNH/
ATB), 9:08–CV–1280 (DNH/ATB).
|
March 30, 2010.

West KeySummary

1    **Constitutional Law** 🔑 Mental Health

**Mental Health** 🔑 Treatment

A *pro se* civilly confined sex offender's
allegations that a treatment program required
his participation in faith-based program were
adequate to state a First Amendment claim. The
sex offender claimed that components of the
program subjected him to religious tenets that
were contrary to his general religious beliefs,
and that participation in the faith-based programs
were required as a condition of his release from
civil confinement. Although sex offender did not
state a specific religion in which he believed, he
identified himself as a Native American, and it
was assumed that his status as a Native American
encompassed particular religious beliefs. U.S.
Const.Amend. 1; 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Donald Carney, pro se.

Aaron M. Baldwin, Asst. Attorney General, for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to Magistrate Judge Gustave
J. Di Bianco for Report and Recommendation pursuant to
28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). Upon
Magistrate Judge Di Bianco's retirement on January 4, 2010,
the case was referred to me by the Honorable Norman A.
Mordue, Chief United States District Judge. (Dkt. No. 20).

Plaintiff filed two complaints in separate cases pursuant to 42
U .S.C. § 1983, challenging the constitutionality of the Sex
Offender Treatment Program ("SOTP") administered at the
Central New York Psychiatric Center ("CNYPC") by the New
York State Office of Mental Health ("OMH"). Magistrate
Judge Di Bianco issued an order on December 10, 2008,
consolidating the cases. (Dkt. No. 5). Plaintiff alleges that the
SOTP violates the United States Constitution in four ways: (1)
the SOTP violates plaintiff's First Amendment right to abstain
from religious practices; (2) the SOTP violates plaintiff's
Fifth Amendment right against self-incrimination through
use of a penile plethysmograph [1] ("PPG") examination; (3)
the SOTP violates plaintiff's Fifth Amendment right against
self-incrimination by requiring a polygraph examination; and
(4) the SOTP violates plaintiff's Fifth Amendment right
against self-incrimination by requiring him to complete an
"autobiography" and a "sexual offense history" that includes
uncharged crimes or dismissed charges. [2] Plaintiff seeks
injunctive relief and monetary damages.

[1]    A plethysmograph is an "instrument for measuring
variations in the size of an organ or body part
on the basis of the amount of blood passing
through or present in the part." WEBSTER'S II
NEW COLLEGE DICTIONARY 847 (Margery S.
Berube et al. eds., 1995.).

[2]    Plaintiff's complaint filed in the lead case (08–
CV–1251) ("Lead Complaint") relates to claims
(1) through (3) and plaintiff's complaint filed

in the member case (08–CV–1280) ("Member Complaint") relates to claim (4).

Defendants move to dismiss plaintiff's claims for failure to state a claim upon which relief can be granted pursuant to FED.R.CIV.P. 12(b)(6). (Dkt. No. 15). Plaintiff responded in opposition to defendants' motion, and defendants filed a reply. (Dkt.Nos.16, 18). For the following reasons, this court will recommend that defendants' motion be granted in part and denied in part.

## DISCUSSION

### I. *Facts*

Plaintiff was placed under civil confinement at CNYPC on July 11, 2008. (Lead Compl. at 2).[3] As part of his treatment regimen, plaintiff has been enrolled in the SOTP, which he alleges incorporates components that violate his constitutional rights. In particular, plaintiff has been directed to complete an "autobiography" and a "sexual offense history." (Member Compl. at 4, 9). Plaintiff alleges that his autobiography and sexual offense history are to include "uncharged crimes and/or charges that were dismissed." (Member Compl. at 4). Plaintiff further alleges that defendant Colasante issued an order to photocopy plaintiff's autobiography bi-weekly for placement in his file "for the New York State Attorney General's review to be used as evidence" to further civilly confine plaintiff. (Member Compl. at 4). Because plaintiff refused to have his autobiography photocopied, he was apparently removed from the "autobiography group" and told that he could not progress toward his release until he allowed the photocopying. (Member Compl. at 4).

[3]     Citations to the Lead Complaint (08–CV–1251) will be cited as "Lead Compl." and a page number. Plaintiff did not number his paragraphs or pages, so the court will number the pages beginning with the first page of the Lead Complaint as page 1. Citations to the Member Complaint (08–CV–1280) will be cited as "Member Compl." and paginated in a like manner.

Plaintiff, a Native American, also complains about specific components of "all program phases," which he alleges subject him to religious practices and rituals based on "Zen Buddhism and Christianity." (Lead Compl. at 2–3). Plaintiff claims that the "Good Lives Model and Boundaries Programs" are unconstitutional because they "teach that you

have to believe in something devoted [sic] as spirituality ... [and] ... teach the rituals and practices of Buddhism." (Lead Compl. at 3). In addition, plaintiff alleges that "From the Inside [O]ut[:] Growing up Male, problem [s]olving anger management programs are all Hazeldon products which incorporate Christian beliefs and practices," and violate his constitutional rights. (Lead Compl. at 3).

**\*2**  Finally, plaintiff alleges that he is being coerced to submit to a PPG and polygraph examination, and a new "contract" has changed the two exams from "therapy tools" to "investigate [sic] tools" to obtain information to keep plaintiff civilly confined. (Lead Compl. at 4). Plaintiff again alleges coercion because his advancement in the program is dependent on his compliance with the two examinations. (Lead Compl. at 4).

### II. *Motion to Dismiss*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). *See also Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (citation omitted). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)). Here, plaintiff attached what appear to be three separate documents to the Member Complaint. The first document, entitled "Sex

2010 WL 2519121

Offender Treatment Program Model," is a bulleted list of criteria for Phases I–III. (Member Compl. at 8). The second document is entitled "Phase Goals" and describes specific assignments for Phases I and II. (Member Compl. at 9). The Phase Goals document appears to be the first page of a multi-page document, because it does not describe assignments for Phase III. The third document is a collection of materials all related to the autobiography component of the SOTP. (Member Compl. at 10–29).

Plaintiff attached nothing to the Lead Complaint, but names specific components of the SOTP, including Dialectical Behavior Therapy ("DBT") and the "Advancement to SOTP Phase II–IV Consent to Participate in Treatment." Defendants have attached these documents to their motion. [4] (Defs.' Mot. to Dismiss, App. B, Exs. B, D and E; *see also* Defs.' Mot. to Dismiss at 3). Because these documents are integral to the complaint and were relied upon by plaintiff in drafting his complaint, the court will consider them in its analysis of defendants' motion. [5]

[4]     The defendants also state that these documents were filed in support of a motion to dismiss an identical section 1983 case, decided in the Northern District of New York. *See Pratt v. Hogan,* 6:08–CV–1003 (DNH/DEP).

[5]     In the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted).

### III. *First Amendment Claim*

**\*3** The Establishment and Free Exercise Clauses of the First Amendment, made applicable to state action by the Fourteenth Amendment, provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. In order to establish a violation of the Free Exercise Clause, a plaintiff must show "direct government compulsion." *Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). In addition, a court should sustain a Free Exercise claim "only if the 'government has placed a substantial burden on the observation of a central religious belief' " that is not otherwise justified by a compelling state interest. *Skoros v. City of New York,* 437 F.3d 1, 39 (2d Cir.2006) (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 384–85, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990)). The Establishment

Clause, by comparison, "prohibits government from officially preferring one religious denomination over another." *Id.* at 38–39.

In this case, plaintiff alleges that the SOTP requires his participation in faith-based programs as a condition of his release from civil confinement. (Lead Compl. at 3). Further, plaintiff claims that this participation violates his "right to believe or not as [his] conscience dictates." *Id.* Defendants argue that plaintiff has failed to state a cognizable claim under the First Amendment because he has failed to set forth any facts concerning the beliefs or practices of his religion and explained why the defendants' program would violate those beliefs. (Defs.' Mem. of Law at 18–19).

In *Decker v. Hogan,* Senior District Judge McAvoy rejected a similar argument made by defendants in a case in which the plaintiff was challenging the SOTP because he was an atheist. *See Decker v. Hogan,* No. 9:09–CV–0239, 2009 U.S. Dist. LEXIS 89048, at \*8–9; 2009 WL 3165830 (N.D.N.Y. Sept.28, 2009) (McAvoy, S.J.). Defendants argued, *inter alia,* that there was no proof of governmental compulsion impacting upon the plaintiff's atheistic beliefs. *Id.* Senior Judge McAvoy found that the court could not make such a determination on a motion to dismiss because plaintiff's factual allegations must be accepted as true, and plaintiff was alleging that the defendants' program was subjecting him to religious practices based upon Zen Buddhism and Christianity, and that this was forcing plaintiff to engage in practices that were contrary to his atheistic beliefs. *Id.* at \*9–10.

In this case, plaintiff has identified himself as a "Native American." Although he has not stated a specific "religion," in affording the *pro se* plaintiff the utmost liberality, the court will assume that his status as a Native American encompasses particular religious beliefs. This plaintiff, like the plaintiff in *Decker,* claims that components of the SOTP subject him to religious tenets that are contrary to his general religious beliefs. Based on *Decker,* Plaintiff Carney has successfully stated a plausible First Amendment Claim, sufficient to withstand defendants' motion to dismiss. As Senior Judge McAvoy stated in *Decker,* it may later become clear on a motion for summary judgment, or at some later stage of the proceedings, that plaintiff's claims are not adequately supported. However, at this stage, the court must accept plaintiff's allegations as true. Accordingly, this court recommends that defendants' motion to dismiss plaintiff's First Amendment claim be denied. [6]

2010 WL 2519121

[6] As noted below, this court will recommend that the plaintiff's First Amendment claim for damages be dismissed based on qualified immunity, leaving only the First Amendment cause of action for injunctive relief.

## IV. *Fifth Amendment Claim*

**\*4** The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U .S. CONST. amend. V. However, a violation of this right "occurs only if one has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez,* 538 U.S. 760, 770, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003); *see also Higazy v. Templeton,* 505 F.3d 161, 171 (2d Cir.2006). Plaintiff is civilly confined, and has made no allegation that the information in his autobiography, sexual history, or information that would be gained from the polygraph and/or PPG examination is currently being used in a criminal case. [7] Any claim that this information might be used against him in the future in a criminal proceeding is not now ripe for adjudication. *Longway v. Jefferson County Bd. of Supervisors,* 24 F.3d 397, 500 (2d Cir.1994).

[7] If any of this information were used in a future criminal proceeding against him, plaintiff could still challenge the use of the information.

The Second Circuit has held that answering questions during a polygraph examination about past offenses and "with respect to any criminal prosecution unrelated to the conviction" does not waive a defendant's right against self-incrimination under the Fifth Amendment; the defendant can still challenge the polygraph examination results in court on Fifth Amendment grounds if it were to be used in a criminal proceeding. *United States v. Johnson,* 446 F.3d 272, 275, 280 (2d Cir.2006). The court also explained that polygraph examinations are reasonably related to promoting the sentencing goals of balancing supervised release conditions against restraint of individual liberty, and served to further sex offender treatment. *Id.* at 277.

Furthermore, the use of a PPG examination does not implicate plaintiff's right against self-incrimination under the Fifth Amendment because the results of the test are not "testimonial." Rather, the test provides an "assessment of an individual's physical reactions to various stimuli." *Decker v. Hogan,* No. 09–CV–0239, 2009 U.S. Dist. LEXIS 89048,

at *21 (citations omitted), 2009 WL 3165830 (N.D.N.Y. Sept.28, 2009). This court also notes that courts often find that PPG examination results inadmissible as evidence. *Id.* (citations omitted).

Use of the polygraph, PPG, autobiography, and/or sexual history as part of the SOTP do not implicate plaintiff's right against self-incrimination and do not violate the Fifth Amendment because they are not being used against him in a criminal case. *See McChesney v. Hogan,* 9:08–CV–1186/6:08–CV–1290, 2010 U.S. Dist. LEXIS 25705, at *27–31, 2010 WL 1027443 (N.D.N.Y. March 18, 2010) (Report Recommendation of Peebles, USMJ), *accepted and adopted by* 2010 U.S. Dist. LEXIS 257171, 2010 WL 1037957 (N.D.N.Y. Mar.18, 2010) (Mordue, CJ). [8] Therefore, plaintiff has failed to state a claim upon which relief can be granted, and this court recommends that defendants' motion to dismiss be granted as to his Fifth Amendment claims.

[8] *McChesney* granted a motion to dismiss a Fifth Amendment claim relating to the SOTP program that was substantially similar to the one asserted in this case.

## V. *Qualified Immunity*

**\*5** Defendants argue that they are entitled to qualified immunity from plaintiff's claim for money damages. Because the court is recommending denial of the defendants' motion to dismiss plaintiff's First Amendment claim, the court will proceed to discuss defendants' argument. [9]

[9] Because the court has determined that there is no Fifth Amendment violation, the court need not discuss qualified immunity with respect to plaintiff's Fifth Amendment claims.

Qualified immunity protects government officials performing discretionary functions in the course of their employment where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A government actor is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001) (internal quotation marks omitted).

In *Decker,* Senior Judge McAvoy denied defendants the protection of qualified immunity in the context of a motion to dismiss a First Amendment cause of action very similar to the claim alleged in the instant action. He observed that the "objective reasonableness" of defendants' actions sometimes depends on factual issues about what they knew about plaintiff's complaints, making a determination of qualified immunity on the pleadings alone premature. *Decker,* 2009 U.S. Dist. LEXIS 89048 at *22–23. Judge McAvoy denied the motion to dismiss without prejudice, noting that a factual basis for affording defendants qualified immunity could arise during discovery. *Id.* at *22–24.

In determining whether defendants involved in the SOTP program are entitled to qualified immunity, this court would focus, not on the "objective reasonableness" prong of the analysis as Judge McAvoy appeared to do in *Decker,* but on whether "... plaintiff's constitutional rights were not clearly established at the time he alleges his rights were violated." *Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (Hurd, J.) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396). When deciding if a constitutional right was "clearly established at the relevant time," a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

*African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002); *see also* *Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). This court concludes, as have several other judges in this district, that the law remains unclear as to whether the use of treatment materials and modalities peripherally related to religious principles violates the constitutional rights of those individuals treated in the SOTP. *Pratt v. Hogan,* 631 F.Supp.2d at 198; *McChesney v. Hogan,* U.S. Dist. LEXIS 25705, at *37–38.

***6** A review of the case law on this issue shows that with respect to treatment programs requiring an inmate to participate in Alcoholics Anonymous methodology, the law was well-settled as early as 1996, that compelled participation could rise to the level of a First Amendment. *See generally* *Cox v. Miller,* 296 F.3d 89, 108 (2d Cir.2002) (citing *inter alia* *Griffin v. Coughlin,* 88 N.Y.2d 674, 692, 649 N.Y.S.2d 903, 673 N.E.2d 98 (holding that "a mandatory, exclusive ASAT addiction treatment program ... incorporating the A.A. Twelve Steps methodology, credo, and meeting practices, violates the Establishment Clause") (1996)). The difference between the A.A. programs in the above-cited cases and the program at issue in this case is that the A.A. programs "placed heavy emphasis on spirituality and prayer," requiring participants to pray to God to overcome their alcohol problems. *Pratt,* 631 F.Supp.2d at 198 (citing *Warner v. Orange County Dep't of Prob.,* 115 F.3d 1068, 1075 (2d Cir.1997)).

As Judge Hurd observed in *Pratt,* a case containing claims identical to the case herein, it "remains unclear whether the 'Good Lives Model and Boundaries Program' and DBT have non-secular purposes and if the primary purpose of the programs are to promote or prohibit religions." As Magistrate Judge Peebles concluded in a Report Recommendation adopted by Chief District Judge Mordue, "... the law is anything but clear on the question of whether compelled use by officials at the CNYPC of treatment materials peripherally based upon religious principles violates the rights of patients involuntarily committed and subjected to the program." *McChesney v. Hogan,* U.S. Dist. LEXIS 25705, at *37–38 (citing *Pratt,* 631 F.Supp.2d at 198). This court agrees that, because the law on this issue is unsettled, it will recommend that defendants be afforded qualified immunity from damages for any First Amendment violation. Plaintiff's claim for injunctive relief against the defendants in their official capacity, however, may proceed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6) (Dkt. No. 15) be **GRANTED IN PART AND DENIED IN PART,** and it is further

**RECOMMENDED,** and that all plaintiff's claims, with the exception of his First Amendment cause of action seeking injunctive relief against the defendants in their official capacity, be **DISMISSED.**

2010 WL 2519121

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of* *Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2519121

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2519961
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donald CARNEY, Plaintiff,

v.

Michael F. HOGAN, Commissioner, NYS
Office of Mental Health; and Donald Sawyer,
Executive Director, CNYPC, Defendants.
Donald Carney, Plaintiff,

v.

Michael F. Hogan; Terri Maxymillian; Valerie
Colasante; and Donald Sawyer, Defendants.

Action Nos. 9:08–CV–1251, 9:08–CV–1280.
|
June 15, 2010.

**Attorneys and Law Firms**

Donald Carney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State
of New York, Aaron M. Baldwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY.

### DECISION and ORDER

DAVID N. BALDWIN, District Judge.

**\*1** Plaintiff, Donald Carney, brought these civil rights
actions in November 2008, pursuant to 42 U.S.C. §
1983. The cases were consolidated in December 2008.
By Report–Recommendation dated March 30, 2010, the
Honorable Andrew T. Baxter, United States Magistrate Judge,
recommended that defendants' motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6) (Dkt. No. 15) be granted in part and

denied in part as follows: all of plaintiff's claims with the
exception of his First Amendment cause of action seeking
injunctive relief against the defendants in their official
capacity be dismissed.

The defendants have filed objections to the Report–
Recommendation.

Based upon a de novo review of the Report–Recommendation
and the entire file, including those portions to which the
defendants have objected, the Report–Recommendation is
accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that defendants' motion to dismiss is GRANTED
in part and DENIED in part as follows:

(a) All of plaintiff's claims with the exception of his First
Amendment cause of action in the Lead Case (08–cv–
1251) seeking injunctive relief against the defendants in their
official capacity are DISMISSED;

(b) The Member Case (9:09–CV–1280) is DISMISSED;

(c) The Clerk shall enter judgment dismissing the Member
Case (08–cv–1280); and

(d) The Lead Case (08–CV–1251) shall be returned to the
Magistrate Judge for handling of further proceedings in the
plaintiff's First Amendment cause of action seeking injunctive
relief against defendants Michael F. Hogan and Donald
Sawyer in their official capacities.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2519961

---

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.